UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

STACEY ARNOLD YERKES,
       Plaintiff,

       Case No. 2:19-cv-2047
       JUDGE EDMUND A. SARGUS, JR.
   v.      Magistrate Judge Elizabeth P. Deavers

OHIO STATE HIGHWAY
PATROL, *et al.*,
       Defendants.

## OPINION AND ORDER

This matter is before the Court for consideration of Defendants' Motion to Dismiss (ECF No. 19), Plaintiff's Response in Opposition to Defendant's Motion (ECF No. 20), and Defendants' Reply in Support of their Motion (ECF No. 21). For the reasons set forth below, the Court **DENIES** Defendants' Motion to Dismiss.

## I.

Plaintiff Stacey Arnold Yerkes was employed for nearly twenty-five years by the Ohio State Highway Patrol ("OSHP" or "Patrol"). She began as a cadet, became a state trooper, rose to level of sergeant, and passed her lieutenant's exam. Plaintiff filed the present lawsuit against the Patrol and four individually-named current Patrol employees who were her supervisors while she was employed: Major Gene Smith, Captain Michael Kemmer, Staff Lieutenant William Stidham, and Lieutenant Scott Wyckhouse ("Individual Defendants"). The two claims Plaintiff brought against the Individual Defendants are based on their alleged class-based discriminatory treatment of her in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Specifically, Plaintiff alleges that the Individual Defendants harassed and discriminated against her because she is a woman (Count V) and because she is gay (Count VI).

The Individual Defendants move for dismissal of Count V and Count VI for failure to state a claim upon which relief can be granted.  That motion is ripe for review.

## II.

In evaluating a complaint to determine whether it states a claim upon which relief can be granted, the trial court must construe it in favor of the plaintiff, accept the factual allegations contained in the pleading as true, and determine whether the factual allegations present any plausible claim. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (clarifying the plausibility standard articulated in *Twombly*).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  The factual allegations of a pleading "must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.

## III.

Plaintiff sets forth the following relevant facts in her Amended Complaint.  (ECF No. 13.)  To be clear, at this stage of the case, the Court must accept the claims made by the plaintiff as true.  The Court must then decide whether such allegations are legally sufficient to state a valid claim.  Thereafter in this case, Defendants may contest the factual allegations.

A.    **Plaintiff's Employment**

Plaintiff began her career with Defendant OSHP as an entry level Cadet in 1994. Plaintiff completed her initial training and became a State Trooper.  While a State Trooper, her annual performance reviews indicated that she met or exceeded expectations.  (Am. Compl. ¶ 13.)

In 1998, OSHP promoted Plaintiff to Criminal Interdiction Officer.  In this role, Plaintiff was part of a specialized unit with a competitive selection process.  Criminal Interdiction Officers receive special training to identify potential criminal activity on Ohio's highways and to apprehend those responsible.  While Plaintiff worked as a Criminal Interdiction Officer, her annual performance reviews indicated that she met or exceeded expectations.  (*Id.* ¶¶ 15, 16.)

In 2014, the Patrol promoted Plaintiff to Criminal Interdiction Training Sergeant. This was a special role created for Plaintiff and Shaun Smart, her work partner.  In this role, Plaintiff and her partner were tasked with representing the OSHP by training law enforcement officers in the State of Ohio and throughout the entire country on criminal interdiction.  Plaintiff and Training Sergeant Smart were the highest-ranking instructors on criminal interdiction in the State of Ohio.  While she worked as a Criminal Interdiction Training Sergeant, Plaintiff's annual performance reviews indicated that she met or exceeded expectations.  (*Id.* ¶¶ 16–18.)

While Plaintiff worked for the OSHP, she received numerous awards for her job performance.  Plaintiff set out the following specific examples in Paragraph 19 of the Amended Complaint:

a. The 2016-2017 Criminal Interdiction Officer of Year awarded by the U.S. Department of Justice, U.S. Drug Enforcement Administration, U.S. Department of Transportation, and the U.S. Federal Motor Carrier Safety Administration.  Criminal interdiction law enforcement officers throughout the country are eligible for this award. Plaintiff was the first and is the only female officer to receive the award.

b. Prior to receiving the 2016-2017 Criminal Interdiction Officer of the Year award, Plaintiff was nominated for it twice.  She was the first and is only female nominee for the award.

c. The 2011 Ohio State Highway Patrol State Trooper Recognition Award, which is considered the "State Trooper of the Year Award" for those assigned to specialty units like criminal interdiction.

d.     The 2010 National Criminal Enforcement Association Director's Award, in recognition of individual achievements in criminal interdiction.  Plaintiff was the first and is only female to receive the award.

e.     The 2010 National Criminal Enforcement Association Robbie Bishop Award, in recognition of individual achievements in criminal interdiction.  Plaintiff was the first and is only female to receive the award.

f.     The 2002 Ohio State Highway Patrol Criminal Patrol Award, in recognition of being responsible for initiating the most felony cases for 2002.  Plaintiff was the first and is only female to receive the award.

g.     A 2002 Letter of Commendation from the Federal Bureau of Investigation, in recognition of apprehending a federal bank robber out of Austin, Texas.

h.     Sixteen annual Ohio State Highway Patrol Criminal Patrol Recognition Awards, in recognition of initiating a minimum of five felony cases for the year.

## B.     Plaintiff's Sex and Sexual Orientation

Plaintiff is female and is gay.  She does not conform to traditional stereotypes as to appearance and dress.  Plaintiff made her sexual orientation known to the Individual Defendants and OSHP several times throughout her career.  Defendants also knew that Plaintiff is married to a woman.  (Am. Compl. ¶¶ 22–28.)

## C.     Allegations of Discriminatory and Hostile Work Environment

Plaintiff alleges that the work environment at the Patrol is hostile to women and to those who are gay and that she was subjected to harassment and discrimination because she is a woman and because she is gay.  Plaintiff states that, on her first day, a male heterosexual co-worker told her "[t]here has only been one other female here before you, so try not to screw it up and make females look bad."[1]  (Am. Compl. ¶¶ 29, 30.)  Plaintiff further alleges that her male heterosexual supervisors consistently created a discriminatory work environment based upon

---

[1] From the Amended Complaint, the date this allegedly occurred is 1994.  At this juncture, the Court makes no decision as to whether statements made so far in the past were isolated comments or part of a continuing practice leading to the final events giving rise to this case.

