**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **STACEY ARNOLD YERKES,** | : | |
| **Plaintiff,** | : | **CASE NO. 2:19-cv-02047** |
| **v.** | : | **JUDGE SARGUS** |
| **OHIO STATE HIGHWAY PATROL,** *et al.*, | : | **MAGISTRATE JUDGE DEAVERS** |
| | : | |
| **Defendants.** | | |

<u>**MOTION FOR SUMMARY JUDGMENT OF DEFENDANT OHIO STATE HIGHWAY PATROL AND MOTION FOR SUMMARY JUDGMENT AND/OR FOR QUALIFIED IMMUNITY OF INDIVIDUAL DEFENDANTS GENE SMITH, MICHAEL KEMMER, WILLIAM STIDHAM AND SCOTT WYCKHOUSE**</u>

Defendants Ohio State Highway Patrol, Gene Smith, Michael Kemmer, William Stidham and Scott Wyckhouse, by and through the undersigned counsel, pursuant to Fed. R. Civ. P. 56, hereby move this Court to dismiss the claims against them and enter judgment in their favor as to all of Plaintiff Stacey Arnold Yerkes's claims because she fails to state any claims upon which relief can be granted against any of them.  A memorandum in support is attached.

Respectfully submitted,

DAVE YOST (0056290)
Ohio Attorney General

*/s/ Rory P. Callahan*

RORY P. CALLAHAN (0072021)
*Trial Counsel*
Principal Assistant Attorney General
Education Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
(614) 466-4391 – Telephone
(614) 644-7634 – Facsimile
rory.callahan@ohioago.gov

AMY RUTH ITA (0074520)
Principal Assistant Attorney General
Employment Law Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
(614) 644-7257 - Telephone
(614) 752-4677 - Facsimile
elsreview@ohioago.gov

*Counsel for Defendants Ohio State Highway Patrol, Gene Smith, Michael Kemmer, William Stidham and Scott Wyckhouse*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... iii

MEMORANDUM IN SUPPORT ................................................................................1

I.     Introduction and Summary of Issues and Argument ........................................1

II.    The Undisputed Facts Controlling Plaintiff's claims..........................................5

       A.    Plaintiff's Employment at the Ohio State Highway Patrol......................5

       B.    Plaintiff's son is born in 2013 and she is granted FMLA and vacation leave but she is not eligible to take childbirth adoption leave..................................6

       C.    In late 2013 Plaintiff Arnold Yerkes receives an excellent evaluation from Sergeant Wyckhouse and Lieutenant Stidham, and is promoted to a new Training Sergeant position in the Criminal Patrol Program .................................7

       D.    Sometime in the spring or early summer of 2017, Arnold Yerkes gets a tattoo on her forearm........................................................................................8

       E.    In October 2017, Kemmer becomes Captain of Criminal Patrol and the issue of whether Arnold Yerkes has a tattoo comes up again............................10

       F.    December 2017 meeting and training opportunities...............................10

       G.    Meeting at the Lima Post on January 26, 2018......................................11

       H.    Kemmer asks Arnold Yerkes if she has a tattoo and gives her a direct order to remove the sleeve and she refuses ........................................................12

       I.    The Administrative Investigation .........................................................13

       J.    The recommendation for discipline from the Patrol's Office of Personnel, the Colonel's Office, and the Director of the Department of Public Safety ..............14

       K.    The allegations in the lawsuit ................................................................18

III.    Law & Analysis ...............................................................................................18

       A.    Arnold Yerkes cannot pursue any claims outside of the end of her employment in February 2018 because of the statute of limitations and her failure to exhaust administrative remedies .........................................................................19

B. The Defendants are Entitled to Summary Judgment on Arnold Yerkes's Claims of Discrimination based on Sex or Sex Stereotyping or Sexual Orientation Under Title VII and 42 U.S.C. § 1983 ...............................................................................21

    1. Arnold Yerkes does not have Direct Evidence of Discrimination.............22

    2. Arnold Yerkes Cannot Establish Discrimination Under an Indirect Evidence Framework ........................................................................23

        a. Arnold Yerkes Cannot Meet Her Prima Facie Case ......................24

            i. Arnold Yerkes Retired from the Patrol Because She would not sign a Last Change Agreement to continue her employment........................................................................24

            ii. Arnold Yerkes Cannot demonstrate that Similarly-Situated Non-Protected Employees Were Treated More Favorably ..........................................................................26

        b. Arnold Yerkes Cannot Establish that the legitimate non-discriminatory reasons for her proposed discipline are pretextual.......................................................................................29

        c. Arnold Yerkes's recommended discharge was not merely pretext for discrimination.............................................................................29

    3. Arnold Yerkes Cannot Establish Discrimination Under A Mixed Motive Theory ..............................................................................................34

    4. Arnold Yerkes Cannot Establish Discrimination Under A Cat's Paw Theory ..............................................................................................35

C. Arnold Yerkes Cannot Establish a Claim of Retaliation .......................................36

D. The Individual Defendants are entitled to Qualified immunity on Arnold Yerkes's claims against them in their individual capacities .................................................43

    1. The individual defendants did not violate Plaintiff's constitutional rights .........................................................................................................44

    2. The individual defendants did not violate any clearly established law .....45

IV. Conclusion ...............................................................................................................53

CERTIFICATE OF SERVICE .............................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpert v. United States*,
  481 F.3d 404 (6th Cir. 2007) ..................................................................................19

*Anderson v. Creighton*,
  483 U.S. 635 (1987)...................................................................................................4

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................................................................19, 26

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011).................................................................................................48

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................................49

*Bailey v. City of Port Huron*,
  507 F.3d 364 (6th Cir. 2007) ..................................................................................53

*Barry v. Noble Metal Processing, Inc.*,
  276 Fed. Appx. 477 (6th Cir. 2008)........................................................................24

*Bass v. Robinson*,
  167 F.3d 1041 (6th Cir. 1999) .............................................................................4, 51

*Bishop v. Hackel*,
  636 F.3d 757 (6th Cir. 2011) ..................................................................................53

*Boykin v. England*,
  2003 U.S. Dist. LEXIS 13350 (D.C. July 16, 2003) ...............................................52

*Braithwaite v. Timken*,
  258 F.3d 488 (6th Cir. 2001) ....................................................................... *passim*

*Brown v. Worthington Steel, Inc.*,
  No. 2:01-cv-1113, 2003 U.S. Dist. LEXIS 13423 (S.D. Ohio May 21, 2003).......................19

*Canitia v Yellow Freight Sys., Inc.*,
  903 F.3d 1064 (6th Cir. 1990) ...........................................................................37, 40

*Carter v. Univ. of Toledo*,
  349 F.3d 269 (6th Cir. 2003) ..................................................................................22

*Chen v. Dow Chemical Co.*,
  580 F.3d 394 (6th Cir. 2009) ........................................................................30

*Choulagh v. Holder*,
  528 F. App'x 432 (6th Cir. 2013) ..................................................................52

*Cline v. Catholic Diocese of Toledo*,
  206 F.3d 651 (6th Cir. 2000) ..............................................................29, 30, 41

*Daniels v. Williams*,
  474 U.S. 327 (1986)........................................................................................51

*Davis v. Scherer*,
  468 U.S. 183 (1984)....................................................................................3, 47

*Day v. Wayne County Bd. of Auditors*,
  749 F.2d 1199 (6th Cir. 1984) .........................................................................4

*Dendinger v. State of Ohio, BCI&I*,
  207 Fed. Appx. 521 (2006) ............................................................................20

*Desoto v. Bd. of Parks and Rec.*,
  64 F. Supp. 3d 1070 (M.D. Tenn. 2014).........................................................50

*Dews v. A.B. Dick Co.*,
  231 F.3d 1016 (6th Cir. 2000) .......................................................................22

*Dixon v. Ashcroft*,
  392 F.3d 212 (6th Cir. 2004) .........................................................................20

*Dixon v. Gonzales*,
  481 F.3d 324 (6th Cir. 2007) .........................................................................39

*Ercegovich v. Goodyear Tire & Rubber Co.*,
  154 F.3d 344 (6th Cir. 1998) ..............................................................23, 26, 28

*Fox v. Eagle Distributing Co., Inc.*,
  510 F.3d 587 (6th Cir. 2007) .........................................................................38

*Gaffney v. Potter*,
  2007 U.S. Dist. LEXIS 85259 (N.D. Ohio Nov. 19, 2007) ...........................23

*Gleed v. AT&T Mobility Servs.*,
  613 F. App'x 535 (6th Cir. 2015) ..................................................................24

*Grace v. USCAR*,
  521 F.3d 655 (6th Cir. 2003) .........................................................................30

*Gragg v. Kentucky Cabinet for Workplace Dev.*,
    289 F.3d 958 (6th Cir. 2002) ................................................47

*Griffin v. Finkbeiner*,
    689 F.3d 584 (6th Cir. 2012) ................................................34

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982)................................................4, 43

*Harrison v. Metropolitan Gov't of Nashville and Davidson County*,
    80 F.3d 1107 (6th Cir. 1996) ................................................27

*Hays v. Jefferson County*,
    668 F.2d 869 (6th Cir. 1982) ................................................4

*Hedrick v. Western Reserve Care System*,
    355 F.3d 444 (6th Cir. 2004) ................................................33

*Hein v. All American Plywood Co.*,
    232 F.3d 482 (6th Cir. 2000) ................................................23

*Heyerman v. Cnty. of Calhoun*,
    680 F.3d 642 (6th Cir. 2012) ................................................50

*Heyne v. Metro. Nashville Pub. Schs.*,
    655 F.3d 556 (6th Cir. 2011) ................................................50

*Hope v. Pelzer*,
    536 U.S. 730 (2002)................................................49

*Hopkins v Michigan*,
    2018 U.S. Dist. LEXIS 196607 (E.D. Mi. Nov. 19, 2018)................................................21, 45

*Hopson v. DaimlerChrysler Corp.*,
    306 F.3d 427 (6th Cir. 2002) ................................................22

*Hornbeak-Denton v. Myers*,
    361 Fed. Appx. 684 (6th Cir. 2010)................................................49

*Irwin v. Dep't of Veterans Affairs*,
    498 U.S. 89 (1990)................................................20

*Johnson v. Univ. of Cincinnati*,
    215 F.3d 561 (6th Cir. 2000) ................................................36

*Keaton v. Ohio*,
    2002 U.S. Dist. LEXIS 19993 (S.D. Ohio June 3, 2002) ................................................46

*Killian v. Yorozu Auto. Tenn., Inc.*,
    454 F.3d 549 (6th Cir. 2006) ........................................................................39

*Kyle-Eiland v. Neff*,
    408 Fed. Appx. 933 (6th Cir. 2011)...............................................................38

*Lanman v. Hinson*,
    529 F.3d 673 (6th Cir. 2008) .................................................................49, 50

*Laster v. City of Kalamazoo*,
    746 F.3d 714 (6th Cir. 2014) .................................................................24, 36

*Leary v. Daeschner*,
    349 F.3d 888 (6th Cir. 2003) .................................................................50, 51

*Logan v. Denny's*,
    259 F.3d 558 (6th Cir. 2001) .................................................................25, 46

*Magley v. Wright*,
    2001 U.S. Dist. LEXIS 4612 (W.D. Mich. Mar. 30, 2001)...................................49

*Majewski v. Automatic Data Processing, Inc.*,
    274 F.3d 1106 (6th Cir. 2001) ...............................................................31, 33

*Manzer v. Diamond Shamrock Chemicals*,
    29 F.3d 1078 (6th Cir. 1994) ........................................................................30

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973).............................................................................22, 36

*McGhee v. Country Fresh, LLC*,
    2011 U.S. Dist. LEXIS 29423 (E.D. Mich. Jan. 11, 2011)...................................52

*McKenna v. Bowling Green State Univ.*,
    568 F. App'x 450 (6th Cir. 2014) ..................................................................49

*Miller v. Admin. Office of Courts*,
    448 F.3d 887 (6th Cir. 2006) .........................................................................4

*Mitchell v. Toledo Hosp.*,
    964 F.2d 577 (6th Cir. 1992) ................................................26, 28, 32, 41

*Nichols v. Muskingum Coll.*,
    318 F. 3d 674 (6th Cir. 2003) .................................................................19, 20

*Noble v. Brinker Int'l, Inc.*,
    391 F.3d 715 (6th Cir. 2004) .................................................................26, 28

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) ................................................................................6

*Ohio Civil Serv. Employees Ass'n v. Seiter*,
    858 F.2d 1171 (6th Cir. 1988) ...............................................................47

*Oldfather v. Ohio Dep't of Transp.*,
    653 F. Supp. 1167 (S.D. Ohio 1986) ....................................................50

*Paterek v. Vill. of Armada*,
    801 F.3d 630 (6th Cir. 2015) .................................................................46

*Pearson v. Callahan*,
    555 U.S. 223 (2009) ..............................................................................47

*Peecook v. Northwestern Nat'l Ins. Group*,
    1998 U.S. App. LEXIS 18265 (6th Cir. 1998) .....................................25

*Poe v. Haydon*,
    853 F.2d 418 (6th Cir. 1987) ..............................................................4, 49

*Reichle v. Howards*,
    566 U.S. 658 (2012) ..............................................................................48

*Romans v. Mich. Dept. of Human Svcs.*,
    668 F.3d 826 (6th Cir. 2012) .................................................................31

*Russell v Ohio Dept. of Admin. Servs.*,
    302 Fed. Appx. 386 (6th Cir. 2008) ......................................................37