4

sex, including the following specific examples set forth in Paragraph 32 of the Amended

Complaint:

  a.    One of her male heterosexual supervisors once placed an envelope in her locker
  that contained a picture of the following: two naked women, embraced in a sexual
  position, with one woman having a snake protruding from her vagina. Plaintiff's
  supervisor later asked her, laughing, "did you get our envelope?"

  b.    One of her male heterosexual supervisors inquired about her sex life. He once
  asked about a party Plaintiff had attended with friends, asking if she had gone to a "back
  room" to "have sex together" with her female friends. Embarrassed, she adamantly
  replied, "no." Her supervisor then proceeded to ask her if she wore underwear.

  c.    One of Plaintiff's supervisors told her to move her "fat ass out of the way." This
  supervisor never spoke to men in this derogatory manner.

During the time Plaintiff worked with them, she alleges that Defendant Captain Kemmer,

Defendant Staff Lieutenant Stidham, Defendant Lieutenant Wyckhouse, and/or other supervisors

consistently made sexist comments about women, providing in Paragraph 32 the following

specific examples:

  a.    They called women, among other things, "cunt," "fucking cunt," "bitch,"
  "fucking bitch," and "broad."

  b.    They commented that "women are only promoted here because they are women,
  not because of merit."

  c.    They commented that "the only reason women are allowed to perform lower than
  men is because they are women."

  d.    They commented on the physical appearance of women in a derogatory manner
  by calling them names such as "fat bitch." They did not do the same for men.

Plaintiff further alleges that Defendants Captain Kemmer, Staff Lieutenant Stidham,

Lieutenant Wyckhouse, and/or other supervisors consistently made sexist, gender stereotyping,

and/or homophobic comments about Plaintiff. She sets forth the following specific examples in

Paragraph 33 of the Amended Complaint:

a.      When Plaintiff came to work with her hair cut short, they commented that her hair "looks stupid" and she "looks butch."

b.      On one occasion, when Plaintiff wore make-up and earrings to work, they commented "what, is she trying to be a girl now?"

c.      They commented that she was "emotional" and that "women are like that" and "bring that with them to the workplace."

d.      Plaintiff requested leave under the Family and Medical Leave Act, 29 USCA § 2611, *et seq*. ("FMLA") for the birth her and her wife's son. She was denied this leave because she is gay and was told "it's not the same" as those who are heterosexual. Plaintiff filed a grievance under her labor contract, but it was denied.

**D.    Allegations of Discrimination Leading to the End of Plaintiff's Employment**

Plaintiff alleges that, beginning in April of 2017, and shortly after she lost her grievance over FMLA leave for the birth of her son, Defendants "started aggressively criticizing" her job performance. (Am. Compl. ¶ 34.) She avers that the criticisms had no merit and that the Individual Defendants were treating her "more harshly than comparable males and more harshly than comparable heterosexuals." *Id*. In Paragraph 34 she provides the following specific examples:

a.      Defendants criticized Plaintiff for leaving her patrol vehicle running and unattended in the parking lot of a patrol post. Male heterosexual patrol officers frequently left their patrol vehicles running and unattended and they were not criticized or disciplined. For instance, Tommy Vaculik, a male heterosexual, left his patrol vehicle running and unattended in the parking lot of a patrol post. In addition, Willie Richardson, a male heterosexual, left his patrol vehicle running and unattended in the parking lot of a patrol post. Finally, Ryan Stewart, a male heterosexual, left his patrol vehicle running and unattended in the parking lot of a patrol post. None of them were criticized or disciplined for this conduct.

b.      Defendants criticized Plaintiff for not wearing her hat during a traffic stop and told her that "some see that as a felony." Male heterosexual patrol officers have failed to wear their hats while working and were not criticized or disciplined. For instance, Defendant Lieutenant Wyckhouse, a male heterosexual, failed to wear his hat during a drug seizure.

c.      Defendants reprimanded Plaintiff for arriving at her assigned patrol post at 8:01 a.m. instead of 8:00a.m. Male heterosexual patrol officers often did the same, or worse,

and were not criticized or disciplined.  For instance, Brian Holden, a male heterosexual, arrived at his assigned patrol post at 8:26 a.m. one day instead of 8:00 a.m.  He was not criticized or disciplined.  Defendant Staff Lieutenant Stidham, a male heterosexual, arrived at his assigned patrol post at 8:12 a.m. one day instead of 8:00 a.m.

d.      Defendants reprimanded Plaintiff for wearing civilian attire in a marked patrol vehicle while driving to the Patrol's Women's Leadership Conference. As a matter of widespread practice, male heterosexual patrol officers often did the same and were not criticized or disciplined, including Kurt Beidelschies and David Smith.  None of these male heterosexuals who had engaged in this conduct had been criticized or disciplined. When told by Plaintiff that Defendants were going to discipline her for engaging in this conduct, both Mr. Beidelschies and Mr. Smith said that was "bullshit."

e.      Defendants reprimanded Plaintiff allegedly for leaving her shift early.  Male heterosexual patrol officers often left work before their shift had ended and were not criticized or disciplined. This included Defendant Captain Kemmer, Defendant Staff Lieutenant Stidham, and other male heterosexual employees of OSHP.

f.      Defendants reprimanded Plaintiff for being unable to testify at a court case even though she was on approved sick leave at the time.  Male heterosexual patrol officers have missed testifying at court cases and were not criticized or disciplined.  For instance, Nicholas Conrad and William Clay, two male heterosexuals, missed testifying at court cases.  They were not criticized or disciplined.

In Paragraph 35, Plaintiff sets forth examples of her allegations of meritless "vague subjective criticisms":

a.      Defendants criticized her for "having a lot going on at home," which apparently referred to her young child with her spouse.

b.      Defendants criticized her for allegedly having a "bad attitude."

c.      Defendants criticized her as allegedly not being "supervisor material."

d.      Defendants criticized her by stating she "better get along and be a team member."

**E.      Plaintiff's Internal Complaint and Charge of Discrimination**

On December 6, 2017, Plaintiff complained to her direct supervisor, Nathan Dickerson, that the Individual Defendants discriminated against her because she is a woman and because she is gay.  Plaintiff asked Mr. Dickerson for his assistance, and he informed his supervisors, but Defendants refused to investigate or take action.

7

The following month, on January 29, 2018, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging sex discrimination based on gender, gender stereotypes, and sexual orientation. After filing her charge with the EEOC, Plaintiff informed Mr. Dickerson of what she had done. Plaintiff also informed her workplace partner, Shaun Smart. (Am. Compl. ¶¶ 36, 37, 38.)

## F.     Plaintiff's Termination/Loss of Employment

On February 2, 2018, less than a week after she filed her charge of discrimination later, Defendant Captain Kemmer accused Plaintiff of violating the OSHP tattoo policy and ordered her to remove her medical sleeve to show him her tattoo. Plaintiff refused and Captain Kemmer stated that he would discipline her for insubordination. (Am. Compl. ¶ 39.)