*Russell v. Univ. of Toledo*,
    537 F.3d 596 (6th Cir. 2008) .................................................................30

*Saucier v. Katz*,
    533 U.S. 194 (2001) .........................................................................4, 44, 49

*Seeger v. Cincinnati Bell Tel. Co.*,
    681 F.3d 274 (6th Cir. 2012) ..............................................................2, 41

*Shehee v. Luttrell*,
    199 F.3d 295 (6th Cir. 1999) .................................................................51

*Sherman v. Chrysler Corp.*,
    47 Fed. Appx. 716 (6th Cir. 2002) ........................................................20

*Silberstein v. City of Dayton*,
    440 F.3d 306 (6th Cir. 2006) .................................................................43

*Simpson v. Vanderbilt Univ.*,
   359 Fed. Appx. 562 (6th Cir. 2009) ...........................................................21, 22

*Smith v. Chrysler Corp.*,
   155 F.3d 799 (6th Cir. 1998) ...........................................................................33

*Smith v. Leggett Wire Co.*,
   220 F.3d 752 (6th Cir. 2000) .......................................................................27, 42

*Smoak v. Hall*,
   460 F.3d 768,777 (6th Cir. 2006) ....................................................................43

*Sosby v. Miller Brewing Co.*,
   415 F.Supp.2d 809 (S.D. Ohio 2005) ..............................................................41

*Staub v. Proctor Hosp.*,
   562 U.S. 411 (2011) .........................................................................................35

*Stinebaugh v. City of Wapakoneta*,
   630 Fed. Apx. 522, 530 n. 2 (6th Cir. 2015) ...................................................45

*Texas Dep't of Community Affairs v. Burdine*,
   450 U.S. 248 (1981) .........................................................................................29

*Tuttle v. Metropolitan Gov't of Nashville*,
   474 F.3d 307 (6th Cir. 2007) ...........................................................................42

*United States Dep't of Air Force v. Federal Labor Relations Authority*,
   949 F.2d 475 (D.C. Cir. 1991) .........................................................................52

*Univ. of Tex. SW Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013) ...............................................................................36, 37, 39

*Voltz v. Erie County*,
   617 Fed. Appx. 417 (6th Cir. 2015) ...........................................................35, 36

*Ward v. Athens City. Bd. Of Edn.*,
   *187 F.3d 639 (6th Cir. 1999)* ...........................................................................44

*Wasek v. Arrow Energy Servs.*,
   682 F.3d 463,471–72 (6th Cir. 2012) ..............................................................39

*Washington v. Newsom*,
   977 F.2d 991 (6th Cir. 1992) ...........................................................................44

*Weberg v. Franks*,
   229 F.3d 514 (6th Cir. 2000) .....................................................................3, 21, 45

*Wexler v. White's Fine Furniture, Inc.*,
   317 F.3d 564 (6th Cir. 2003) ..............................................................................23

*Wheeler v. City of Columbus*,
   No. 2:16-CV-1159, 2019 U.S. Dist. LEXIS 133518 (S.D. Ohio Aug. 8, 2019)
   (Marbley, J.)...............................................................................................34, 42

*White v. Baxter Healthcare Corp.*,
   533 F.3d 381 (6th Cir. 2008) ..............................................................................34

*Willoughby v. Allstate Ins. Co.*,
   104 Fed. Appx. 528 (6th Cir 2004)......................................................................38

*Wilson v. Layne*,
   526 U.S. 603 (1999).............................................................................................48

*Woythal v. Tex-Tenn Corp.*,
   112 F.3d 243 (6th Cir. 1997) ........................................................................33, 41

*Zanders v. Nat'l R.R. Passenger Corp.*,
   898 F.2d 1127 (6th Cir. 1990) ............................................................................39

**Statutes**

42 U.S.C.§ 1983................................................................................................ *passim*

ADEA ...............................................................................................................38

FMLA ............................................................................................................6, 7

**Other Authorities**

First Amendment ...................................................................................................49

Bates-stamped "DEFENDANT 000002" ..................................................................17

Bates-stamped "DEFENDANT 000014" ..................................................................13

Rule 56................................................................................................................26, 42

<u>**MEMORANDUM IN SUPPORT**</u>

**I.      Introduction and Summary of Issues and Argument**

Plaintiff Stacey Arnold Yerkes, a law enforcement officer, intentionally violated an employer rule and, even worse, thereafter attempted to hide her misconduct.  Her subsequent discipline fully related to her deceptiveness and insubordination—not her gender, sexual orientation, or any alleged protected activity.  Her claims of discrimination based on her sex or "sex stereotyping" or sexual orientation, as well as her claims of retaliation, should all be dismissed.  There are no genuine questions of material fact to submit to a jury regarding the reasons for recommending her removal from employment with the Ohio State Highway Patrol, and the defendants are all entitled to judgment as a matter of law.  It is undisputed that the recommendation for Plaintiff's removal from employment followed:  (1)  the discovery that she had a tattoo in violation of the Patrol's appearance standards policy, which she had concealed for months, and (2) her insubordination when Captain Michael Kemmer questioned her about whether she had a tattoo, and gave her a direct order to remove a sleeve she wore on her arm to conceal the tattoo.

During testimony in this case, Arnold Yerkes admitted that she knew the tattoo that she got violated policy, testifying, "I knew I couldn't have one.  Did I think it was a terminable offense, no."  (Arnold Yerkes I, 270).  Her difference of opinion about what is a "terminable" offense is not evidence of unlawful discrimination or retaliation.  An administrative investigation established both that she had a tattoo and was insubordinate.  There are no questions of fact that she engaged in misconduct, and that the misconduct formed the basis for recommending significant discipline.

Plaintiff Arnold Yerkes filed the present lawsuit raising multiple claims of discrimination

and retaliation against her former employer, the Ohio State Highway Patrol ("OSHP") and four individually-named current or former OSHP employees – Gene Smith ("Smith"), Michael Kemmer ("Kemmer"), William Stidham ("Stidham"), and Scott Wyckhouse ("Wyckhouse") (collectively, "Individual defendants"). On her discrimination claims, however, she cannot establish a *prima facie* case of discrimination because she cannot point to any similarly situated employee of the Patrol who engaged in the misconduct that she did. Neither can she present any evidence that the decision to recommend discipline was a pretext for discrimination based on her sex or sexual orientation, or unlawful retaliation. She cannot make any argument that the Patrol did not make a reasonably informed decision in recommending her removal from employment, and that there were substantial grounds to support that recommendation. In the words of long established case law on this point, she cannot point to any material evidence that the Patrol did not make a reasonably informed and considered decision in recommending her removal from employment, based on the particularized facts available in February 2018, and that the relevant decision makers did not "honestly believe" that Arnold Yerkes should be removed from her position as a Sergeant in the Criminal Patrol program. *See, e.g., Seeger v. Cincinnati Bell Tel. Co.,* 681 F.3d 274, 285 (6th Cir. 2012). So long as the Patrol demonstrates such an "honest belief" based on "particularized facts", the Plaintiff "cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial or baseless." *Id.* (internal citations omitted).

The same problems exist with her claims of retaliation; she cannot establish a prima facie case that "but for" any protected activity she would not have been investigated and disciplined, and she cannot show that the recommendation for discipline was a pretext for unlawful retaliation. Any attempts by Plaintiff to establish discrimination or retaliation under a cat's paw

2

or mixed motive theory similarly should fail, because there is simply no evidence that Arnold Yerkes's sex or sexual orientation was a motivating factor in the proposed discipline; she had engaged in substantial misconduct and that was the basis for recommending her removal from employment.

The claims of discrimination against the individual defendants should also be dismissed, either on the merits or because of qualified immunity. The analysis of the discrimination claims for equal protections cases under 42 U.S.C.§ 1983 typically tracks the analysis of discrimination claims under Title VII. "To establish an equal protection claim against a public employee under § 1983, the plaintiff must show that the employer made an adverse employment decision 'with discriminatory intent and purpose.'" *Weberg v. Franks,* 229 F.3d 514, 522 (6th Cir. 2000). After developing a factual record in discovery, the obvious question raised by this case is that none of the individually named defendants were "decision-makers" who made a recommendation for discipline in Plaintiff's case. Case law establishes that none of them took an "adverse employment action" against Plaintiff merely by recommending a matter for investigation or otherwise identifying misconduct that should have been the basis for investigation.

Because none of the individual defendants were decision-makers involved in recommending discipline for Plaintiff in this case, they are also entitled to qualified immunity. At most, any of the individual defendants simply recommended or requested that there should be an investigation of whether Arnold Yerkes had a tattoo. The same agency principles that could apply to an institutional employer under Title VII do not apply to hold a non-decision maker liable under 42 U.S.C. § 1983. Simply because an employer may be liable for claims of employment discrimination under Title VII, Title VII does not form an independent basis for enforcement of constitutional rights under 42 U.S.C. § 1983. *See, e.g., Davis v. Scherer,* 468

3

U.S. 183, 194 n. 12 (1984); *see also Day v. Wayne County Bd. of Auditors,* 749 F.2d 1199, 1204 (6th Cir. 1984). The Sixth Circuit has long recognized that the various agency principles and *respondeat superior* liability that may or may not be available to support her claims under Title VII cannot support individual capacity claims. *See Hays v. Jefferson County*, 668 F.2d 869, 872 (6th Cir. 1982) ("The law is clear that liability of supervisory personnel must be based on more than merely the right to control employees"). Consequently, Plaintiff's claims against the individual defendants must rest on alleged violations of the Constitution. *See Poe v. Haydon,* 853 F.2d 418, 428-29 (6th Cir. 1987). Liability under 42 U.S.C. § 1983 must be based upon "active unconstitutional behavior" pled against each individual defendant. *See Bass v. Robinson,* 167 F.3d 1041, 1048 (6th Cir. 1999). Arnold Yerkes cannot point to any clearly established case law, as that phrase has been interpreted by the U.S. Supreme Court and the Sixth Circuit, to support a constructive discharge claim based upon the facts she asserts in this lawsuit under an equal protection theory enforced by § 1983. The claims against the Individual Defendants in their individual capacities are subject to the defense of qualified immunity "insofar as [defendants'] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Arnold Yerkes has the burden of demonstrating that the defendants are not shielded by qualified immunity. *See Miller v. Admin. Office of Courts,* 448 F.3d 887, 894 (6th Cir. 2006). To satisfy that burden, she must show that she possessed a constitutional right that defendants violated and that such a right was "clearly established" by relevant case law at the time of the alleged violation, *see Saucier v. Katz,* 533 U.S. 194, 201 (2001), meaning that "the contours of the rights must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). Because each of the

individual defendants were not decision-makers and did not have any control over the disciplinary process in this case, they have a separate and additional basis for dismissal of the claims against them, in addition to the fact that the claims on the merits should be dismissed.

## II.    The Undisputed Facts Controlling Plaintiff's claims.

Plaintiff self identifies as female and gay.  (Doc. #13, Am. Comp. ¶¶ 22, 24).  She was employed as a patrol officer at the Ohio State Highway Patrol from February 1994 until she retired on February 12, 2018.  (See id., ¶¶ 13, 47).  All of the Individual Defendants are long-time current or former members of the Ohio State Highway Patrol.  (See id., ¶¶ 9 – 12).  Smith served as a Major, Kemmer serves as Captain, Stidham is a Staff Lieutenant and Wyckhouse is a Lieutenant.  (See id.).  Plaintiff generally alleges that all of the individual defendants have "had supervisory authority" over Plaintiff at various times.  (See id.).

### A.    Plaintiff's Employment at the Ohio State Highway Patrol

Stacey Arnold Yerkes had been employed with the Ohio State Highway Patrol for approximately 24 years at the time she retired on February 12, 2018.  (Yerkes I 26, 354).  She took the customary path of beginning with about 6 months of training at the OSHP Academy in 1994, followed with several years as a Trooper at a Post, first at the Findlay Post in northwest Ohio.  (*Id.* at 26, 29).  Around 1998, she moved into an assignment as a Trooper for the Traffic Drug Interdiction Team ("TDIT"), where the focus of her assignment was drug interdiction, or interception of criminals traveling the State, on interstate highways.  (*Id.* at 30–31).  In the early 2000s she also began regularly attending trainings and conference with MVCI (Motor Vehicle Criminal Interdiction) and DIAP (Drug Interdiction Assistance Program).  (*Id.* at 49–52, 71–78).  This included regularly traveling out of state to attend conferences and trainings.  (*Id.*)

During this time, Arnold Yerkes also worked with three of the individual defendants in the case, particularly Scott Wyckhouse and William Stidham.  (*Id.* at 35–36).  Stidham was a Sergeant in the Findlay District in the early 2000s when Arnold Yerkes was TDIT trooper.  (*Id.*)  From 2011 to 2013, Stidham was a Lieutenant and Post Commander in Findlay.  (Yerkes I 85–86).  From 2011 to 2013, Stacey Arnold Yerkes was a Trooper in a position as a canine handler in the Findlay Criminal Patrol District, and reported to Sergeant Scott Wyckhouse when he was in the Findlay District as a Criminal Patrol Sergeant.  (Wyckhouse 14).  Wyckhouse first got to know Stacey Arnold Yerkes when he was a Sergeant at the Toledo Patrol Post during the years 2009 or 2010.  (Wyckhouse 30).  At the time, Arnold Yerkes worked with Trooper Al Romero and Trooper Ryan Stewart as well as Criminal Patrol Sergeant Dave Schultz.  (Wyckhouse 30).  When that criminal patrol team would have drug seizures, they would frequently bring them into the Toledo Patrol Post.  (Wyckhouse 30).  He knew at that time that she was gay.  (Wyckhouse 30).