Plaintiff alleges that the criticism regarding her tattoo was meritless because the OSHP's tattoo policy requires employees to conceal their tattoos when they wear uniforms or other clothing approved by Defendant OSHP. According to Plaintiff, she has never violated that policy and the tattoo underneath her medical sleeve was never visible while she wore Defendant OSHP's approved uniforms or clothing. Plaintiff alleges that other males working for Defendant OSHP have tattoos, including Nicholas Malo, a male heterosexual state trooper, who have never been disciplined or criticized for having tattoos. (*Id.* ¶¶ 40, 41.)

Plaintiff attached a photograph as Exhibit 1 to her Amended Complaint that shows another heterosexual male, Lieutenant Tim Karwatskie, with a tattoo showing on his forearm while in uniform. Plaintiff alleges that Defendant Major Smith was at the gathering where the photograph was taken, he observed the tattoo, but declined to either discipline or terminate Lieutenant Karwatskie. (*Id.* ¶ 42, Ex. 1.)

On February 5, 2018, three days after Plaintiff was accused of violating the tattoo policy, she was involuntarily placed on administrative leave. On February 9, 2018, Plaintiff was told that she was scheduled for a pre-disciplinary hearing with a recommendation that her employment be terminated. (*Id.* ¶¶ 43, 44.)

Plaintiff alleges that one of the "ultimate decision-makers" regarding Plaintiff's potential termination was Defendant Major Smith. (*Id.* ¶ 45.) In Paragraph 45, Plaintiff sets for the "standard process for discipline or termination" as follows:

a. After someone accuses a trooper of misconduct, the Administrative Investigation Unit ("AIU") of OSHP will investigate the allegations.

b. The AIU will report to the officer in charge of human resources for OSHP. In the case of Plaintiff, that was Major Richard Fambro.

c. Major Fambro then must consult with both the Major and Captain who are in the chain of command for the trooper being investigated. In the case of Plaintiff, the Major and Captain in the chain of command would have been Defendant Smith and Defendant Kemmer. Defendant Smith and Defendant Kemmer then had the power to agree or disagree with any discipline for or termination of Plaintiff. This means that Smith or Kemmer would veto, or approve, the discipline or termination.

d. If the trooper being investigated is at the supervisory level or higher, then Major Fambro would consult with the OSHP's Colonel. As a sergeant, Plaintiff was considered supervisory personnel.

e. If there is a recommendation for termination or a last chance agreement involved, then the Director of Public Safety will also be consulted.

Plaintiff further alleges that Defendant Major Smith was aware of the disparate treatment of her, setting forth the following specific examples in Paragraph 46 of the Amended Complaint:

a. Defendant Major Smith routinely worked closely with Defendants Captain Kemmer and Staff Lieutenant Stidham at general headquarters in Columbus, Ohio. Their offices were connected on the same floor in the same hallway. The sexist and homophobic comments made by Kemmer and Stidham described above in Paragraphs 32 and 33 were heard by Smith. Major Smith never disciplined Kemmer or Stidham for those comments.

b.      Defendant Smith, as the Major in the chain of command for Plaintiff, would have been consulted as an ultimate decision-maker regarding the reprimands she received that were described above in Paragraphs 34(a)-(f).  Major Smith would have either vetoed, or approved of, any reprimands.

c.      Defendant Major Smith, as the Major in the chain of command for male heterosexual counterparts of Plaintiff, would have been consulted as an ultimate decision-maker regarding any reprimands those male heterosexual counterparts did or ultimately did not receive.

d.      As noted above in Paragraph 42, Defendant Major Smith has also observed male heterosexual troopers with visible tattoos that violated policy but did nothing to discipline or terminate them.

On February 9, 2018, Plaintiff's union offered her a Last Chance Agreement ("LCA"), which she attached as Exhibit 2 to the Amended Complaint. (*Id.* ¶¶ 47, 48, E. 2.)  Plaintiff was told that she had to accept the LCA or her employment would be terminated.  Plaintiff avers that the LCA terms were "onerous and unrealistic," setting forth some of the terms in Paragraph 47 of the Amended Complaint, as summarized below:

a.      The LCA required Plaintiff to accept a demotion from sergeant to trooper.

b.      The LCA prohibited Plaintiff from working in criminal interdiction as she had for the last twenty years.

c.      The LCA required Plaintiff to surgically remove the tattoo within one year, even though it did not violate any policy.

d.      The LCA required Plaintiff to "provide a tattoo removal/treatment plan from her physician/treatment provider . . . ."

e.      The LCA required Plaintiff to provide "monthly progress reports from her physician/treatment provider and monthly progress photos of the removal process" to Defendants until the tattoo was removed.

f.      The LCA required Plaintiff to waive any potential legal claims she had against Defendants as a result of their actions against her.  It also required Plaintiff to waive any grievance rights she may have under her labor contract

g.      The LCA required Plaintiff to withdraw her charge of discrimination filed with the EEOC.

10

According to Plaintiff, other LCAs of which she was aware at the time did not require employees to withdraw an EEOC charge. (*Id.* ¶ 50.)

On February 12, 2018, "knowing she would be fired since she would not sign the LCA and give up her discrimination claims under federal law," Plaintiff alleges that she "chose to retire and avoid the adverse consequences of a termination of her employment." (*Id.* ¶ 51.) Throughout the Amended Complaint, Plaintiff refers to this action as a termination or a constructive discharge.

G. **Plaintiff Supplements Her Charge of Discrimination and Right to Sue Letter**

After she left her employment, Plaintiff consulted with an EEOC investigator about everything that had transpired since she filed her charge. Plaintiff then supplemented her EEOC charge to include wrongful termination claims and retaliations claims. The EEOC investigated and issued Plaintiff a Right- to-Sue letter on March 4, 2019. (Am. Compl. ¶¶ 52–57, Exs. 3, 4.)

IV.

Plaintiff brings her claims against the Individual Defendants under the Civil Rights Act of 1871, 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege that a person acting under the color of state law deprived her of a constitutional right. *West v. Atkins,* 487 U.S. 42, 48 (1988); *Harris v. City of Circleville,* 583 F.3d 356, 364 (6th Cir. 2009). The Individual Defendants move for dismissal based on (A) qualified immunity, and alternatively, based on (B) failure to adequately plead under Rule 12(b)(6) of the Federal Rule of Civil Procedure.

A. **Qualified Immunity**

Government officials, including law enforcement officials, are generally shielded from civil liability when performing discretionary functions, unless their conduct violates a clearly established statutory or constitutional right such that a reasonable officer would have known that

his or her conduct was unlawful. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Once a defendant raises qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to such immunity. *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013).

In opposing the Individual Defendants' claim of qualified immunity at the motion to dismiss stage, Plaintiff must show that: (1) the Individual Defendants violated a constitutional or statutory right based on the facts alleged, and (2) the right was clearly established. *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001) receded from in *Pearson*, 555 U.S. 223).