### B.  Plaintiff's son is born in 2013 and she is granted FMLA and vacation leave but she is not eligible to take childbirth adoption leave.

In 2009, Plaintiff traveled to Hawaii with Emily Yerkes, and the couple entered into a civil union under Hawaii state law.  (First Amd. Compl. ¶ 26)  In April 2013, prior to the U.S. Supreme Court decision in *Obergefell v. Hodges,* 576 U.S. 644 (2015) (recognizing a fundamental constitutional right to marry for same sex couples), Emily Yerkes gave birth to the couple's son, and Plaintiff applied for leave and took leave to help care for her newborn son.  (Yerkes I 110, 117–18).  She also initiated paperwork to be a legal guardian for her son, since she was not a biological parent.  (*Id.* 137 & Ex. 32).  After initiating the process to take leave, however, Plaintiff learned that she was not allowed to take "Childbirth and Adoption Leave" under the collective bargaining agreement between the Ohio State Highway Patrol and her union,

the Ohio State Troopers Association, which would have granted her an additional 160 hours of partially paid leave or up to $2,000.00 in reimbursement for adoption related expenses; however, she was not eligible for this type of leave, because her son was neither her biological child and she had not adopted him. (Arnold Yerkes I, Ex. 55). She did qualify for FMLA leave however, and was granted FMLA leave that she could take on an intermittent basis for the next year to care for her son. (Yerkes I, Ex. 36). She had over 500 hours of paid vacation and sick leave available to her at this time, and was able to take 160 hours of leave over the following month to be with her son. (Yerkes I, Exhs. 43, 44 and 45).

She filed a grievance regarding the denial of "Adoption Childbirth Leave" which was denied. (Yerkes I, Ex. 36). The application actually had to be reviewed by the State of Ohio's Department of Administrative Services, which again denied the application because she was neither a biological parent, nor an adoptive parent. She was able to take other leave after this time.

> **C.  In late 2013 she receives an excellent evaluation from Sergeant Wyckhouse and Lieutenant Stidham, and is promoted to a new Training Sergeant position in the Criminal Patrol Program.**

Late in 2013, she received an excellent evaluation from then-Sergeant Scott Wyckhouse and then-Lieutenant William Stidham. (Yerkes I, 206-08, Ex. 56) At the same time, she applied for and interviewed for a position as a Sergeant in Criminal Patrol, and she was awarded that promotion. (Arnold Yerkes I, 208-09). Michael Kemmer, a Staff Lieutenant in the Criminal Patrol program in late 2013, helped create the two new positions in Criminal Patrol for Sergeants who would specialize in training law enforcement officers on skills and tactics in criminal interdiction. The training Sergeant positions, called ACIRT (for Advanced Criminal Interdiction Rider Training) were created with two people in mind – Sergeant Shaun Smart and Stacey

Arnold Yerkes and awarded to those candidates.  (Arnold Yerkes I, 209, Def. Ex. 57).

She continued these training activities for the next three years, often travelling for trainings while also serving as a support for criminal interdiction activities in the Findlay District of northwest Ohio.  Although her position reported to General Headquarters in Columbus, she was given a report in location nearer her home at the Bowling Green Post, which she frequently reported to for administrative work.   (Yerkes I 221, 226, 252)

**D.      Sometime in the spring or early summer of 2017, Arnold Yerkes gets a tattoo on her forearm.**

At some point in time in 2017, Stacey Arnold Yerkes got a large tattoo on her right forearm.  She cannot remember when she got the tattoo, she cannot remember a physical location or shop or business where she obtained the tattoo, and she cannot remember what she paid for the tattoo.  (*Id.* 271–72)  She testified that it was sometime in 2017.  (*Id.* 266)  Her partner in the ACIRT Program, Sergeant Shaun Smart, was more helpful.  He testified that in the spring or summer of 2017, he and Arnold Yerkes were in Bowling Green, Kentucky for a criminal interdiction training with the Kentucky State Police.  (Smart 143-44).  After a training session during the day, Smart asked Plaintiff about the sleeve she was wearing and whether she had a tattoo under the sleeve.  (Smart 144).  She confirmed that she did have a tattoo on her forearm.  Smart responded, "And I said, Stacey, you got to get rid of it.  Take that thing off."  (Smart 144).  He testified that she responded "Okay" and that she would get rid of the tattoo.  (Smart 144).  In fact, Smart testified that he should have reported to his chain of command that Arnold Yerkes had a tattoo, but did not report it.  (Smart 189).  He said that was because he believed she would get rid of the tattoo, "My partner says she's going to do it, she's going to do it."  (Smart 144).

During this time, the Patrol had a policy in place for many years prohibiting sworn law enforcement personnel from obtaining tattoos that would be visible on their arms in a short

sleeved uniform, or otherwise visible on the neck or face.  Plaintiff had been advised of this policy, and had signed off on updates to this policy multiple times during her employment. (Yerkes I 270–71)  OSP-505.03 states "[A]ll uniformed employees, hired after July 22, 2015, shall not have visible tattoos, brandings or body art while wearing any class of issued uniform. Optional wear uniform items or any other item that would cover/conceal a visible tattoo, branding or body art may not be used in order to comply with the standard." OSP-505.03 further provides that "All uniformed employees … hired prior to July 22, 2015, with tattoos, brandings, or body art that are visible in any class of uniform shall not be required to remove the existing tattoo, branding, or body art but shall not add to, modify, enhance or receive additional tattoos, branding or body art." (*Id.* 334–35 & Ex. 85)

In August 2017, there were rumors that Arnold Yerkes had gotten a tattoo on her forearm. (Stidham 106-07).  Captain Altman of the Findlay District contacted Stidham to ask why Sergeant Arnold Yerkes was wearing a sleeve with her uniform. (Stidham 113).  Stidham, after receiving the email from Captain Altman, went to talk to HR and said that there was a rumor that Arnold Yerkes had a tattoo and that she was covering it up with the sleeve. (Stidham 114).  HR told Stidham that they can ask her to remove the sleeve, and if she did not have a tattoo, she can wear the sleeve if she has a DPS 66 on file. (Stidham 114).  Stidham shared this information with Captain Richard Meadows, who was the Captain of Criminal Patrol at that time in August 2017, and Captain Meadows informed Stidham that Sergeant Arnold Yerkes's direct supervisor, Lieutenant Dickerson would follow up on the issue. (Stidham 114).

During this time, Stidham and Dickerson were also having ongoing disagreements about procedures and practices.  Lieutenant Dickerson (her supervisor) was asked to check to see if she had a tattoo, and he reported back that she did not have a tattoo. (Stidham 106).  Lt. Dickerson

left a copy on Stidham's desk to let him know that the DPS 66 was on file for Arnold Yerkes. (Stidham 112).  After seeing a copy of the DPS 66, Stidham followed up with Dickerson and asked him just wanted to confirm that Dickerson looked and she does not have a tattoo and Dickerson said correct, she does not have a tattoo.  (Stidham 119-20). Stidham did not learn until later that Sergeant Arnold Yerkes had never seen her own doctor about the DPS 66.  (Stidham 179).  Instead, Lt. Dickerson had gone to a Patrol doctor at the Academy and had him complete the DPS 66 on her behalf.  (Stidham 179-80).

### E.    In October 2017, Kemmer becomes Captain of Criminal Patrol and the issue of whether Arnold Yerkes has a tattoo comes up again.

In October 2017, Richard Meadows retired and Michael Kemmer was promoted to the position of Captain of the Criminal Patrol program.  (Dickerson 19–20)  At the Academy on or around October 30, 2017, Captain Kemmer, Lieutenant Dickerson and Lieutenant Wyckhouse met and discussed morale in the program.  Lieutenant Wyckhouse again said that other members of the Criminal Patrol team in District 1 were still saying that Arnold Yerkes had a tattoo that she was concealing under the sleeve she wore.  Wyckhouse asked Dickerson if Arnold Yerkes had a tattoo, and Dickerson said, "No."  To confirm, Wyckhouse asked, "You looked" and Dickerson answered "Yes."  (Wyckhouse 82, 86, Dickerson 68–70).

### F.    December 2017 meeting and training opportunities

Lts. Dickerson and Wyckhouse, and Sergeant Arnold Yerkes and Sergeant Nate Henn, all met at the Bowling Green post in December 2017.  (Wyckhouse 91–93)  Wyckhouse testified, as did Kemmer, that this was a meeting that Captain Kemmer had requested they all have to get everyone on the same page on operational issues.  At the meeting, Dickerson and Arnold Yerkes raised the issue of reports of activities going from District 1 to Stidham, and said that she was being "targeted."  (*Id.*)  Dickerson did not say or allege that Arnold Yerkes felt she was being

10

treated differently because she was a woman or because she was gay.  (Dickerson 111–13).

**G.    Meeting at the Lima Post on January 26, 2018**

Later in January 2018, with disagreements in the Findlay District among troopers and Arnold Yerkes continuing, a meeting was called to clear the air with the District 1 Criminal Patrol team (Kemmer 105) Kemmer, Stidham and Dickerson along with Arnold Yerkes, Smart and Breck Williamson all attended.  (Id.) Arnold Yerkes wanted to make a point of the report that she had not worn her uniform Stetson hat and challenged Stidham on this point multiple times.  Stidham initially denied that he had heard this from Trooper Ryan Stewart but later relented and indicated that Stewart was the source of the information.  This led Arnold Yerkes to claim that Stidham lied.  Kemmer decided that another meeting would be held with the Troopers in Criminal Patrol of District 1, and part of the meeting would be to make clear that Arnold Yerkes was a Sergeant and Supervisor in the Criminal Patrol program, and that she should be treated with respect by the Criminal Patrol staff in District 1.  (Kemmer 105-06).

Stidham testified that after he contacted Wyckhouse about arranging the meeting, the tattoo issue came up again.  (Stidham 106).  Stidham reported around January 30, 2018, that Lieutenant Wyckhouse was reporting back to him that other troopers on the District 1 criminal patrol team (headquartered in Findlay district of northwest Ohio) were upset that they were being criticized for not supporting Sergeant Arnold Yerkes when she had a tattoo on her arm in violation of policy.  (Stidham 107).

Stidham had Lt. Wyckhouse talk to Captain Kemmer about this issue, since they thought the tattoo issue had been resolved.  Kemmer asked for Troopers to come forward with evidence that they had seen a tattoo on Plaintiff's arm.  Two of the troopers, Anthony Martin and Michael Ziehr said they did know that she had a tattoo in violation of policy, and that it was concealed

under the sleeve that she wore.  (Kemmer 109).  They sent emails to Captain Kemmer stating this, and based on this information from two witnesses, Captain Kemmer decided to look into the matter further.  Kemmer consulted with then-Captain Linek in the Patrol's Office of Personnel. Personnel said that Kemmer could simply ask Arnold Yerkes if she had a tattoo, and that he could ask her to remove the sleeve on her arm to see if it covered a tattoo.  If she refused to remove the sleeve, he could give her an order to remove the sleeve and he could give her a written order so there was no confusion as to what she was asked to do.

**H.  Kemmer asks Arnold Yerkes if she has a tattoo and gives her a direct order to remove the sleeve and she refuses.**

On February 2, 2018, Kemmer met with Arnold Yerkes while the two were at the Ohio State Highway Patrol Academy.  Kemmer wanted to directly ask her about the tattoo allegation, and had brought a written order to make clear that his request was an order.  He told Arnold Yerkes, "Look, the allegations have come up again that you have a tattoo and you're concealing it with your arm brace on your right arm."  (Kemmer 116)  Kemmer asked her, "Look, I'm going to ask you, do you have a tattoo", and Arnold Yerkes responded, "I'm not answering that." (Kemmer 116).  Kemmer continued, "I'm going to ask you to take off your jacket and roll up your sleeve so I can look at your arm", and Arnold Yerkes responded, "Cap, I'm not doing it." (Kemmer 116).  He continued, stating to her, "Look, I got a written order I'm going to give to you." (Kemmer 116).  He placed the written order on the table in front of her, and she would not look at the order, so he read her the order.  (Kemmer 116).  Arnold Yerkes refused to remove the sleeve after receiving this order.  (Arnold Yerkes I 316).  Kemmer informed Arnold Yerkes that she was dismissed.

The written order was prepared as an "Inter-Office Communication", dated February 2, 2018, with a subject line that stated, "Written order to visually inspect forearms for tattoo."

(Kemmer Ex. 5, "Attachment C", page Bates-stamped "DEFENDANT 000014").  The order itself stated, "You are being ordered to show your forearms, without any type of sleeve, bandage, brace or coverings so a visual inspection can be completed.  This is due to allegations of you having a tattoo which would be visible while wearing the class C uniform."  (Arnold Yerkes Def. Ex. 79; Kemmer Ex. 5, "Attachment C", page Bates-stamped "DEFENDANT 000014").