When suing an individual for a constitutional violation under § 1983, a plaintiff must demonstrate that the actor "'directly participated' in the alleged misconduct, at least by encouraging, implicitly authorizing, approving or knowingly acquiescing in the misconduct, if not carrying it out himself." *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

### 1. Constitutional Right: Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment 'protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights.'" *Davis v. Prison Health Services*, 679 F.3d 433, 438 (6th Cir. 2012) (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006)); *see also TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th Cir. 2005) (stating that the Equal Protection Clause "prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference"). This analysis begins by defining an "identifiable group." *Engquist v. Oregon*

12

*Dep't of Agric.,* 553 U.S. 591, 601 (2008) (quoting *Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279 (1979)).

Plaintiff contends that the Individual Defendants' discriminatory actions toward her detailed in her Amended Complaint were taken because she is a woman and because she is gay. Plaintiff maintains that these actions culminated in her termination by virtue of the doctrine of constructive discharge in violation of the Equal Protection Clause of the Fourteenth Amendment.

The Individual Defendants argue that "Plaintiff's Amended Complaint attempts to assert a Title VII constructive discharge claim against the Individual Defendants under 42 U.S.C. § 1983." (Defs' Mot. at 7) (referring to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.) They contend that Plaintiff's claim must fail because Title VII does not form an independent basis for enforcement of constitutional rights under § 1983. The Individual Defendants further posit:

> By the terms of her own Amended Complaint (and any number of documents that can be offered), there was no "termination of employment" in her case; she exercised her right to retire from her service with the Ohio State Highway Patrol. Although Title VII case law may allow her to state a claim against her former employer under Title VII, § 1983 does not provide a vehicle for her to pursue those same Title VII claims against the Individual Defendants in their individual capacities for money damages.

*Id*. at 7–8 ("Plaintiff's employment was not terminated; as she states in her Amended Complaint, she retired on February 12, 2018.").

In their Reply, the Individual Defendants concentrate on "their primary argument of the motion to dismiss, that is, that none of the Individual Defendants were her 'employer' who could 'terminate' her employment, or support a claim of constructive discharge against them." (Defs'

13

Reply at 1.) Thus, the Individual Defendants posit (a) Plaintiff was not terminated and that they are not employers with the authority to terminate her, and (b) Title VII is not an independent basis for § 1983 liability.

### a. Termination

The Individual Defendants' focus on their lack of authority to "terminate" Plaintiff misapprehends the nature of a constructive discharge. While a constructive discharge and a termination/firing both result in the same injury – loss of employment – they are not the same thing. A constructive discharge occurs if "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Yates v. Avco Corp.*, 819 F.2d 630, 636–37 (6th Cir. 1987) (citing *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)). It is the employee who acts under this compulsion to end the employment through resignation or retirement. A constructive discharge is not the employer's overt action of firing the employee, rather it is the individual personnel's conduct attributable to the employer that resulted in working conditions that were so difficult or unpleasant that a reasonable person would have felt compelled to resign.

Instead of focusing on whether the Individual Defendants possessed authority to terminate, the appropriate focus in this constitutional equal protection claim is determination of whether the pleadings allege that Plaintiff was subjected to invidious discrimination based on her membership in an identifiable group. The pleadings here do just that. As can be seen above, Plaintiff alleges that she was harassed and discriminated against because she is a woman and because she is gay, and that her otherwise similarly situated coworkers who are male heterosexuals were treated more favorably. The Court finds a case upon which both parties rely instructive.

14

In *Davis v. Prison Health Services*, the Sixth Circuit analyzed a § 1983 case brought

against individual prison personnel by a homosexual inmate claiming Fourteenth Amendment

Equal Protection violations.  679 F.3d at 438.  The Sixth Circuit reversed the district court's

grant of dismissal under Rule 12(b)(6) based on qualified immunity of the individual defendants.

The *Davis* court stated:

> In this case, Davis has alleged facts that, taken as true, state a plausible claim
> that the defendants removed him from the public-works program because of an anti-
> gay animus. He alleged that the public-works officers supervising his work crew
> treated him differently than other inmates, ridiculed and belittled him, and "ma[d]e
> a spectacle" of him when they brought him back to the correctional facility after a
> public-works assignment because of his sexual orientation.  He further alleged that
> these officers did not want to strip search him because he was homosexual and
> would make "under the breath" remarks when selected to do so.  These allegations
> directly support Davis's claim that the officers' actions toward him were motivated
> by an anti-gay animus.
>
> Davis also claimed that the public-works officers were looking for a reason,
> "even if that reason was invalid," to have him removed from the public-works
> program in order to "eliminat[e] the need to have to deal with a homosexual" and
> claimed that the officers found just such a pretextual reason when he suffered what
> he believed at the time to be a diabetic episode while on a public-works assignment.

*Id.* at 438.  The Sixth Circuit concluded that the plaintiff had stated a constitutional equal

protection claim against the prison personnel:

> The combined effect of these alleged facts, taken as true at this stage of the
> litigation, lead us to conclude that Davis has stated a plausible claim that he was
> improperly removed from the public-works program based upon the defendants'
> anti-gay animus.  Dismissal of this claim was improper.

*Id.* at 439.

Likewise, in the case *sub judice*, Plaintiff has alleged facts that, taken as true, state a

plausible claim that the Individual Defendants treated her less favorably than her male

heterosexual coworkers based on their anti-gay and anti-female animus, *(e.g.*, differential

discipline for her tattoo, differential treatment under the LCA, differential treatment for FMLA

leave for the birth of her child; differential reprimands and criticism for not wearing a hat,

arriving one minute late, wearing civilian attire in a marked patrol car); that the Individual

Defendants ridiculed, harassed, and belittled her with offensive name-calling (*e.g.*, "cunt,"

"fucking cunt," "bitch," "fucking bitch," "fat bitch," "fat ass," "broad," "look stupid," "butch";

asking if Plaintiff and other gay women "have sex together" in the "back room"; opining that

women are given unwarranted preferential treatment, are emotional and bring improper emotions

into the workplace). Plaintiff also claimed that the Individual Defendants were looking for a

reason, even if it was invalid, to make her working conditions intolerable so that she would quit

or be terminated so they did not have to deal with a gay woman, and that they found just such a

pretextual reason with her tattoo. The tattoo is in the same place that her male heterosexual

counterparts wear them with no consequence, yet Plaintiff was required to have hers surgically

removed if she wanted to keep her job.

Similar to the allegations in *Davis*, these allegations directly support Plaintiff's claim that

the Individual Defendants' actions toward her were motivated by anti-gay and/or anti-female

animus. The combined effect of these alleged facts, taken as true at this stage of the litigation,

lead this Court to conclude that Plaintiff has stated a plausible claim under § 1983 that, based on

anti-gay and anti-female animus, the Individual Defendants intentionally made her working

conditions so difficult and unpleasant that it was reasonable for her to feel compelled to retire.