## I.     The Administrative Investigation

On February 5, 2018, OSHP initiated an investigation into whether Arnold Yerkes did in fact have a tattoo on her forearm.  (Bush 121–24 & Ex. 6)  She was interviewed on February 5, 2018 and confirmed that she had gotten a tattoo during the summer of 2017 and had covered it up with the medical sleeve. (*Id.*)  She acknowledged that she violated the policy. (*Id.*)  The administrative investigation was relatively straightforward and not complicated, since the only issues were whether Arnold Yerkes had a visible tattoo on her forearm and whether she was insubordinate.  (Bush 201).  She was called into an interview by administrative investigator Lieutenant Terry Bush of the Patrol's Administrative Investigative Unit, and at that time, removed her sleeve and showed them the tattoo on her forearm.  (Bush 121–24 & Ex. 6)  Bush testified that there were no procedures that were not followed in the Arnold Yerkes investigation, and that the investigation was fair and appropriate.  (Bush 196-97).  Arnold Yerkes admitted that she had the tattoo, showed it to the investigators and acknowledged that Kemmer had ordered her to show him the tattoo and she had refused to comply with the order.  (Bush 202).  His investigation did not show that she was given an unlawful order by Captain Kemmer.  (Bush 203-04).

She did state during the interview that she had filed a complaint with the EEOC.  (Bush 121–24 & Ex. 6)  Then-Captain Charles Linek in the Office of Personnel did review the

administrative investigation report, but did not ask for a new investigation based on her statement to the investigator that she had filed a charge with the EEOC. (Linek 96-97). Linek expected that he would be notified by the Department of Public Safety's EEO Officer, or a similar individual or office, whenever the actual charge was received. (Linek 97). He viewed those allegations as separate from the alleged misconduct in Arnold Yerkes's case, and not a basis to refrain from reviewing the findings of the investigation and whether imposition of discipline was appropriate. (Linek 101).

> **J.** **The recommendation for discipline from the Patrol's Office of Personnel, the Colonel's office, and the Director of the Department of Public Safety.**

When the administrative investigation was completed, the matter was first reviewed in the Patrol's Office of Personnel for the imposition of discipline. A recommendation would then be made by the Office of Personnel which would be reviewed by the Office of the Colonel of the Ohio State Highway Patrol. After the Colonel's office reviewed and made a recommendation, the matter could then go to the Office of the Director of the Department of Public Safety, depending upon the severity of the discipline recommended.

This case, although serious, was not complicated. All levels of review agreed. Then-Captain Charles Linek reviewed the Administrative Investigation and discussed proposed discipline with Staff Lieutenant Cassandra Brewster and Lieutenant Jacob Pyles in the Office of Personnel's Professional Standards Unit. (Linek 128-29) All agreed that a recommendation of discharge, but with the option to take a demotion from a position as a supervisor and sign a last chance agreement was the appropriate resolution. (See id). Brewster recalls the discussions of discipline in this case as well, testifying, "I just remember there being a surprise and a kind of shock that someone of her [Arnold Yerkes] tenure would go out and get a tattoo so large across her arm, that there's no way you would ever be able to hide something like that, knowing it's a

blatant violation of policy.  I remember those conversations." (Brewster 68).  She also testified, "I don't know how to stress to you the tattoo policy with the patrol.  It's just engrained in all of us that you do not do this." (Brewster 60).

Linek could not recall other cases of misconduct similar to the Arnold Yerkes case, but did recall two Patrol dispatchers who had gotten new tattoos in violation of the Patrol's appearance standard policy.  (Linek 112).  Those dispatchers had been required to sign last chance agreements, or be discharged from employment, and go through a process of having the tattoo removed.  (Linek 112). Arnold Yerkes was not a dispatcher, she was a Sergeant and a supervisor who was not only responsible for her own compliance with orders and policies of the Patrol, but had a responsibility to make sure that Troopers and other employees of the Patrol follow the rules and regulations of the Patrol.  (Linek 102, 112-13).  The tattoo was a permanent, ongoing violation of the Patrol's appearance standard policy; if some lesser discipline of a short suspension was imposed, Arnold Yerkes would have still had the tattoo after the suspension. (Linek 113).  If there was not major discipline imposed, the employee could simply decide to get a tattoo, take a short suspension and then say the Patrol could not take any further action on the tattoo.  (Linek 113).  Linek and then-Staff Lieutenant Brewster and Lieutenant Pyles were all in agreement on the proposed discipline of removal from employment, but offering a last chance agreement with a demotion and transfer out of the specialty Criminal Patrol position, and a process to have the tattoo removed.  (Linek 128-29). Linek also informed then-Major Richard Fambro of the recommendation.  Fambro had recused himself because he had commanded Arnold Yerkes, as well as several of the other individuals involved from Criminal Patrol, and thought it was the appropriate thing to do.  (Fambro 72-73).

In the Colonel's office, Lt. Col. Kevin Teaford agreed with the proposed discipline, and

discussed the matter with Colonel Paul Pride. (Teaford 85, 88-90). Teaford was aware of the allegations that Arnold Yerkes had a visible tattoo, and that she had refused Captain Kemmer's orders to show him the tattoo, before he received the final copy of the Administrative Investigation report. (Teaford 91-92). Teaford agreed with the disciplinary recommendation of the Office of Personnel, because of the seriousness of Arnold Yerkes having a visible tattoo in violation of policy, and the seriousness of her failure to obey multiple lawful orders to show whether or not she had a tattoo. (Teaford 93-94). Colonel Pride was out of the office that day, so Lt. Col. Teaford actually signed the disciplinary trail sheet, but both were in agreement with the recommendation from the Office of Personnel. (Pride 134-35). Pride was aware of the allegations prior to that time that Arnold Yerkes had a visible tattoo that was in violation of policy, and that she refused a direct order from Captain Kemmer when she was questioned about the tattoo. (Pride 136). When the Administrative Investigation report was completed and he spoke with Lt. Colonel Teaford about the recommendation for discipline, this was just confirmation of the serious allegations that he was already aware of. (Pride 136-37). Pride wanted to know what the recommendation from the Office of Personnel was, and he agreed with that recommendation, because of the seriousness of the allegations, that Arnold Yerkes knowing had a tattoo that was in violation of policy and that she had disobeyed a direct order from a commanding officer when questioned about whether she had a tattoo. (Pride 136-37). That fact that Arnold Yerkes had stated during her investigatory interview for the Administrative Investigation that she had filed a claim with the EEOC was not a factor in his evaluation of discipline. (Pride 151).

The final step of review was Director of Public Safety John Born. Director Born had previously served as a Trooper and at multiple levels in the Ohio State Highway Patrol, and had

also served as Colonel from 2011 to 2013.  (Born 12-13).  As Director of Public Safety, he served as the appointing authority for the Agency, and had certain statutory responsibilities as the final decision-maker in certain personnel matters, including a recommendation to discharge an employee from their position.  (Born 73, 122-23).  In the case of Arnold Yerkes, Born also agreed with the recommendation of the Office of Personnel, and signed the "Disciplinary Trail" form.  (Born 98-99, 174, Born Ex. 5, page Bates-stamped "DEFENDANT 000002").  During questioning, Born agreed that as Director of Public Safety, he understood that there were not only statutory but also policy responsibilities protecting officers and employees from discrimination on the basis of gender and sexual orientation, as well as other grounds.  (Born 159-61).  He agreed that discrimination based on gender or sexual orientation was also personally offensive to him, and that if it had occurred, he would want to put a stop to it.  (Born 162-63).

Stacey Arnold Yerkes had limited interactions with Born, Pride, Teaford and Linek during her career with the Patrol.  (Arnold Yerkes II, 398 – 403).  She did attend the Patrol Academy with Charles Linek, and recalled working a Criminal Patrol detail with Pride at one point earlier in her career.  (Arnold Yerkes II, 401).  She never heard any of these decision-makers, Born, Pride, Teaford and Linek, make any comments that she viewed as sexist, gender stereotyping or homophobic.  (Arnold Yerkes II, 398 – 403).  Neither did she ever hear anyone else allege that any of these individuals made sexist, gender stereotyping or homophobic comments.  (See id.).

As part of the recommendation of discipline, it was agreed that a Last Chance Agreement would be offered to Arnold Yerkes.  The last chance agreement was not included with the disciplinary packet that went to the Colonel's office and the Director of Public Safety, but was

instead drafted in the Patrol's Office of Personnel by the Professional Standards Unit, including then-Staff Lieutenant Cassandra Brewster and Lieutenant Jacob Pyles. Included in the provisions were a requirement that Arnold Yerkes begin a process of removing the tattoo, that she accept transfer out of her special position as a Training Sergeant in the Office of Criminal Patrol, and a demotion to a position as a Post Trooper. The last chance agreement also required that she essentially settle her discipline through her union, and that she agree not to grieve the discipline that was imposed, that she agree not to file a lawsuit related to the imposition of discipline, and that she agree to withdraw any charge filed with the Ohio Civil Rights Commission of Equal Employment Opportunity Commission related to the imposition of discipline to which the last chance agreement related.

### K. The allegations in the lawsuit.

In the Amended Complaint, it is alleged that some of the individual defendants, specifically Captain Kemmer and Staff Lieutenant Stidham, frequently made sexist comments about women and used derogatory profanities in the offices of the Patrol. (Doc. #13, ¶¶ 32-33). Arnold Yerkes testified that she never heard these comments, and none of her supervisors ever directed such comments to her. Lt. Dickerson testified that he heard two of the individual defendants use these derogatory profanities around the office, but never heard those profane comments directed towards Arnold Yerkes. (Dickerson 83). Plaintiff's counsel also deposed two Administrative Professionals in this case, Tiffany DeArmond and Jessica Jones, and both denied ever hearing any of the individual defendants use those profanities in the workplace.

## III. Law & Analysis

Arnold Yerkes asserts multiple claims in her Amended Complaint but under two general theories: (1) she claims she was discriminated against because she was a woman or gay or based

on sex stereotyping; and/or (2) she claims she was retaliated against for protected activity. However, she cannot establish a prima face case of either unlawful discrimination or retaliation, and she cannot demonstrate pretext as to any of the actions against her.   Further, to the extent Arnold Yerkes asserts claims of discrimination against the individual defendants under 42 U.S.C. § 1983, not only should this claim be dismissed on the merits, the individual defendants are also entitled to qualified immunity based on the undisputed facts in the case.

The standard of review for a motion for summary judgment is well-established and need not be outlined here, other than to note that a plaintiff cannot rest on her own subjective and unverified assertions to defeat a properly supported motion for summary judgment.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986).  It is also well settled that only admissible evidence may be considered in ruling on a motion for summary judgment.  *See Alpert v. United States,* 481 F.3d 404, 409 (6th Cir. 2007).

A.     **Arnold Yerkes cannot pursue any claims outside of the end of her employment in February 2018 because of the statute of limitations and her failure to exhaust administrative remedies.**

In this case, Arnold Yerkes raised a number of claims relating to events from almost the entirety of her career with the Patrol.  However, she is barred from asserting claims under Title VII outside of challenging the end of her employment in February 2018, based on the related doctrines of the statute of limitations and exhaustion of administrative remedies.  Arnold Yerkes filed a charge of discrimination with the EEOC on or around February 23, 2018, alleging that she had been forced to retire on February 12, 2018.  (Arnold Yerkes I, Ex. 94).  This was years after the many minor injuries and slights she alleges in this lawsuit.  Timely administrative exhaustion is a statutory prerequisite to maintaining claims brought under the Title VII.  *See, e.g., Nichols v. Muskingum Coll.*, 318 F. 3d 674, 677 (6th Cir. 2003); *Brown v. Worthington Steel, Inc.*, No. 2:01-

cv-1113, 2003 U.S. Dist. LEXIS 13423 at *3-4 (S.D. Ohio May 21, 2003).  This requirement is designed "to trigger an investigation, which gives notice to the alleged wrongdoer of its potential liability and enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation." *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004).  Consequently, an employee's judicial complaint alleging discrimination must be limited to the scope of the EEOC investigation reasonably expected to grow out of the EEOC charge.  *Id*. at 218.  The failure to timely exhaust administrative remedies is an appropriate basis for dismissal of a claim.  *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990).

Arnold Yerkes filed a charge of discrimination with the EEOC on February 23, 2018. (Arnold Yerkes I, Ex. 94).  In that charge, she alleged that she had been treated to different terms and conditions of employment since the beginning of her employment in 1994.  (See id).  In her Amended Complaint, she recounts general incidents going back to the 1990s that are not mentioned in her charge.  Thus, any claims with regard to those allegations must be dismissed. *See, e.g. Dendinger v. State of Ohio, BCI&I*, 207 Fed. Appx. 521, 526-27 (2006) (affirming grant of summary judgment as to discrete acts not administratively exhausted).

In addition, Arnold Yerkes failed to exhaust her administrative remedies with regard to any alleged actions taken by the Patrol prior to approximately 300 days before she filed her charge following the end of her employment.  Arnold Yerkes filed her first and only charge with the EEOC on February 23, 2018.   Events prior to April 2017 therefore occurred well outside of the EEOC statute of limitations of 300 days.  *Nichols*, 318 F. 3d at 678; *Sherman v. Chrysler Corp.*, 47 Fed. Appx. 716, 721 (6th Cir. 2002) ("each alleged discrete act of discrimination and retaliation must be exhausted and a plaintiff cannot rely on a continuing violations theory").

Therefore, the main dispute in this case, the end of her employment where she alleges she

was forced to retire on February 12, 2018, will be discussed on the merits below.