      **b.**    **Title VII**

The Individual Defendants contend that Plaintiff attempts to use Title VII as an

independent basis for enforcement of a constitutional right under § 1983. *Poe v. Haydon,* 853

F.2d 418, 428 (6th Cir. 1988) ("Title VII does not provide the basis for an action brought under

§ 1983"), *citing Davis v. Scherer,* 468 U.S. 183, 194 n. 12 (1984). Plaintiff responds that she is

not attempting to enforce Title VII rights through § 1983, but instead her independent

constitutional rights to be free from class based invidious discrimination based on her sex and her sexual identity. This Court agrees.

As Plaintiff correctly points out, discrimination based upon sex is both a violation of Title VII and, because this is a public-sector employment case against state actors, a violation of the Equal Protection Clause of the Fourteenth Amendment. The Sixth Circuit has long held that a plaintiff may assert both Title VII and § 1983 claims concurrently. *Day v. Wayne County Bd. of Auditors*, 749 F.2d 1199, 1205 (6th Cir. 1984) ("Where an employee establishes employer conduct which violates both Title VII and rights derived from another source—the Constitution or a federal statute . . . the claim based on the other source is independent of the Title VII claim, and the plaintiff may seek the remedies provided by § 1983 in addition to those created by Title VII."); *see also Bullington v. Bedford County, Tenn.*, 905 F.3d 467, 472 (6th Cir. 2018) ("Several circuits, including our own, have allowed constitutional claims to be brought under § 1983, even where the plaintiff's constitutional claims run parallel to claims brought under analogous statutes.").

Consequently, Plaintiff has sufficiently alleged that the Individual Defendants violated a constitutional right independent of rights provided for in Title VII.

### 2.    Clearly Established

In determining whether a law is clearly established, this Court looks to decisions of the Supreme Court and the Sixth Circuit. *Carver v. City of Cincinnati*, 474 F.3d 283, 287 (6th Cir. 2007); *Wilson v. Layne*, 526 U.S. 603, 617 (1999). If controlling authority does not establish the law, this Court may consider other circuit authority. *Andrews v. Hickman Cty.*, 700 F.3d 845, 853 (6th Cir. 2012). Although a prior case need not be directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*,

563 U.S. 731, 741 (2011). *Ashcroft v. al-Kidd*, 563 U.S. at 741. The clearly established prong will depend "substantially" on the level of generality at which the legal rule is identified. *Anderson*, 483 U.S. at 639. "'This standard requires the courts to examine the asserted right at a relatively high level of specificity[,]' and 'on a fact-specific, case-by-case basis[.]'" *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (quoting *Cope v. Heltsley*, 128 F.3d 452, 458-59 (6th Cir. 1997)).

It is not necessarily true that the exact factual circumstances alleged in a given case must have been found to be a constitutional violation before a right can be clearly established for purposes of a qualified immunity analysis. The United States Supreme Court has explained that officials can be on notice that their conduct violates established law even in novel factual circumstances. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "When a general constitutional principle 'is not tied to particularized facts,' the principle 'can clearly establish law applicable in the future to different sets of detailed facts.'" *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005). Throughout the qualified immunity analysis, "[t]he 'dispositive inquiry . . . [remains] whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th 2017) (quoting *Saucier*, 533 U.S. at 201, 202).

The Individual Defendants contend that (a) the law on the right to be free from constructive discharge is not clearly established, and (b) the right to be free from discrimination based on sexual orientation is not supported by clearly established law.

### a.   Law Regarding Freedom from Arbitrary Employment Discrimination

The Individual Defendants argue that even if "a claim for constructive discharge is cognizable under an equal protection theory enforceable under 42 U.S.C. § 1983, the defendants

are still protected by qualified immunity because such a right was not 'clearly established' at the time of the various, cumulative alleged actions and inactions in 2017 and 2018 alleged and recounted in Plaintiff's Amended Complaint." (Defs' Mot. at 9.)  The Individual Defendants maintain that the Plaintiff's "Response in Opposition fails to raise any clearly established law to support Plaintiff's equal protection theory that individual supervisors, with no authority to 'terminate' her employment, can be sued for her 'constructive discharge." (Defs' Reply at 2.) The Individual Defendants' argument misses the mark.

The Individual Defendants erroneously direct their attention to Plaintiff's "constructive discharge," instead of the constitutional right that was allegedly violated.  The constitutional right at issue here is not the right to be free from constructive discharges, but the right to be free from arbitrary employment discrimination on the basis of sex and on the basis of sexual orientation pursuant to the Fourteenth Amendment's Equal Protection Clause.

The Individual Defendants do not, nor could they successfully, argue that there is no clearly established law that guarantees female employees the right to be free from arbitrary sex discrimination in the workplace.  The Sixth Circuit and Supreme Court have found in multiple decisions that the Fourteenth Amendment's Equal Protection Clause guarantees female employees the right to be free from arbitrary sex discrimination in the workplace. *See Davis v. Passman*, 442 U.S. 228, 234-235 (1979) ("The equal protection component of the Due Process Clause thus confers on [the female] petitioner a federal constitutional right to be free from gender discrimination"); *Poe v. Hayden,* 853 F.2d at 429-430 (explaining that "[t]here can be little doubt that, before December 1984, a female public employee had a constitutional right to be treated on the same basis as a male employee.")

Accordingly, the Court concludes that Plaintiff has sufficiently alleged that she was subjected to arbitrary employment discrimination on the basis of sex and on the basis of sexual orientation in violation of the Fourteenth Amendment's Equal Protection Clause.  Further, the parties do not dispute, and the Court finds, that there is clearly established law protecting female employees from arbitrary discrimination based on sex for § 1983 purposes.

### b.    Law Regarding Protection of Sexual Orientation

The Individual Defendants assert that they are entitled to qualified immunity on Plaintiff's § 1983 claim for discrimination based on sexual orientation because such a claim is not supported by clearly established law.  Specifically, they contend that (i) "[t]the Sixth Circuit has precedents denying plaintiffs the right to assert sexual orientation discrimination claims under the equal protection clause of the Fourteenth Amendment and 42 U.S.C. § 1983," and (ii) "sexual orientation is not a suspect classification under the Equal Protection Clause, and, as such, must typically be analyzed as a "class of one" under rational basis review."   (Defs' Mot. at 11–12.)

### (i)    Identifiable Group Entitled to Protection

The Individual Defendants posit that the Sixth Circuit in *Heike v. Guevara*, 519 F. Appx 911 (6th Cir. 2013) has denied the right to assert sexual orientation discrimination claims under the Equal Protection Clause.  The Individual Defendants are mistaken.