**B.   The Defendants are Entitled to Summary Judgment on Arnold Yerkes's Claims of Discrimination based on Sex or Sex Stereotyping or Sexual Orientation Under Title VII and 42 U.S.C. § 1983.**

The Defendants are entitled to summary judgment on Arnold Yerkes's claims of discrimination, whether based on sex or sex stereotyping or sexual orientation.  She has no direct evidence of discrimination to support any discrimination claims, i.e. statements tying a prohibited motive to a decision-maker and the adverse action challenged, and she cannot prove a circumstantial case of differential treatment.  The same standards apply to her § 1983 claims. "To establish an equal protection claim against a public employee under § 1983, the plaintiff must show that the employer made an adverse employment decision 'with discriminatory intent and purpose.'" *Weberg v. Franks,* 229 F.3d 514, 522 (6th Cir. 2000). "Because both Title VII and § 1983 prohibit discriminatory employment practices by public employers," the Sixth Circuit "looks to Title VII disparate treatment cases for assistance in analyzing race discrimination in the public employment context under § 1983." *Id.* As such, the plaintiff can survive summary judgment with either direct evidence or under the circumstantial-evidence approach." *See Hopkins v Michigan,* 2018 U.S. Dist. LEXIS 196607, at *47 (E.D. Mi. Nov. 19, 2018).  As will be discussed below, Arnold Yerkes cannot advance a case for discrimination under either evidentiary approach.

In order for a discrimination case to proceed under Title VII, under a theory of either disparate treatment based on sex or sex stereotyping or sexual orientation, to survive a motion for summary judgment, the plaintiff must adduce either direct or circumstantial evidence of unlawful discrimination.  *Simpson v. Vanderbilt Univ.*, 359 Fed. Appx. 562, 568 (6th Cir. 2009). Direct evidence often comes in the form of comments by a person or persons with decision-making

authority regarding a plaintiff's employment.  *See, e.g. Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003).  The *McDonnell Douglas* burden-shifting framework applies where a plaintiff offers no direct evidence of discrimination.  *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)).  Under this framework, the plaintiff must first make out her prima facie case of discrimination, after which the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for its decision.  *Dews v. A.B. Dick Co*., 231 F.3d 1016, 1020–21 (6th Cir. 2000).  If the employer meets its burden, the plaintiff must then prove by a preponderance of the evidence that the employer's proffered reason is pretextual.  *Id*.  Here, Arnold Yerkes does not claim the existence of any direct evidence of discrimination, since she conceded during her deposition that none of the decision-makers who recommended that she be discharged based on her misconduct, Charles Linek, Kevin Teaford, Paul Pride or John Born, ever made any comments to her that she viewed as sexist, gender stereotyping or homophobic, and she has never heard anyone else allege that any of these individuals made such inappropriate comments. (Arnold Yerkes II, 398-403).  Similarly, none of the individual defendants, or anyone else at the Patrol, ever made any comments directly to her about her sex or sexual orientation.  Instead, Arnold Yerkes alleges unlawful discrimination circumstantially, alleging disparate treatment. Accordingly, the *McDonnell Douglas* burden-shifting framework applies.  *Simpson*, 359 Fed. Appx. at 568.

## 1.    Arnold Yerkes does not have Direct Evidence of Discrimination

Arnold Yerkes has no direct evidence of any unlawful discrimination or retaliation in this case.  Direct evidence often comes in the form of comments by a person with decision-making authority regarding a plaintiff's employment.  *See, e.g. Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003) (comments made by non-decisionmaker not direct evidence); *Hopson v.*

22

*DaimlerChrysler Corp.*, 306 F.3d 427, 433 (6th Cir. 2002) (same); *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 354 (6th Cir. 1998)("isolated discriminatory remark made by one with no managerial authority over the challenged personnel decisions is not considered indicative of … discrimination").  Neither did any employee of the Patrol ever make any statements to Arnold Yerkes regarding her sex or sexual orientation.  (Arnold Yerkes I, 214).  Finally, Arnold Yerkes could not recall any statements made to her by Born or Pride or Linek tying the recommendation to remove her from employment to any protected activity or her sex or sexual orientation.  (Arnold Yerkes I, 97-98, 231-32, Arnold Yerkes II, 398-403).

Direct evidence generally requires unmistakable verbal assertions that the plaintiff was treated adversely because of some unlawful factor, such as her sex, sex stereotyping or sexual orientation in this case.  *See Gaffney v. Potter*, 2007 U.S. Dist. LEXIS 85259 (N.D. Ohio Nov. 19, 2007).  *See also Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 570 (6th Cir. 2003) (direct evidence of discrimination, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's action).  Further, direct evidence must be such that it establishes not only that the Patrol was predisposed to act on a discriminatory basis, but also that the Patrol actually acted on that predisposition in this case.  *Hein v. All American Plywood Co*., 232 F.3d 482, 488 (6th Cir. 2000).  Arnold Yerkes has not identified any statement by the authorities responsible for her proposed discipline as evidence that her sex, sexual orientation or any protected activity, played any role in the decision to discipline for her tattoo and her insubordination.  (Arnold Yerkes II, 398-403).  She has no direct evidence of any unlawful discrimination or retaliation.

## 2. Arnold Yerkes Cannot Establish Discrimination Under an Indirect Evidence Framework.

In order to establish a prima face case of unlawful discrimination through circumstantial

evidence under the disparate treatment method, in a case of substantial misconduct and discipline such as this, Arnold Yerkes must demonstrate that 1) she is a member of a protected class; 2) she was qualified for the job and performed it satisfactorily; 3) despite her qualifications and performance, she suffered an adverse employment action; and 4) she was treated less favorably than a similarly situated individual outside of her protected class. *See Barry v. Noble Metal Processing, Inc.,* 276 Fed. Appx. 477, 480 (6th Cir. 2008), *citing Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582-83 (6th Cir. 1992); *see also Braithwaite v. Timken,* 258 F.3d 488, 493 (6th Cir. 2001).[1] In this case, Plaintiff faces serious challenges overcoming the relatively "low bar" of showing a *prima facie* case on the third and fourth elements, since she actually retired despite being given the opportunity to continue her employment, and the substantial misconduct she engaged in was singular – she can point to no comparator who engaged in the same misconduct that she engaged in in this case based on the undisputed facts in the record.

      a.    *Arnold Yerkes Cannot Meet Her Prima Facie Case of Discrimination.*

           i.    <u>Arnold Yerkes Retired from the Patrol Because She would not sign a Last Chance Agreement to continue her employment.</u>

Because Plaintiff voluntarily resigned from her position, her separation from DPS could only be an adverse action if she were constructively discharged. A plaintiff can establish a constructive discharge by showing her employer "deliberately created intolerable working conditions with the intent to force the plaintiff to quit." *Gleed v. AT&T Mobility Servs.*, 613 F. App'x 535, 539-540 (6th Cir. 2015) (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 727-28

---

[1] Courts also have allowed Plaintiffs to satisfy the fourth element of a *prima facie* case of discrimination by a showing that the Plaintiff was replaced by an individual outside the protected classification, *see, e.g. Laster v. City of Kalamazoo, supra*, but in a case of undisputed and substantial misconduct such as this one, this alternative showing should not raise an inference of discrimination.

(6th Cir. 2014)).  There is no evidence that the Patrol intended to force Arnold Yerkes to retire in this case; instead they were enforcing neutral workplace rules and gave her an opportunity to continue her career with the Patrol if she signed a last chance agreement.  In determining whether a reasonable person would have felt compelled to resign due to working conditions, the inquiry should focus on seven relevant factors: "(1) demotion, (2) reduction in salary, (3) reduction in job responsibilities, (4) reassignment to menial or degrading work, (5) reassignment to work under a younger supervisor, (6) badgering, harassment or humiliation by the employer calculated to encourage the employee's resignation, or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." *Logan v. Denny's*, 259 F.3d 558, 569 (6th Cir. 2001).  Again, the offer to continue to work under different terms and conditions of employment was based on Arnold Yerkes's admitted misconduct.  She agreed that she knew she could not have a tattoo on her arm, but did not think it was a "terminable offense." (Arnold Yerkes I, 270).  The offer to continue to work under a last chance agreement all flowed from that choice that she made.  The employee's perception of forced resignation is viewed objectively without a consideration of undue sensitivities. *Peecook v. Northwestern Nat'l Ins. Group*, 1998 U.S. App. LEXIS 18265, *13 (6th Cir. 1998).  In this case, Arnold Yerkes was given the option to continue working at the Patrol, but under different terms because of her admitted misconduct.  She chose not to exercise that right to continue working with the Patrol and essentially resigned her employment.

She had the opportunity to continue employment with the Patrol on a last chance agreement.  Despite the fact that this also involved a demotion and transfer from the Criminal Patrol unit, she cannot say that no reasonable employee would have worked under these conditions.

ii.  Arnold Yerkes Cannot Demonstrate that Similarly-Situated Non-Protected Employees Were Treated More Favorably.

Arnold Yerkes also cannot offer any evidence for the fourth element of her *prima facie case*, that that she was treated differently than a similarly-situated, non-protected employee in the workplace.  In a conclusory fashion, Arnold Yerkes broadly asserts that males and/or heterosexual employees were treated more favorably than her.  However, her discrimination claims fail because she cannot offer evidence of a similarly situated employee who was treated differently; indeed, Arnold Yerkes cannot point to another employee who engaged in similar misconduct, her misconduct was singular.

Arnold Yerkes cannot point to a substantially similar comparator to establish a *prima facie* case.  "It is the plaintiff's burden to establish that a similarly situated person outside the protected class was treated more favorably than [plaintiff]."  *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 728-29 (6th Cir. 2004) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).  To meet this burden, Arnold Yerkes must show that comparable employees "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell,* 964 F.2d at 583.  While an exact correlation is not required, "the employee with whom the plaintiff seeks to compare [her]self ... must be similar in all of the *relevant* aspects." *Ercegovich v. Goodyear*, 154 F.3d 344, 352 (6th Cir. 1998) (internal citations and quotations omitted).

Arnold Yerkes must meet this burden using evidence sufficient under Rule 56, and cannot simply rely upon her own subjective and unverified assertions to create a material question of fact.  *See Anderson*, 477 U.S. at 248-49 (1986).  Similarly, a plaintiff simply arguing about whether removal from employment was appropriate based upon the undisputed facts in the

record is inappropriate.  A court should not speculate as to which rule or rules any alleged comparators may have violated nor will it attempt to weigh the severity of each such speculative infraction.  "[I]t is inappropriate for the judiciary to substitute its judgment for that of management." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000).

Arnold Yerkes has not pointed to any similarly situated employees who were treated more favorably than her; her misconduct was singular.  First, Arnold Yerkes had a fairly unique position within the ACIRT program of the Patrol.  As multiple decision-makers testified, she was also a Sergeant and a supervisor, with responsibility for enforcing the Patrol's rules and regulations.  (Linek 113).  Almost no other Patrol employee had responsibilities similar to Arnold Yerkes's work as a training sergeant.  In comparing the misconduct of employees, the Court does not require "precise equivalence in culpability."  *See Harrison v. Metropolitan Gov't of Nashville and Davidson County*, 80 F.3d 1107, 1115 (6th Cir. 1996).  The plaintiff must show, however, that the employees were engaged in misconduct of comparable seriousness, and that the "non-protected" employees to whom he seeks to compare himself were similarly situated in all respects.  *Id.*  Therefore, Arnold Yerkes must show that the comparators had the same supervisor, were subject to the same standards and engaged in conduct of comparable seriousness.

Further, Arnold Yerkes not only had a tattoo that she deceptively concealed for many months, when questioned on this point, she was insubordinate.  In *Braithwaite*, the plaintiff was fired for two rules violations, and pointed to three other employees who were only suspended for five days for violating one of these two rules.  *Braithwaite*, 258 F.3d at 497.  The court ruled that violating two work rules instead of one was sufficiently distinct to render the other three employees not similarly situated to the plaintiff.  *Id.*  Similarly, her misconduct was unique, she

cannot identify a similar set of circumstances to establish a comparator.

"It is the plaintiff's burden to establish that a similarly situated person outside the protected class was treated more favorably than [plaintiff]." *Noble v. Brinker Int'l, Inc*., 391 F.3d 715, 728-29 (6th Cir. 2004) (*citing Mitchell v. Toledo Hosp*., 964 F.2d 577, 583 (6th Cir. 1992)).  To meet his burden, Arnold Yerkes must show that comparable employees "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583.  While an exact correlation is not required, "the employee with whom the plaintiff seeks to compare [herself] ... must be similar in all of the relevant aspects." *Ercegovich v. Goodyear*, 154 F.3d 344, 352 (6th Cir. 1998).  Arnold Yerkes cannot meet this standard.

Arnold Yerkes had been promoted to the position of supervisor in the Ohio State Highway Patrol and had almost 24 years of experience at the time of her retirement.  As a supervisor, she had authority not only to enforce the laws of the State of Ohio during her interactions with alleged perpetrators, but also to enforce the rules with other Troopers of the Ohio State Highway Patrol.  As a matter of law, she is not similarly situated to the array of other employees of the Ohio State Highway Patrol who were identified during discovery in this case for discipline for insubordination and other rules violations.  She is not similarly situated to Troopers who are not supervisors, Motor Carrier Enforcement Inspectors or Motor Vehicle Inspectors, Administrative Professionals or other employees who engaged in different violations of the appearances policy for instance, by having nail polish at work on a particular day.  The tattoo is different, something much more permanent.  (Linek 112-13).

In addition, when she was confronted regarding her tattoo on February 2, 2018, she was

insubordinate and refused to comply with Captain Kemmer's lawful order. She was not being asked to perform any unlawful act, or any act that would physically harm her.

Therefore, because Arnold Yerkes cannot establish a prima facie case of unlawful discrimination, the Patrol and the individual defendants are entitled to summary judgment as a matter of law.