The Individual Defendants claim that *Heike* denied a plaintiff the right to assert a claim of sexual orientation discrimination under the Equal Protection Clause because "sexual orientation is not a suspect classification and [therefore] the equal protection analysis 'ends before it begins.'"  (Defs' Mot. at 12) (quoting *Heike*, 519 F. Appx at 921–22).  *Heike*, however, stands for no such proposition.

20

The *Heike* plaintiff did not claim membership in an identifiable group subject to constitutional protections. She was heterosexual and argued that her coach discriminated against her because, *inter alia*, she was heterosexual. *Brook Elizabeth Heike v. Sue Guevara, et al*, Case No. 1:09-cv-10427, ECF No. 1, ¶ 35 (E.D. Mich. Feb. 3, 2009) (the complaint alleges that the defendant coach "continued to subject plaintiff to unwelcome harassment and discrimination because of plaintiff's heterosexual preference and refusal to abandon her heterosexual preference and adopt a homosexual preference"). After accepting the parties' position that heterosexual orientation is not a suspect classification, the *Heike* opinion then surmised that the plaintiff must therefore be asserting a claim under an equal protection class of one theory. It was proceeding under a class of one theory that caused the analysis to "end before it began" – not the proposition that sexual orientation claims are improper under the Equal Protection Clause:

> The parties agree that sexual orientation [heterosexuality] is not a suspect class. Heike's second equal-protection claim, therefore, could only proceed under a 'class-of-one' theory. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (recognizing class-of-one theory in property context).
>
> Our analysis of this alleged constitutional violation ends before it begins. In *Engquist v. Oregon Department of Agriculture*, the Supreme Court held that "the class-of-one theory of equal protection does not apply in the public employment context." 553 U.S. 591, 598 (2008).

*Heike*, 519 Fed. Appx. at 921–22.

Moreover, even if *Heike* did state that homosexuality is not a suspect class, which it did not, the question of whether sexual orientation is a suspect or quasi-suspect class is of no moment in the instant analysis. That is, the Court need not determine the level of scrutiny applicable to Plaintiff's claims at this juncture. "In typical equal protection cases, plaintiffs 'generally allege that they have been arbitrarily classified as members of an identifiable group.'" *Davis*, 679 F.3d at 441 (citing *Engquist*, 553 U.S. at 601; *Pers. Adm'r of Mass. v. Feeney*, 442

U.S. 256, 279 (1979)). "When the identifiable group has been recognized as a suspect or quasi-suspect class, courts examine the classification under a heightened level of scrutiny." *Id.* (citing as examples *Regents of Univ. of California v. Bakke,* 438 U.S. 265, 290–91 (1978) (opinion of Powell, J.) (treating race as a suspect classification) and *Craig v. Boren,* 429 U.S. 190, 197 (1976) (treating gender as a quasi-suspect classification)). When the identifiable group has not been recognized as a suspect or quasi-suspect class, courts examine the classification under rational basis review. *See, e.g., Massachusetts Bd. of Ret. v. Murgia,* 427 U.S. 307, 312 (1976) (discrimination based on age).

In the instant action, the relevant inquiry is not the level of scrutiny applicable to alleged discrimination of gays, but instead it is whether Plaintiff has alleged that she is a member of an identifiable group for equal protection purposes. As to that inquiry, Plaintiff alleges that she is a member of an identifiable group, gays, that is protected by constitutional equal protection. Plaintiff is correct.

The law from the United States Supreme Court and the Sixth Circuit has been clearly established for decades that "homosexuals do constitute an 'identifiable group' for equal protection purposes." *Davis,* 679 F.3d at 441–42 (6th Cir. 2012) (citing *Stemler v. City of Florence*, 126 F.3d 856, 873–74 (6th Cir. 1997) and noting that "'[o]ther circuits have likewise held that gay people constitute an identifiable group in the equal protection context. *See, e.g., Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134–35 (9th Cir. 2003) ("The plaintiffs are members of an identifiable class for equal protection purposes because they allege discrimination on the basis of sexual orientation."); *Nabozny v. Podlesny*, 92 F.3d 446, 457 (7th Cir. 1996) ("[T]he Constitution prohibits intentional invidious discrimination between otherwise similarly situated persons based on one's membership in a definable minority, absent at least a

rational basis for the discrimination. There can be little doubt that homosexuals are an identifiable minority subjected to discrimination in our society.")). Four years ago, the Sixth Circuit referred to this law as "settled" in a case of discrimination based on transgenderism, stating:

> Under settled law in this Circuit, gender nonconformity, as defined in *Smith v. City of Salem*, is an individual's "fail[ure] to act and/or identify with his or her gender. . . . Sex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination." 378 F.3d 566, 575 (6th Cir. 2004) [(holding that equal protection claim by a woman arrested because police officers believed her to be a lesbian, even though she was not, survived summary judgment)].

*Dodds v. U.S. Dept. of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016) (denying a request to stay the district court's imposition of a "preliminary injunction ordering the school district to treat an eleven-year old transgender girl as a female and permit her to use the girls' restroom").

Likewise, the United States Supreme Court has clearly established law recognizing homosexuality as an identifiable group entitled to constitutional protection. In 1996, the Court recognized that homosexuals are entitled to protection under the Equal Protection Clause. *Romer v. Evans*, 517 U.S. 620 (1996) (holding Equal Protection Clause violated by amendment to Colorado constitution that prohibited all action at any level of state or local government designed to protect homosexual persons from discrimination); *see also Rowland v. Mad River Local School Dist., Montgomery County, Ohio*, 470 U.S. 1009 (1985) (Brennan, *J.*, dissenting from denial of certiorari) ("[H]omosexuals constitute a significant and insular minority of this country's population.").

In 2003, the Court held that laws making same-sex intimacy a crime "demea[n] the lives of homosexual persons." *Lawrence v. Texas*, 539 U.S. 558, 575 (2003). The Court explained its holding in *Lawrence v. Texas* with regard to equal protection, stating:

> In *Lawrence* [*v. Texas*], the Court acknowledged the interlocking nature of these constitutional safeguards in the context of the legal treatment of gays and lesbians. 539 U.S. 558, 575 (2003). Although *Lawrence* elaborated its holding under the Due Process Clause, it acknowledged, and sought to remedy, the continuing inequality that resulted from laws making intimacy in the lives of gays and lesbians a crime against the State. See *ibid. Lawrence* therefore drew upon principles of liberty and equality to define and protect the rights of gays and lesbians, holding the State "cannot demean their existence or control their destiny by making their private sexual conduct a crime." *Id.,* at 578.

*Obergefell v. Hodges*, 135 S. Ct. 2584, 2604 (2015).