> **b.      Arnold Yerkes Cannot Establish that the legitimate non-discriminatory reasons for her proposed discipline are Pretextual.**

Even if Arnold Yerkes could establish a *prima facie* case, the Patrol would still be entitled to summary judgment. Once a plaintiff demonstrates a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248 (1981). A defendant need not prove a nondiscriminatory reason for terminating an employee, but rather must only articulate a valid rationale. *See id.* In Arnold Yerkes's case, the reasons for recommending her discharged were established by the Administrative Investigation: she violated the Professional Appearances policy by getting a tattoo and was insubordinate by refusing to answer questions about whether she had a tattoo from Captain Kemmer.

> **c.      Arnold Yerkes's recommended discharge was not merely pretext for discrimination.**

The absence of pretext further entitles the defendants to summary judgment on her discrimination claims. A defendant's production of a legitimate, nondiscriminatory reason for termination or other adverse action not only rebuts the presumption of discrimination created by a plaintiff's *prima facie* case, but also invites summary judgment review of plaintiff's burden to show pretext. *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 661 (6th Cir. 2000). Simply put, Arnold Yerkes has no evidence of pretext.

To demonstrate pretext, a plaintiff is required to show: (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the decision; or (3) that they were insufficient to motivate the employment decision.  *See, e.g., Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008); *see also Manzer v. Diamond Shamrock Chemicals,* 29 F.3d 1078, 1083 (6th Cir. 1994).  "In order to prove pretext, therefore, the plaintiff must introduce admissible evidence to show that the proffered reason was not the true reason for the employment decision and that discriminatory animus was the true motivation driving the employer's determination."  *Grace v. USCAR*, 521 F.3d 655, 677–78 (6th Cir. 2003) (internal citations omitted).  Notably, the absence of evidence of pretext invites summary judgment.  *See, e.g., Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).  The Sixth Circuit has cautioned that *Manzer*'s three part text should not be applied in a formalistic manner.  *See Chen v. Dow Chemical Co.,* 580 F.3d 394, 400 fn. 4 (6th Cir. 2009).  Rather, the Court must bear in mind that "[p]retext is a commonsense inquiry:  did the employer fire the employee for the stated reason or not?"  *Id.*   In this case, Arnold Yerkes's misconduct was conducted by an independent investigator of the Patrol's Administrative Investigation Unit.  Her discipline was recommended by an independent commander of the Patrol's Office of Personnel, and that recommendation was agreed with by Lt. Colonel Kevin Teaford, then-Colonel Paul Pride and then-Director of Public Safety John Born.  All of these individuals are independent from the disputes that she had with coworkers and the individual defendants whose motives she challenges.

In order to establish that the employer's stated reason was a pretext, the plaintiff must produce evidence that could cause a reasonable jury to reject the defendant's explanation and infer that the defendant intentionally discriminated against the plaintiff. *Braithwaite*, 258 F.3d at

493. Such evidence must demonstrate "that the employer did not honestly believe in the proferred non-discriminatory reason for its adverse employment action." *Id.* at 494. In determining whether an employer had an "honest belief" in the proffered basis for the adverse employment action, courts must look to "whether the employer can establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Id.* Arnold Yerkes's only evidence of discrimination are her own personal beliefs. The *Braithwaite* decision makes clear that a plaintiff must go far beyond such conclusory allegations to establish that an employer's claim that it removed an employee for facially neutral reasons was a mere pretext for racial discrimination. None of Plaintiff's claims of pretext undermine the Patrol's assertion that it had a well-founded belief, based on the findings in the Administrative Investigation, that Arnold Yerkes had engaged in substantial misconduct. *See Romans v. Mich. Dept. of Human Svcs.*, 668 F.3d 826, 839 (6th Cir. 2012) (employer's reliance on Summary of Investigation constituted reasonable reliance on particularized facts that were before it at the time the adverse employment decision was made).

Further, if the Patrol had "an honest belief in its preferred non-discriminatory reason" for his removal, Arnold Yerkes "cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). Arnold Yerkes must provide evidence beyond her simple dispute and opinion about the fairness of her recommended discharge since she did not believe the tattoo, which she actively concealed for months, was not a "terminable offense." (Arnold Yerkes I, 270) She must provide evidence from which a jury could conclude that the Patrol, including the Patrol's Office of Personnel, the Colonel and the Director of Public Safety, did not honestly believe that her conduct in having a tattoo placed on her forearm and her insubordination when

31

questioned about it after actively concealing it were legitimate reasons for recommending her removal from employment.  *See, e.g., Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001).  Arnold Yerkes has failed to show that the Patrol applied its policies in a discriminatory fashion and she fails to articulate any clear and substantiated claims of unlawful discrimination with respect to any decision maker.  Arnold Yerkes cannot claim that there is no basis in fact for recommending her removal.

Additionally, Arnold Yerkes has no evidence to show that her misconduct, both her tattoo in violation of policy and insubordination when questioned on the topic, did not actually motivate the decision to recommend her removal from employment.  The Director had the authority to remove her from employment.  Arnold Yerkes did not, and cannot, offer any evidence of discriminatory statements by anyone at the Patrol related to this disciplinary recommendation.  At her deposition, Arnold Yerkes admitted that she could not have the tattoo on her arm, she simply had a different opinion that it was not a "terminable offense."  (Arnold Yerkes I, 270).  As her own partner testified, "[w]hat Stacey did she brought on herself by getting a tattoo."  (Smart 143).  He testified that the two had a conversation in the spring or summer of 2017 when she showed Smart her tattoo, and that he told her she could not have that tattoo and she needed to "get rid of it", and she said she understood and that she would take care of it.  (Smart 144).  Arnold Yerkes cannot seriously contend that her tattoo and insubordination had nothing to do with the decision to recommend her removal from employment.

Finally, Arnold Yerkes's general assertions of discrimination are not sufficient to overcome the Patrol's explanation for recommending her removal.  See *Mitchell*, 964 F.2d at 584-585 (plaintiff's subjective belief and/or conclusory statements are not sufficient evidence to maintain a claim of race discrimination).  The Sixth Circuit has held that an unsubstantiated

32

belief of discrimination does not rise to the level of a scintilla of evidence. *Woythal v. Tex-Tenn Corp.,* 112 F.3d 243, 247 (6th Cir. 1997). As Arnold Yerkes's only evidence is her own personal beliefs, she has no admissible evidence and her discrimination claims should be dismissed.

"[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason," the employee cannot establish pretext simply because the reason is ultimately shown to be incorrect. *Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1117 (6th Cir. 2001). The key to assessing whether an employer had an honest belief is whether the employer made a "reasonably informed and considered decision before taking its adverse employment action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). An employer has an honest belief in its rationale when it "reasonably relied 'on the particularized facts that were before it at the time the decision was made.'" *Majewski*, 274 F.3d at 1117 (*quoting Smith*, 155 F.3d at 807). "[W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith*, 155 F.3d at 807. Instead, a plaintiff must "put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered nondiscriminatory reason for its adverse employment action." *Braithwaite v. Timken Co*., 258 F.3d 488, 494 (6th Cir. 2001) (*citing Smith*, 155 F.3d at 806–07). Here, Arnold Yerkes has no evidence that any of the Patrol's actions were pretextual and in fact based upon her sex or sexual orientation.

In *Braithwaite,* the plaintiff had engaged in two rules violations, and pointed to alleged comparators who had violated one rule. The Sixth Circuit agreed, recognizing that the violation of two rules instead of one rendered the individuals different and not similarly situated for pretext analysis. "As we have oft times repeated, it is inappropriate for the judiciary to substitute its judgment for that of management. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Hedrick v. Western Reserve Care System*, 355 F.3d

33

444, 462 (6th Cir. 2004) (internal citations and quotations omitted).

### 3. Arnold Yerkes Cannot Establish Discrimination Under A Mixed Motive Theory

To survive a motion for summary judgment on her mixed motive theory, Arnold Yerkes must produce evidence sufficient to convince a jury that: (1) DPS took an adverse employment action against Arnold Yerkes; and (2) sex or her sexual orientation was a motivating factor for DPS's adverse employment action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008) (citing 42 U.S.C. § 2000e-2(m)).  Even assuming Arnold Yerkes can show the first prong, she cannot produce sufficient evidence of the second prong.   Plaintiff has not offered any evidence that any of the decision-makers took her sex or sexual orientation into account in making the decision.  Indeed, she admits that she engaged in misconduct.

Importantly, Plaintiff has produced no evidence that the ultimate decision-maker in the disciplinary trail, Born, had any bias toward her because of her gender or sexual orientation. Where a plaintiff fails to provide such evidence, a court will grant summary judgment to the employer on a mixed motive claim.  *See*, *e.g.*, *Wheeler v. City of Columbus*, No. 2:16-CV-1159, 2019 U.S. Dist. LEXIS 133518, at *28 (S.D. Ohio Aug. 8, 2019) (Marbley, J.) (*citing Reed v. Proctor & Gamble Mfg. Co.*, 556 Fed. Appx. 421, 429 (6th Cir. 2014) (unpublished) ("affirming a grant of summary judgment where 'general statements' attesting to bias and animus 'shed no light' on the decision-maker's motivations"); *Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012) ("generally, in a mixed-motive case, there must be evidence of the decision-maker's animus and 'isolated and ambiguous' comments are insufficient").

The investigation of her misconduct was by an independent investigator of the AIU, and the decision-makers reviewing the facts of the case were all independent of her disagreements with coworkers and direct supervisors.  She cannot proceed under a mixed motive theory.

**4.      Arnold Yerkes Cannot Establish Discrimination Under A Cat's Paw Theory.**

Arnold Yerkes does not put forth any evidence that any of the individually named defendants, or anyone else, had a discriminatory intent that could even be imputed to Born.  To properly rely on the cat's paw theory, a plaintiff must show an "agent[s] committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment action."  *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011) (internal footnote omitted).   Again, there was an independent administrative investigation and a recommendation for discipline from independent decision-makers based on her admitted misconduct.  Arnold Yerkes can point to nothing in the record to demonstrate the requisite discriminatory animus by Kemmer or Stidham or any of her other supervisors—the administrative investigator responsible for the investigation into Arnold Yerkes's misconduct or anyone else in the disciplinary trail.

In such a situation, the Sixth Circuit supports summary judgment for an employer.  For example, in  *Voltz v. Erie County*, 617 Fed. Appx. 417, 423-26 (6th Cir. 2015), the court found the plaintiff failed to establish the necessary sex-based or national origin-based discriminatory animus to support a cat's paw argument that the director of human resources harbored discriminatory animus which led to the Board's termination of the plaintiff.  Importantly, the court noted, "'[E]vidence of animus is difficult to demonstrate.' . . . 'Discriminatory animus ... requires a showing of prejudice, spite, or ill will.'"  Id. at 424-25 (*citing Thompson v. UHHS Richmond Heights Hosp., Inc.*, 372 F. Appx. 620, 626 (6th Cir. 2010); *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 344 (11th Cir. 2012)).  The court found there was no evidence of discriminatory animus on the part of the human resources director, even though at one point the human resources director commented the plaintiff's "'command presence' was an issue in a building 'full of estrogen ... as a male, he was not going to survive . . . .'"  *Id.*  The Sixth Circuit

affirmed summary judgment on the plaintiff's sex and national origin discrimination claims.  *Id.* at 428.

Here, Arnold Yerkes has no evidence of discriminatory animus by any of the decision-makers or of the individual defendants that resulted in an unlawful action.  Accordingly, any discrimination claim based on a cat's paw theory must fail.

### C.    Arnold Yerkes Cannot Establish a Claim of Retaliation.

Arnold Yerkes's claim of retaliation fares no better than her claims for sex and sexual orientation discrimination.  A plaintiff may demonstrate she suffered unlawful retaliation in either of two ways: "by introducing direct evidence of discrimination or by proving circumstantial evidence which would support an inference of discrimination." *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 572 (6th Cir. 2000).  Arnold Yerkes has presented no direct evidence that she was subjected to unlawful retaliation and must therefore use the *McDonnell Douglas* framework to establish her *prima facie* case of retaliation by showing that (1) she engaged in protected activity; (2) the Patrol knew Arnold Yerkes engaged in protected activity; (3) the Patrol took a materially adverse employment action against her; and (4) there is a "but-for" causal connection between the protected activity and the materially adverse action.  *See Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014), *citing Jones v. Johanns*, 264 Fed. Appx. 463, 466 (6th Cir. 2007) (internal citations omitted)).  The "but-for" causation standard "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *See Univ. of Tex. SW Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  Here, Plaintiff's protected activity is mentioning during her investigatory interview that she had filed a charge of discrimination with the EEOC.   There is no evidence in this case that "but for" this statement no adverse action would have occurred.

Arnold Yerkes already had a tattoo and was under investigation for the tattoo and insubordination on February 5, 2018 when she stated in her investigatory interview that she had filed a claim with the EEOC. She cannot simply stop a valid investigation into her misconduct by stating that she was filing an EEOC claim. Put another way "… the act of filing an EEOC claim does not immunize her from all negative feedback in her workplace." *Russell v Ohio Dept. of Admin. Servs.,* 302 Fed. Appx. 386, 394 (6th Cir. 2008) (anti-retaliation provisions do not immunize employee from all negative feedback in the workplace).