Similarly, in finding the Defense of Marriage Act, 1 U.S.C. § 7 ("DOMA")

unconstitutional, the Court discussed the constitutional rights of homosexuals, explaining:

> DOMA seeks to injure the very class New York seeks to protect [*i.e.*, gays and lesbians]. By doing so it violates basic due process and equal protection principles applicable to the Federal Government. See U.S. Const., Amdt. 5; *Bolling v. Sharpe,* 347 U.S. 497 (1954).

> The Constitution's guarantee of equality "must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot" justify disparate treatment of that group. *Department of Agriculture v. Moreno,* 413 U.S. 528, 534–535 (1973). In determining whether a law is motived by an improper animus or purpose, " ' [d]iscriminations of an unusual character' " especially require careful consideration. *Supra,* at 2692 (quoting *Romer, supra,* at 633, 116 S.Ct. 1620). . . . . The avowed purpose and practical effect of the law here in question are to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority of the States.

*U.S. v. Windsor*, 570 U.S. 744, 769–70 (2013) ("the differentiation demeans the couple, whose

moral and sexual choices the Constitution protects, see *Lawrence,* 539 U.S. 558, and whose

relationship the State has sought to dignify).

And finally, most recently the Court afforded constitutional protection to homosexuals

when it recognized "[t]he right to marry is a fundamental right inherent in the liberty of the

person, and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment

couples of the same-sex may not be deprived of that right and that liberty." *Obergefell*, 135 S.

Ct. at 2591 (overruling *Baker v. Nelson*, 409 U.S. 810 (1972). In *Obergefell*, the Court explained:

> The challenged laws burden the liberty of same-sex couples, and they abridge central precepts of equality. The marriage laws at issue are in essence unequal: Same-sex couples are denied benefits afforded opposite-sex couples and are barred from exercising a fundamental right. Especially against a long history of disapproval of their relationships, this denial works a grave and continuing harm, serving to disrespect and subordinate gays and lesbians.

*Id.* at 2590–91.

Based on the foregoing, the Court finds a "a robust consensus of cases of persuasive authority" of sufficient clarity to have placed "the constitutional question" of whether homosexuality is an identifiable group entitled to protection under the Equal Protection Clause of the Fourteenth Amendment "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). It would have been clear to any reasonable officer in the Individual Defendants' positions that the Constitution protects homosexuals from invidious discrimination based on their sexual orientation.

### (ii)    Class of One Equal Protection

The Individual Defendants contend that Plaintiff's claim based on her homosexuality "must fail because sexual orientation is not a suspect classification under the Equal Protection Clause, and, as such, must typically be analyzed as a "class of one" under rational basis review." (Defs' Mot. at 11.) This Court disagrees.

The Sixth Circuit has explained the difference between "typical" or "traditional" equal-protection cases and class of one equal protection cases. *See Davis*, 679 F.3d at 441. In the former, plaintiffs "generally allege that they have been arbitrarily classified as members of an 'identifiable group.'" *Id.* (quoting *Enquist v. Ore. Dep't of Agric.*, 553 U.S. 591, 601 (2008)).

In contrast, in class of one claims, "the plaintiff [does] not allege membership in a class or group" but rather simply "alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). "The hallmark of a class of one claim is 'the allegation of arbitrary or malicious treatment not based on membership in a disfavored class." *Id.* (citing *Aldridge v. City of Memphis*, 404 Fed. Appx. 29, 42 (6th Cir. 2010) and *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 592 (9th Cir. 2008) ( "The 'class of one' theory . . . is unusual because the plaintiff in a 'class of one' case does not allege that the defendants discriminate against a *group* with whom she shares characteristics, but rather that the defendants simply harbor animus against her *in particular* and therefore treated her arbitrarily." (emphasis in original, alteration by *Aldridge* court)).

In the present case, Plaintiff alleges that she is a member of an identifiable group, and therefore, does not allege a class of one claim.

**B.      Adequacy of Pleading**

The Individual Defendants assert that Plaintiff has failed to plausibly plead that they participated in the alleged discrimination as required for supervisor liability under 42 U.S.C. § 1983. They do not argue qualified immunity on this basis, but rather assert an argument under Rule 12(b)(6). In support, the Individual Defendants point to documents that are attached to the Patrol's Answer, which Plaintiff contends is not permitted at this stage of the litigation.

**1.      Allegations of Participation in the Discrimination**

The Individual Defendants correctly describe the law as to the pleadings necessary to show supervisory liability. Specifically, a plaintiff must allege "that the [supervisor] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the

offending officers." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson Cnty. Ky.*, 668 F.2d 869, 874 (6th Cir. 1982)). "A supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it." *Id.* (quoting *Hays*, 668 F.2d at 874).

The Individual Defendants, however, do not contend that Plaintiff failed to sufficiently plead that they directly participated in the alleged discrimination. Instead, they argue that "Plaintiff has not adequately pled a claim that she was 'terminated,' but instead has pled some implausible theory of supervisory liability to support a claim of 'constructive discharge' against the Individual Defendants assert none of whom had the authority to terminate her employment." (Defs' Mot. at 13.) They further maintain that "[n]one of the Individual Defendants 'terminated' Plaintiff's employment, as the Amended Complaint erroneously contends." *Id.* Defendants' arguments go astray.

The relevant inquiry is whether Plaintiff sufficiently pleaded that the Individual Defendants directly participated in the alleged discrimination; that is, whether they "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee*, 199 F.3d at 300. There is no dispute that Plaintiff has alleged that the Individual Defendants had the authority to, and did, engage in conduct that Plaintiff claims made her working conditions so difficult that a reasonable person in her shoes would have felt compelled to resign. Specifically, Plaintiff alleges that under the Patrol's standard policies and procedures, Defendants Major Smith and Captain Kemmer had to approve of the LCA, which required Plaintiff to agree to discriminatory terms within it or be terminated. These terms included requiring Plaintiff to give up her work in criminal interdiction where she had received

national awards and distinction, undergo an invasive surgical procedure, disclose private medical information with progress reports to the very same supervisors she alleges discriminated and retaliated against her, and waive legal claims and grievance rights. The LCA also required Plaintiff to choose between her EEOC charge and her job, when other LCAs the Patrol has used did not do so. Plaintiff challenges this conduct as discriminatory constructive discharge. These allegations sufficiently plead that Major Smith and Captain Kemmer were decision-makers that directly participated in the alleged discriminatory conduct.

Likewise, Plaintiff alleges that Defendants Captain Kemmer, Staff Lieutenant Stidham, and Lieutenant Wyckhouse directly participated as decision-makers in the discriminatory reprimands against Plaintiff that were part of the bases for the actions Plaintiff contends make up her constructive discharge and the terms of the LCA. Moreover, Captain Kemmer was allegedly directly involved in confronting Plaintiff about her tattoo, suspending her, and having her investigated, all of which ultimately led to the LCA and the constructive discharge.