Looking at the recommendation for her removal in February 2018, Arnold Yerkes has problems establishing the relatively low bar of a *prima facie case* of retaliation. On the decision to recommend her discharge from employment, she cannot put forth sufficient evidence to show that her weak assertion of any "protected activity" was "causally connected" to the final decision. She must show that but for her protected activity, show would not have been disciplined. *See Univ. of Tex. SW Med. Ctr. v. Nassar,* 570 U.S. 338 (2013). This she cannot do; her misconduct was substantial. She cannot claim to be the "trouble-free" employee who was suddenly subject to retaliation after some protected activity. *See Canitia v Yellow Freight Sys., Inc.,* 903 F.3d 1064, 1067 (6th Cir. 1990) (Plaintiff had received multiple disciplines prior to making a complaint of race discrimination and the Court noted "we are not examining the case of a trouble-free employee during the months and years before the incident he alleges gave rise to a retaliatory motive and subsequent and sudden job warnings by the employer."). In this case, the undisputed facts show that Arnold Yerkes already faced significant discipline as a result of her misconduct, and her allegation that she had filed an EEOC claim was irrelevant to the investigation of that misconduct and the proposed implementation of discipline.

Similarly, the vague assertion that she had spoken with her supervisor, Nathan Dickerson,

prior to this time about unfair treatment does not amount to protected activity. First, Lt. Dickerson himself stated that he did not tell any other supervisors that Arnold Yerkes was thinking about filing a claim with the EEOC. Second, when she spoke to him, he said that she did not allege to him that she believed she was being treated differently because she was a woman or because she was gay. This is too vague an assertion to support a retaliation claim. As one example, the Sixth Circuit has recognized that a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice. *See Fox v. Eagle Distributing Co., Inc*., 510 F.3d 587, 591 (6th Cir. 2007) (under ADEA anti-retaliation provision, plaintiff's expression must concern a violation of ADEA); *see also Willoughby v. Allstate Ins. Co*., 104 Fed. Appx. 528, 531 (6th Cir 2004) (rejecting claim that letter sent preceding retaliation constituted protected activity where letter made vague references to unhappiness among Caucasian employees). In addition, simply complaining to one employee of an institution cannot impute knowledge of the alleged protected activity to a decision-maker. *See, e.g., Kyle-Eiland v. Neff*, 408 Fed. Appx. 933, 941 (6th Cir. 2011)(knowledge of OCRC filings by human resources manager cannot be imputed to supervisor of plaintiff without supporting evidence).

Consequently, her only assertion of protected activity that any of the decision-makers had knowledge of was her statement, memorialized in the AI report, that she had just filed an EEOC claim. This is too late since she had already engaged in misconduct, and cannot form the basis of a causal connection under well-established case law.

A final problem with her attempt to simply establish a *prima facie case,* is how attenuated any of this alleged protected activity is, and the inability to causally connect it to the decision to recommend her discharge from employment. To establish a causal connection between the

protected activity and adverse employment action, a plaintiff must present evidence "sufficient to raise [an] inference that her protected activity was the likely reason for the adverse action." *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990).  To demonstrate a causal connection between an adverse action and the exercise of protected rights, "a plaintiff must proffer evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action."  *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).  Arnold Yerkes bears the burden of demonstrating the causal connection. *Killian v. Yorozu Auto. Tenn., Inc.,* 454 F.3d 549, 556 (6th Cir. 2006).  She must show that the Patrol's stated reasons for recommending her removal were pretextual and the true reason for these adverse actions was retaliation for some conversations of which she cannot remember the date, and can only generalize the content.

To show a causal connection, Arnold Yerkes must "proffer evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action."  *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990).  Moreover, the claim "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 360 (2013).  That she cannot do. She cannot contend that simply stating during an interview in her administrative investigation that she had filed, or was going to file, a claim with the EEOC, resulted in retaliation.

Arnold Yerkes would like to rely on temporal proximity. However, it is clear that temporal proximity alone is insufficient; to show a causal connection, there must be something more than temporal proximity. *Wasek v. Arrow Energy Servs*., 682 F.3d 463,471–72 (6th Cir. 2012) ("But we have repeatedly cautioned against inferring causation based on temporal

proximity alone.").  She knew the tattoo was misconduct when she spoke to Sergeant Smart earlier in 2017, the issue arose in August 2017 and again in October 2017, all well before she went into an investigatory interview on February 5, 2018 and said that she had filed a claim with the EEOC.  The causation element overcomes any weak attempt to claim temporal proximity here.

Further, even assuming that Arnold Yerkes is able to demonstrate a prima facie case of retaliation, the Patrol has proffered legitimate, non-retaliatory reasons for its actions that were thoroughly detailed above.  Arnold Yerkes cannot demonstrate that the Patrol's thoughtful, articulated reasons for its decisions, are not grounded in fact, did not actually motivate the Patrol's decisions, or are insufficient.  She simply relies on conjecture and supposition to try to overcome the Patrol's actions, which is insufficient as a matter of law.

As discussed above, Arnold Yerkes cannot claim to be a "trouble free" employee who was suddenly subject to retaliation after some protected activity.  *See, e.g., Canitia v. Yellow Freight Sys., Inc.*, 903 F.3d 1064, 1067 (6th Cir. 1990) (Plaintiff had received multiple disciplines prior to making a complaint of race discrimination and the Court noted "we are not examining the case of a trouble-free employee during the months and years before the incident he alleges gave rise to a retaliatory motive and subsequent and sudden job warnings by the employer.")  To challenge this decision, Arnold Yerkes has the burden not just to show that the recommendation to remove her was somehow incorrect or unfair, or that she (or anyone else) has a difference of opinion with the decision-makers, but that the reasons for the recommendation to remove her from employment were a lie and a pretext to retaliate against her for her any Title VII protected activity.  This she cannot do.  As long as the employer had an honest belief in its proffered reason, the employee cannot establish pretext even if the employer's reason is

ultimately found to be mistaken, foolish, trivial or baseless.  *See Seeger v. Cincinnati Bell Telephone Co.,* 681 F.3d 274, 285-86 (6th Cir. 2012).  The record is undisputed here that Arnold Yerkes's own partner, Shaun Smart, told her many months before the investigation that the tattoo was a problem, that she could not have it, and needed to take steps to get rid of the tattoo. "Evidence that an employer has been concerned about a problem before the employee engaged in protected activity undercuts the significance of the temporal proximity."  *Sosby v. Miller Brewing Co*., 415 F.Supp.2d 809, 822 (S.D. Ohio 2005).  Here, the tattoo was the subject of rumors for many months, undercutting any claim by Arnold Yerkes that temporal proximity is evidence of unlawful motivation and retaliation.

Arnold Yerkes cannot show that the reasons for recommending her removal from employment were a pretext for unlawful retaliation.  Her own subjective belief is not any evidence of unlawful discrimination.  Just as in other employment discrimination cases, Arnold Yerkes's general assertions of unlawful discrimination are not sufficient to overcome the Patrol's well-documented explanations for recommending her removal from employment.  *See, e.g., Mitchell v. Toledo Hosp*., 964 F.2d 577, 584-585 (6th Cir. 1992) (a plaintiff's subjective belief and/or conclusory statements are not sufficient evidence to maintain a claim of race discrimination).  The Sixth Circuit has held that an unsubstantiated belief of discrimination does not rise to the level of a scintilla of evidence.  *Woythal v. Tex-Tenn Corp*., 112 F.3d 243, 247 (6th Cir. 1997).

The absence of pretext further entitles the defendants to summary judgment.  A defendants' production of a legitimate, nondiscriminatory reason for termination or other adverse action not only rebuts the presumption of discrimination created by a plaintiff's prima facie case, but also invites summary judgment review of plaintiff's burden to show pretext.  *Cline v.*

*Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000). Simply put, Arnold Yerkes has no evidence of pretext in this case. To prove pretext, a plaintiff can demonstrate that the employer's proffered reasons had no basis in fact, or that the reasons stated were insufficient to motivate the action taken or did not actually motivate the adverse action. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000). Shifting or inconsistent explanations for action are generally good evidence of pretext. *See, e.g., Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 319 (6th Cir. 2007). Arnold Yerkes has no such evidence here, since her misconduct is undisputed. Her own opinion that her tattoo was prohibited by policy but not a "terminable" offense is just that – her opinion – and not evidence of any unlawful motivation.

Without some other evidence, Arnold Yerkes cannot meet his burden to create a genuine issue of material fact to support her retaliation claims. Arnold Yerkes must meet her burden using evidence sufficient under Rule 56. A court should not speculate and substitute its judgment for that of management.'" *See, e.g., Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) (*citing Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004). Arnold Yerkes's claims of "retaliation" for protected activity do not raise any genuine questions of material fact requiring a trial, and should be dismissed.

To the extent Arnold Yerkes would try to raise a cat's paw argument under her retaliation claim, such a theory also fails. Arnold Yerkes can point to no evidence that "(1) non-decisionmakers took actions intended to produce a materially adverse employment action against the plaintiff in retaliation for her protected conduct; and (2) those retaliatory actions were a but-for cause of the decision-maker's ultimate materially adverse employment action." *Wheeler v. City of Columbus*, No. 2:16-CV-1159, 2019 U.S. Dist. LEXIS 133518, at *41 (S.D. Ohio Aug. 8, 2019) (Marbley, J.) (*citing Seoane-Vazquez v. Ohio State Univ.*, 577 Fed. Appx. 418, 428 (6th

Cir. 2014) (unpublished)).  After depositions and documents are reviewed in this matter, there is no evidence that anyone outside of the relevant decision-makers exercised some singular influence to accomplish an unlawful result.  No allegations of discriminatory animus or motive are made against Charles Linek, Kevin Teaford, Paul Pride or John Born in this case.  There was an independent administrative investigation that found Arnold Yerkes had a tattoo in violation of policy and that she was insubordinate when she was questioned about the tattoo.

In sum, Arnold Yerkes cannot point to any evidence of pretext to establish that "but for" her alleged protected activity she would have been treated differently.  Accordingly, her retaliation claim fails as a matter of law.

### D. The Individual Defendants are entitled to qualified immunity on Arnold Yerkes's claims against them in their individual capacities.

In Claims V and VI of the Amended Complaint, Arnold Yerkes alleges that the individual defendants deprived her of equal protection of the law in violation of 42 U.S.C. § 1983, because of her sex and/or sexual orientation.  As discussed above under Title VII, the undisputed facts demonstrate that no unlawful discrimination occurred in this case.  Defendants Smith, Kemmer, Stidham and Wyckhouse, in their individual capacities, are entitled to qualified immunity as no constitutional violation occurred and none of them violated any clearly established law.  Once a defendant raises qualified immunity, the burden is on the plaintiff to demonstrate that the official is not entitled to qualified immunity.  *See Smoak v. Hall,* 460 F.3d 768,777 (6th Cir. 2006); *Silberstein v. City of Dayton,* 440 F.3d 306, 311 (6th Cir. 2006). "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  "Qualified immunity is an entitlement not to stand trial or fact the other burdens of

litigation." *Saucier v. Katz,* 533 U.S. 194, 200 (2001).

To overcome a claim of qualified immunity, a plaintiff must establish both that: (1) the defendant's conduct violated a constitutional right; and (2) the right was clearly established. *See Saucier,* 533 U.S. at 201. Specifically, the Plaintiff must establish that the right was so clearly established that a reasonable person in defendant's position would have clearly understood that he was under an affirmative duty to refrain from such conduct. *See id.; see also Washington v. Newsom,* 977 F.2d 991, 992 (6th Cir. 1992). Additionally, a defendant is entitled to qualified immunity for his reasonable but mistaken belief as to the legality of his actions. *See Saucier,* 533 U.S. at 206.

### 1. The individual defendants did not violate Plaintiff's constitutional rights.

In this case, first, as discussed above in the Title VII discussion, Plaintiff cannot establish a *prima facie* case of disparate treatment and she cannot demonstrate that her proposed discipline was a pretext for sex discrimination or discrimination against her based on her sexual orientation. Ergo, she was not deprived of the equal protection of the laws by the individual defendants or anyone else.

In addition, after discovery in this case, it is undisputed that none of the individual defendants were decision-makers who recommended that Arnold Yerkes be removed from employment with the Patrol. While the Sixth Circuit has held that "an influential recommender" can be liable under § 1983 without being the final decisionmaker, there must be a showing that the recommendations are "sufficiently influential." *See Ward v. Athens City. Bd. Of Edn., 187 F.3d 639 (6th Cir. 1999),* (*citing Adkins v. Bd. Of Edn.,* 982 F.3d 952 (6th Cir. 1993). No such showing can be made here with any of the individual defendants. There is no genuine issue of material fact regarding the sufficiency of influence of any of the individual defendants. *Cf*

*Stinebaugh v. City of Wapakoneta,* 630 Fed. Apx. 522, 530 n. 2 (6th Cir. 2015) (denying summary judgment to fire chief, despite the city safety director's final say in the plaintiff's termination, because "a reasonable jury could find that [the chief] played an influential role in [plaintiff's] demotion and termination").  As discussed above, the Patrol is a public employer, and Arnold Yerkes's position as a Sergeant was governed by a collective bargaining agreement that had to be followed in the imposition of any formal discipline.  In her case, the proposed discipline of removal from employment was recommended by then-Captain Charles Linek in the Patrol's Office of Personnel, it was agreed with by Colonel Paul Pride and Lt. Colonel Kevin Teaford, and was agreed with by the Director of the Department of Public Safety, John Born. All of the testimony and documentation shows that this was an independent process that was not manipulated by any of the individual defendants.