Additionally, Plaintiff also plausibly alleged discriminatory intent with the allegations that Captain Kemmer, Staff Lieutenant Stidham, and Lieutenant Wyckhouse regularly engaged in sexist and homophobic conduct. Plaintiff further alleged specific instances of how the Individual Defendants treated similarly situated male heterosexual officers more favorably. This includes Major Smith declining to discipline a male heterosexual officer with a prominent tattoo on his forearm yet approving of Plaintiff's termination for the same reason. Plaintiff also alleged that Major Smith directly participated in the discriminatory reprimands of her and knowingly approved of or acquiesced in the sexist and homophobic conduct by the other Individual Defendants.

28

These alleged facts, taken as true at this stage of the litigation, lead to the conclusion that Plaintiff has sufficiently pleaded supervisor liability against the Individual Defendants.

### 2. Documents Outside the Pleadings

In their Motion to Dismiss, the Individual Defendants rely on two lengthy exhibits they attached to their Answer that they contend are public records central to Plaintiff's claims, and thus may be considered by this Court without converting their Motion to Dismiss into one for summary judgment. (Defs' Mot. at 1, 4) (citing *Carney v. University of Akron*, No. 5:15-cv-2309, 2016 U.S. Dist. LEXIS 98712 *15 (N.D. Ohio July 28, 2016); *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)). The exhibits contain documents that were allegedly part of the AIU investigation, including, among other things, inter-office communications, handwritten notes about interviews that allegedly took place during the investigation, and emails.

The Individual Defendants contend that these exhibits show that they were not involved in the investigation of Plaintiff's alleged insubordination and violation of the tattoo policy that resulted in the option to accept the LCA or be terminated. Specifically, the contend that she was "investigated by a Lieutenant and Staff Lieutenant who are mentioned nowhere else in the Amended Complaint; a recommendation for discipline was made by another Captain of the OSHP, and agreed with by the OSHP Colonel and Director of Public Safety, none of whom are named anywhere in the Amended Complaint." (Defs' Mot. at 14–15.)

Plaintiff offers the following in response:

> Plaintiff disputes that the administrative investigative report shows the Individual Defendants were not involved. The document shows only part of the process. As Plaintiff alleged, the Patrol's process for discipline or termination must proceed through the chain of command. (First Am. Compl., ¶¶ 45(a)-(e), ECF No. 13.) It starts with the Individual Defendants accusing Plaintiff of misconduct with the prior reprimands and the supposedly offending tattoo. (*Id.*, ¶ 45(a).) It then

29

> proceeds to the Administrative Investigation Unit (AIU). (*Id.*, ¶ 45(b).) The AIU then reports to the officer in charge of human resources, who at the time was Major Richard Fambro. (*Id.*)
>
> The administrative investigation report attached to the Patrol's Answer documents only this part of the process. However, there are additional steps the Individual Defendants leave out. After the AIU reports to Major Fambro, he must then obtain the approval of Defendants Smith and Kemmer for any discipline or termination because they are in the chain of command for Plaintiff. (*Id.*, ¶ 45(c).) . . . . Moreover, Plaintiff disputes the contents of the report, yet another reason not to consider it.

(Pl's Opp. at 17–18.) Plaintiff's arguments are well taken.

First, "in order to preserve a party's right to a fair hearing, a court, on a motion to dismiss, must only take judicial notice of facts which are not subject to reasonable dispute." *Passa v. City of Columbus,* 123 Fed. Appx. 694, 697 (6th Cir. Feb.16, 2005). Plaintiff here reasonably disputes the contents of the documents the Individual Defendants attach to their Answer.

Second, it is inappropriate for this Court to view the exhibits that allegedly only show part of an incident for reasons explained by the Sixth Circuit:

> The [district] court did not abuse its discretion when it disregarded evidence that the defendants filed in support of their motion to dismiss, including public documents and a videotape of the incident. . . . A court may consider public records without converting a Rule 12(b)(6) motion into a Rule 56 motion. *Jackson v. City of Columbus,* 194 F.3d 737, 745 (6th Cir.1999). Where the evidence "captures only part of the incident and would provide a distorted view of the events at issue," as the district court concluded with respect to the videotape, we do not require a court to consider that evidence on a 12(b)(6) motion.

*Jones v. City of Cincinnati*, 521 F.3d 555, 561–62 (6th Cir. 2008).

Here, Plaintiff alleges other processes that occurred as part of the discriminatory conduct about which she complains that did in fact involve the Individual Defendants, including the required approval of Defendants Major Smith and Captain Kemmer for any discipline or termination because they are in the chain of command. Therefore, because the evidence offered

30

by the Individual Defendants "captures only part of the incident and would provide a distorted view of the events at issue," the Court will not consider the evidence at this time. *Id.*

However, even assuming arguendo that the Court were to consider the documents *and* accept the Individual Defendants' assessment of what the documents show, (*i.e.*, they were not involved in the investigation or the decision to offer the LCA or termination), it would not change the outcome of the Court's decision. That is because, whether the Individual Defendants had the ultimate decision-making authority is not dispositive. The Individual Defendants may still be found to have directly participated if Plaintiff can show that, "[b]y relying on [a] discriminatory information flow, the ultimate decisionmakers 'acted as the conduit of [the Individual Defendant's] prejudice—[their] cat's paw[,]'" *Madden v. Chattanooga City Wide Serv. Dep't,* 549 F.3d 666, 677 (6th Cir. 2008) (concluding that "there was evidence that [the defendant supervisor] discriminated in the information that he provided about employee misconduct to senior managers by reporting the misconduct of a black employee, but not the virtually identical misconduct of white employees"). The Sixth Circuit applies the cat's paw theory of liability in § 1983 cases. *See Paterek v. Vill. of Armada,* 801 F.3d 630, 651 (6th Cir. 2015). Plaintiff alleges that the investigators and other decision makers relied upon information provided by the Individual Defendants that was motivated by their discriminatory animus.

Thus, even if the Individual Defendants could show that they were not directly involved in the investigation or the decisions about which Plaintiff complains, they could still be liable if Plaintiff could show that the decision makers were a conduit of the Individual Defendants' prejudice. While the Court makes no determination as to whether Plaintiff has shown or could in the future show supervisor liability, she has plausibly pleaded it against the Individual Defendants, and they are not entitled to dismissal on that basis.

31

## V.

Based on the foregoing, the Court **DENIES** the Individual Defendants' Motion to Dismiss.  (ECF No. 19.)

**IT IS SO ORDERED.**

4 - 17 - 20
**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**