The analysis for whether Plaintiff's claim(s) of unlawful discrimination may proceed past summary judgment is essentially the same as under Title VII, and she cannot meet this standard. "To establish an equal protection claim against a public employee under § 1983, the plaintiff must show that the employer made an adverse employment decision "with discriminatory intent and purpose." *Weberg v. Franks,* 229 F.3d 514, 522 (6th Cir. 2000).  "Because both Title VII and § 1983 prohibit discriminatory employment practices by public employers," the Sixth Circuit "looks to Title VII disparate treatment cases for assistance in analyzing race discrimination in the public employment context under § 1983." *Id.* As such, the plaintiff can survive summary judgment with either direct evidence or under the circumstantial-evidence approach." *See Hopkins v Michigan,* 2018 U.S. Dist. LEXIS 196607, at *47 (E.D. Mi. Nov. 19, 2018).

**2. The individual defendants did not violate any clearly established law.**

In this case, Plaintiff has actually filed a constructive discharge lawsuit under 42 U.S.C.

§1983 against four individual defendants who, while they did serve as supervisors at the time of her retirement in February 2018, none of them had the authority to remove her from employment. Plaintiff does not allege a sexual harassment claim under 42 U.S.C. § 1983 as in other cases, *see, e.g., Keaton v. Ohio,* 2002 U.S. Dist. LEXIS 19993 (S.D. Ohio June 3, 2002), but instead strictly argues a claim for "termination" of her employment in Counts V and VI of her Complaint. Instead, Plaintiff is attempting to assert a novel, "reverse" cat's paw case against the individual defendants, none of whom had the legal authority to terminate her employment with the Ohio State Highway Patrol. Although, for the sake of argument in this motion, she may state a claim against the Patrol for "constructive discharge" under Title VII (which the Patrol and the defendants do <u>not</u> concede), *see, e.g., Logan v. Denny's Inc*., 259 F.3d 558 (6th Cir. 2001) (discussing elements of a constructive discharge claim), no such case law supports a claim against individual supervisors of her employer in a case where none of the defendants have the lawful authority to effect her removal from employment.

In its earlier order, denying the Defendants' motion to dismiss (Doc. #29), the Court noted that the Sixth Circuit has applied the cat's paw theory of liability in § 1983 cases, citing *Paterek v. Vill. of Armada,* 801 F.3d 630, 651 (6th Cir. 2015). (Doc. #29, p. 31, PAGEID # 609). In the *Paterek* case, however, the Plaintiff was not an employee of the Village, but instead provided evidence that a Village administrator had directed a Village inspector to unfairly issue citations to Plaintiff. The case does not involve a public employee, and certainly not a case where the individual supervisors cannot order the removal of an employee with protections of the union and a collective bargaining agreement, and in this case there is no testimony that any of the individual defendants exercised a "singular influence" over the process. At most, the individual defendants merely recommended that Arnold Yerkes be investigated for a tattoo in violation of

policy (and insubordination when she refused to answer questions about whether she had a tattoo).  Since she did, in fact, have a tattoo, there is no constitutional violation for simply recommending investigation.

In *Pearson v. Callahan,* 555 U.S. 223 (2009), the Court held that courts may grant qualified immunity on the ground that a purported right was not "clearly established" by prior case law, without resolving the often more difficult question of whether the purported right exists at all.  *Id.,* at 227.  The Court can dismiss this "constructive discharge" claim under 42 U.S.C. § 1983 because no clearly established case law supports pursuing such a constructive discharge claim under an equal protection theory enforced under 42 U.S.C. § 1983, against these individual defendants.  In *Davis v. Scherer,* 468 U.S. 183 (1984), the U.S. Supreme Court ruled that "neither federal nor state officials lose their immunity by violating the clear command of a statute or regulation – of federal or of state law – unless that statute or regulation provides the basis for the cause of action sued upon."  *Scherer,* 468 U.S. at 194 n. 12.  Even if this Court were to decide, as a matter of first impression, that a claim for constructive discharge is cognizable under an equal protection theory enforceable under 42 U.S.C. § 1983, the defendants are still protected by qualified immunity because such a right was not "clearly established" at the time of the her retirement in February 2018 which she challenges.   Whether the relevant right is "clearly established" and thus sufficient to overcome qualified immunity is determined by reference to the published decisions of the U.S. Supreme Court or the Sixth Circuit.  *See Ohio Civil Serv. Employees Ass'n v. Seiter,* 858 F.2d 1171 (6th Cir. 1988).  "[I]t is only in extraordinary cases that we can look beyond Supreme Court and Sixth Circuit precedent to find clearly established law." *Gragg v. Kentucky Cabinet for Workplace Dev.,* 289 F.3d 958, 964 (6th Cir. 2002).

The inquiry into whether a right was "clearly established" requires that a court first define

the right at the appropriate level of particularity.  For a right to be "clearly established" (or "settled") the right allegedly violated must be established "not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Reichle v. Howards,* 566 U.S. 658, 665 (2012) (internal citations omitted).  Here, Arnold Yerkes lawsuit raises novel legal arguments against these individual defendants, none of whom were "decision-makers" who could make a recommendation that she be removed from employment with the Patrol  Her Amended Complaint raises various theories arguing pretext and agency principles that she attributes broadly to all the individually named "defendants" without relying on clearly established law to show what standards of equal protection were violated simply for recommending that she be investigated for violating workplace rules that she was in fact violating.

Once the right is framed at the appropriate level of particularity, the reviewing court must ask whether "every reasonable official would [have understood] that what he is doing violates that right." *Reichle,* 566 U.S. at 654-55 (citations omitted, brackets in original).  This standard requires either "controlling authority" or "a robust consensus of cases of persuasive authority" of sufficient clarity to have placed "the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011) (quotations omitted).  Here, it cannot be said to be "beyond debate" that the novel legal theory Plaintiff is pursuing under 42 U.S.C. § 1983 given the paucity of precedent to support it.  When "judges … disagree on [the] constitutional question" presented, it would be "unfair to subject [government officials] to money damages for picking the losing side of the controversy." *Wilson v. Layne,* 526 U.S. 603, 618 (1999); *see also Reichle,* 566 U.S. at 654-55.  The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, constitute a constitutional violation.

*See Hope v. Pelzer*, 536 U.S. 730, 736 (2002).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Again, at most, what the record evidence show is that one or all of the individual defendants recommended that Arnold Yerkes be investigated for violating the Professional Appearances policy based on the allegation that she had a tattoo.  Recommending investigation in and of itself is not an adverse action that is actionable under 42 U.S.C. § 1983.  *See, e.g., Magley v. Wright,* 2001 U.S. Dist. LEXIS 4612 at *19 (W.D. Mich. Mar. 30, 2001) ("an employer's commencement of an investigation, [or] … criticisms, accusations, threats, or 'bad mouthing' are not enough" to constitute adverse actions in First Amendment retaliation cases); *see also Hornbeak-Denton v. Myers,* 361 Fed. Appx. 684, 688 (6th Cir. 2010) (in First Amendment retaliation case, finding that "[m]ere threats … are generally not sufficient to satisfy the adverse action requirement")  The standard for determining individual capacity claims in a §1983 action is whether the named defendant engaged in "active unconstitutional behavior." *McKenna v. Bowling Green State Univ.*, 568 F. App'x 450, 460 (6th Cir. 2014).  A person cannot be held liable under § 1983 for mere failure to act.  *Poe v. Haydon*, 853 F.2d 418 (6th Cir. 1988) (Supervisors who did not participate in sexual harassment but were merely aware of it and failed to act are not liable under § 1983).  To establish §1983 liability against a person in their individual capacity, the plaintiff must prove "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  To meet her burden, Arnold Yerkes must allege *with particularity* facts that demonstrate what the individual defendants did to violate the asserted right, here her right to employment.  *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008) ("This Court has

49

consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right.")  Arnold Yerkes claim fails on this point, as well as the merits.

In order to hold individuals liable in their individual capacities under § 1983, a plaintiff must show that each defendant was personally involved in the alleged constitutional deprivations.  *Desoto v. Bd. of Parks and Rec.*, 64 F. Supp. 3d 1070, 1087 (M.D. Tenn. 2014) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).   To do so, the plaintiff "must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States, (2) caused by a person acting under color of state law." *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012).   The Sixth Circuit "has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right." *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008) (emphasis in original) *see also Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 563 (6th Cir. 2011) ("We must analyze separately whether [the plaintiff] has stated a plausible constitutional violation by each individual defendant, and we cannot ascribe the acts of all individual defendants to each individual defendant.").   Only the defendants who were responsible for the discriminatory decision can be held liable under § 1983. *Oldfather v. Ohio Dep't of Transp.*, 653 F. Supp. 1167, 1180 (S.D. Ohio 1986).   Under these long-standing precedents, the individual defendants did not personally act to end the employment of Arnold-Yerkes, and should be dismissed from the case.

Again, § 1983 liability cannot be premised on a theory of *respondeat superior*. *Leary v.*

*Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003) (citing *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995)).  A supervisor may be held liable only when "the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it," or "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Leary*, 349 F.3d at 903 (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)).

The Administrative Investigation and disciplinary trail in this case demonstrate that there are no material questions of fact that none of the individual defendants manipulated or controlled the investigation, and none of the individual defendants manipulated or controlled the disciplinary recommendation.

Neither should a purported "failure to act" by one of the individual defendants form a basis for liability.  Negligence is not actionable under 42 U.S.C. § 1983.  *Daniels v. Williams*, 474 U.S. 327, 334 (1986).  Plaintiff must present evidence that Smith did more than play a passive role in the alleged decision.  Nor has Plaintiff adequately demonstrated any supervisory liability on the part of the Individual Defendants.  In order to show supervisory liability, a plaintiff must "show that the [supervisor] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson Cnty. Ky.*, 668 F.2d 869, 874 (6th Cir. 1982)).  "A supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it." *Id*. (quoting *Hays*, 668 F.2d at 874).  Supervisory liability under 42 U.S.C. § 1983 cannot attach where the allegation of liability is based upon a mere failure to act. *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999).

51

To the extent Arnold Yerkes attempts to focus in on the Last Chance Agreement that was offered to her was somehow discriminatory, this claim fails as well.  First, none of the individual defendants actually "offered" her the LCA, which she did not sign.  The Sixth Circuit has specifically held that neither unsatisfactory work reviews nor an employer's placement of an employee on a performance improvement plan constitutes an adverse employment action under Title VII.  *Choulagh v. Holder*, 528 F. App'x 432, 438-439 (6th Cir. 2013).  Importantly, a "Last Chance Agreement – in and of itself – does not constitute an 'adverse employment action' for purposes of [a Title VII claim for discrimination/retaliation claim] since it did not require Plaintiff to adhere to stricter rules than other employees."  *McGhee v. Country Fresh, LLC*, 2011 U.S. Dist. LEXIS 29423, *11 (E.D. Mich. Jan. 11, 2011).  LCAs are "probationary contracts negotiated by an agency with an employee who faces removal or serious discipline for poor performance.  In exchange for the employer's withholding the adverse action, the employee pledges rehabilitation or job performance improvement in specific ways."  *United States Dep't of Air Force v. Federal Labor Relations Authority*, 949 F.2d 475, 478 (D.C. Cir. 1991).  The fact that plaintiff's removal would have been effectuated had she not signed the LCA does not mean that her decision to execute the LCA would be involuntary.  *Boykin v. England*, 2003 U.S. Dist. LEXIS 13350, *20-21 (D.C. July 16, 2003)(citing *Williams v. United States Postal Service*, 58 Fed. Appx. 469, 471 (Fed. Cir. 2003) ("The unpleasant alternative of removal that [plaintiff] faced does not render his acceptance of the [last chance] agreement involuntary, nor does it amount to coercion or duress.").

Even if Arnold-Yerkes' Equal Protection claims had potential merit in substance against any of the named Defendants, all Defendants enjoy qualified immunity for both claims.  The qualified immunity doctrine shields government officials performing discretionary functions

from civil liability unless their conduct violates clearly established rights. *See Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011). Thus, a defendant is entitled to qualified immunity unless the plaintiff can establish: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Bailey v. City of Port Huron,* 507 F.3d 364, 366 (6th Cir. 2007).

## IV.    Conclusion

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment. There are no genuine issues of material facts and the defendants are entitled to judgment as a matter of law. This lawsuit should be dismissed.

Respectfully submitted,

DAVE YOST (0056290)
Ohio Attorney General

*/s/ Rory P. Callahan*

RORY P. CALLAHAN (0072021)
*Trial Counsel*
Principal Assistant Attorney General
Education Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
(614) 466-4391 – Telephone
(614) 644-7634 – Facsimile
rory.callahan@ohioago.gov

AMY RUTH ITA (0074520)
Principal Assistant Attorney General
Employment Law Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
(614) 644-7257 - Telephone
(614) 752-4677 - Facsimile
elsreview@ohioago.gov

*Counsel for Defendants Ohio State Highway Patrol, Gene Smith, Michael Kemmer, William Stidham and Scott Wyckhouse*

## **CERTIFICATE OF SERVICE**

This will certify that the foregoing *Motion for Summary Judgment of Defendant Ohio State Highway Patrol and Motion for Summary Judgment and/or for Qualified Immunity of Individual Defendants Gene Smith, Michael Kemmer, William Stidham and Scott Wyckhouse* was filed electronically on June 11, 2021.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Rory P. Callahan*

RORY P. CALLAHAN (0072021)
*Trial Counsel*
Principal Assistant Attorney General