# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**STACEY ARNOLD YERKES,**

        **Plaintiff,**

    **v.**

                                        **Case No. 2:19-cv-2047**

                                        **JUDGE EDMUND A. SARGUS, JR.**

**OHIO STATE HIGHWAY PATROL,**                    **Magistrate Judge Elizabeth Preston Deavers**

        **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Judgment as a Matter of Law, or for a New Trial, or for Remittitur (ECF No. 180) and on Plaintiff's Motion for Attorney's Fees, Costs, Pre-Judgment Interest, Post-Judgment Interest, and Equitable Relief (ECF No. 181). The trial in this case concluded on August 8, 2023. (*See* Jury Verdict, ECF No. 175.) A jury found in favor of Plaintiff, Stacey Arnold Yerkes, on her discrimination and retaliation claims against Defendant, Ohio State Highway Patrol, under Title VII of the Civil Rights Act of 1964. (*Id.*) The jury awarded her compensatory damages, back pay, and front pay. (*Id.*)

For the reasons stated in this Opinion and Order, this Court **DENIES** Defendant's Motion for Judgment as a Matter of Law, **DENIES** Defendant's Motion for a New Trial, and **GRANTS** Defendant's Motion for Remittitur. (ECF No. 180.) Further, this Court **GRANTS IN PART and DENIES IN PART** Plaintiff's Motion (ECF No. 181) as described in this Opinion and Order.

## BACKGROUND

Plaintiff Stacey Arnold Yerkes worked as a sworn officer at the Ohio State Highway Patrol from 1994 until 2018, obtaining the rank of Sergeant. (Order Denying MSJ, ECF No. 112, PageID

7245.) From 2014 until her retirement from the Patrol in 2018, Plaintiff worked as a Criminal Interdiction Training Sergeant and trained law enforcement officers throughout the country. (*Id.*) She alleged that while she was employed at the Patrol, other employees, including those in supervisory positions, made discriminatory and derogatory comments about women. (*Id.*, PageID 7246.) Lieutenant Nathan Dickerson, who was Plaintiff's direct supervisor, testified in a deposition that he heard these remarks from his supervisor Lieutenant William Stidham, Stidham's supervisor Captain Michael Kemmer, Kemmer's supervisor Major Gene Smith, and Plaintiff's coworker Lieutenant Scott Wyckhouse (together, "Individual Defendants"). (*Id.*)

Plaintiff, who is a gay woman, further alleged that the Individual Defendants targeted her for minor rule infractions and subjected her to demeaning tasks in ways different from her colleagues who were heterosexual men. (*Id.*, PageID 7247.) After raising her sex discrimination concerns at a meeting on January 26, 2018, where Defendants Kemmer and Stidham were present, Plaintiff filed an Equal Employment Opportunity Commission (EEOC) charge on January 29, 2018, alleging sex and sexual orientation discrimination. (*Id.*) One day later, Defendant Wyckhouse reported to Defendant Stidham that troopers under Plaintiff's supervision were upset because Plaintiff had a tattoo on her arm in violation of the Patrol's appearance standards policy. (*Id.*, PageID 7248.) On February 2, 2018, Defendant Kemmer confronted Plaintiff and ordered her to remove a medical sleeve concealing the tattoo, and Plaintiff refused. (*Id.*) Defendant Kemmer reported the incident to the personnel department. (*Id.*, PageID 7248–49.)

On February 5, 2018, the personnel department investigated Plaintiff for violating the appearance standards policy and for insubordination. (*Id.*, PageID 7249.) Two days later, Patrol officials recommended to Colonel John Born that the Patrol offer Plaintiff the choice to have her employment terminated or to sign a Last Chance Agreement (LCA) under which the Patrol would

demote her, pay her less, and require her to remove her tattoo. (*Id.*) She also would have to withdraw her EEOC complaint and waive her right to file future claims about past Patrol actions. (*Id.*) On February 8, 2018, Colonel Born, Director of the Department of Public Safety, approved the disciplinary decision, and the Patrol made the LCA offer to Plaintiff. (*Id.*) Instead of taking the offer, Plaintiff retired from the Patrol on February 12, 2018. (*Id.*, PageID 7250.)

Plaintiff filed this lawsuit against the Patrol on May 20, 2019, alleging the Partrol discriminated and retaliated against her based on her sex and sexual orientation, in violation of Title VII of the Civil Rights Act of 1964. (Amended Compl., ECF No. 13.) She also alleged that Individual Defendants discriminated against her based on her sex and sexual orientation, in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983. (*Id.*) Defendants moved for summary judgment and asserted that Individual Defendants were entitled to qualified immunity. (ECF No. 96.) This Court denied that motion, holding that Individual Defendants were not entitled to qualified immunity. (Order Denying MSJ, PageID 7265.) On appeal, the Individual Defendants were found to be entitled qualified immunity. (*See* ECF No. 119); *Yerkes v. Ohio State Highway Patrol*, No. 22-3030, 2022 WL 17753528 (6th Cir. Dec. 19, 2022). The case then proceeded to trial against the lone remaining Defendant, the Patrol.

On the first day of trial, July 31, 2023, Plaintiff informed the Court that one of her witnesses, Lt. Dickerson, who now lives in Hawaii, had not yet responded to her subpoena. (Transcript, ECF No. 182, PageID 8692–93.) Plaintiff had arranged for Lt. Dickerson to attend trial via a Zoom video call, but she was unsure if Lt. Dickerson would attend that call. (*Id.*) Plaintiff had attempted to obtain Lt. Dickerson's presence by contacting him with multiple methods, including an e-mail to multiple e-mail addresses associated with him, telephone calls to his wife and to the police department where he now works, and a LinkedIn message. (*Id.*, PageID 8694–

96, 8870.) Plaintiff also asked another witness, Shaun Smart, to contact Lt. Dickerson about the subpoena. (*Id.*, PageID 8870.) On the second day of trial, Plaintiff's counsel informed the Court that he had spoken with Lt. Dickerson's coworker in Hawaii and that counsel informed him about the subpoena. (*Id.*, PageID 8866.) Defendant objected to Plaintiff's proposal to use the deposition testimony as a substitute for Lt. Dickerson's trial testimony because substantial efforts had not been made to obtain the witness's presence at trial. (*Id.*, PageID 8868.) The Court allowed the transcript of Lt. Dickerson's deposition testimony to be read into the record, with Plaintiff's counsel reading the questions and another attorney reading Lt. Dickerson's answers. (*Id.*, PageID 9111–9146, 9154–9219.)

At the conclusion of Plaintiff's case in chief, Defendant moved for judgment as a matter of law under Federal Rule of Civil Procedure 50 and was denied. (*Id.*, PageID 9698–9700.) At the conclusion of all evidence, Plaintiff moved for judgment as a matter of law under Federal Rule of Civil Procedure 50 and was denied. (*Id.*, PageID 9976–78.) Defendant moved for judgment as a matter of law on a renewed basis and was denied. (*Id.*, PageID 9978–79.)

The jury found that the Patrol constructively discharged Plaintiff, discriminated against her on the basis of sex and sexual orientation, and retaliated against her for protected activity. (Jury Verdict, ECF No. 175.) It awarded her $1,308,927.00 in compensatory damages, $624,109.00 in back pay, and $684,815.00 in front pay. (*Id.*, PageID 8461.)

Defendant filed a renewed motion for judgment as a matter of law, or for a new trial, or for remittitur of Plaintiff's compensatory damages. (D. Mot., ECF No. 180.) It requested supplemental briefing because trial transcripts were not yet available (*Id.*), and this Court granted the request (ECF No. 191). Defendant filed its supplemental brief. (Supp. Brief, ECF No. 196.) Plaintiff responded to Defendant's motion (Pl. Resp., ECF No. 199) and Defendant replied (D. Reply, ECF

No. 202). Separately, Plaintiff moved for attorney's fees, costs, pre-judgment interest, post-judgment interest, and equitable relief. (Pl. Mot., ECF No. 181.) Defendant responded to Plaintiff's motion (D. Resp., ECF No. 192), and Plaintiff replied (Pl. Reply, ECF No. 193).

## ANALYSIS

### I.  Defendant's Motion for Judgment as a Matter of Law

#### a.  Applicable Legal Standard

Under Federal Rule of Civil Procedure 50(a), a court may grant a party judgment in its favor "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). If a Rule 50(a) motion is denied at trial, the proponent may later renew their motion under Rule 50(b). A "'Rule 50(b) motion is only a renewal of the preverdict motion,'" and "'it can be granted only on grounds advanced in the preverdict motion.'" *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 491 (6th Cir. 2008) (quoting Rule 50(b) advisory committee's note to 2006 amendment); *see Kay v. United of Omaha Life Ins. Co.*, 709 F. App'x 320, 328 (6th Cir. 2017) (same). In ruling on a renewed motion for judgment as a matter of law under Rule 50(b), the court may: "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b).

A court may grant a party's renewed motion "only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001). In making its decision, the court may "not weigh the evidence, evaluate the credibility of the witnesses, or substitute [its] judgment for that of the jury." *Wehr v. Ryan's Family Steak Houses, Inc.*, 49 F.3d 1160, 1152 (6th Cir. 1991).

### b. *McDonnell Douglas* Framework for Title VII Claims

Under the *McDonnell Douglas* framework for Title VII discrimination claims, the plaintiff must first present a *prima facie* case of discrimination showing that (1) Plaintiff engaged in a protected activity, (2) Defendant knew of Plaintiff's engagement in the protected activity, (3) Defendant took an adverse employment action against Plaintiff, and (4) there is a causal connection between Plaintiff's engagement in the protected activity and Defendant's adverse action. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). If the plaintiff meets this initial burden, the burden is shifted to the defendant "'to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action.'" *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981)). If Defendant's burden is met, "'the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination.'" *Id.* (quoting *White*, 533 F.3d at 391–92.)

To establish pretext, a plaintiff can demonstrate that the defendant's explanation for the adverse employment action "'(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Id.* at 779 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). A plaintiff can rebut defendant's explanation as pretextual (and prove their *prima facie* case at the first step) by using "comparator" evidence—that is, "'evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff.'" *Id.* at 779–80 (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds*

*by Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009)). "An exact correlation" between the plaintiff and the comparators is unnecessary—rather, the comparators must be similar "'in all of the *relevant* aspects.'" *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (emphasis in original) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). Comparators' conduct need not be identical to that of the plaintiff, but it must be of "comparable seriousness." *Jackson*, 814 F.3d at 777, 778 n.4.

### c. Sufficiency of Plaintiff's Comparators

Defendant argues Plaintiff's comparators were insufficiently similar and that the Court therefore should have excluded them from evidence. (D. Mot., PageID 8557–60.) But Defendant too narrowly articulates the standards for proper comparator evidence in this Circuit in several ways.

First, Plaintiff did not need to show that her comparators had the exact same supervisors, as Defendants claim. It is enough that Plaintiff and her comparators shared "the same ultimate decision-maker" regarding her discipline, *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005), or that "all of the people involved in the decision-making process . . . were well-aware of the discipline meted out to past violators" of the relevant policies, *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 479 (6th Cir. 2003). Plaintiff demonstrated that, according to the Patrol's disciplinary "grid," every employee of the Patrol is subjected to the same disciplinary process regardless of rank or whether they are a sworn law enforcement officer. (*See* Transcript, PageID 9226–28, 9894–95.)

The Patrol's disciplinary process starts with a recommendation from the office of personnel, followed by a recommendation from the Colonel of the Patrol (the Patrol's highest ranking official), and ends with a final decision from the Director of Public Safety. (Transcript, PageID 9577–9582.) Plaintiff presented comparator evidence for several employees disciplined

through this process between 2014 and 2018, when the relevant decision-makers in key roles at the Patrol and the Department of Public Safety were the same as when Plaintiff was disciplined. (Pl.'s Trial Ex. 13, ECF No. 156-3; Transcript, PageID 9220–21, 9522–23, 9617, 9736). Thus, to the extent Plaintiff's comparator evidence relied on the comparators sharing an ultimate decision-maker and the same decision-making process, such evidence was properly admitted.

Second, Defendant argues that Plaintiff improperly introduced evidence of comparators who did not hold supervisory positions akin to Plaintiff's position. As explained in the preceding paragraph, all employees of the Patrol were subject to the same disciplinary process with the same ultimate decision-maker. Plaintiff established that there was no official policy that an employee's status as a supervisor would serve as an "aggravating" disciplinary factor. (Transcript, PageID 9233–34, 9559–61.) *See White v. Duke Energy-Kentucky Inc.*, 603 F. App'x 442, 448 (6th Cir. 2015) (holding that the plaintiff, who was a supervisor, could use non-supervisory employees as comparators in his Title VII discrimination case because "none of the company policies cited in connection with the decision to terminate [the plaintiff] appear[ed] to make meaningful distinctions between management and other union or non-union employees"). Defendant also argues that the Court improperly admitted comparator evidence regarding other supervisors disciplined for conduct dissimilar from Plaintiff's conduct. But Plaintiff used that evidence to rebut Defendant's argument that supervisors were subject to higher disciplinary scrutiny.

Third, Defendant argues that the conduct of Plaintiff's comparators was too dissimilar from Plaintiff's conduct to be properly considered by the jury. (D. Mot., PageID 8559.) But the comparators' conduct need not be identical to Plaintiff's conduct—it is enough that the conduct was of "comparable seriousness." *Jackson*, 814 F.3d at 777. Here, Plaintiff was disciplined for violating the appearance standards policy because of her tattoo and for insubordination because

she refused to show the tattoo to a supervisor. Plaintiff introduced comparator evidence of other Patrol employees' conduct violations that fell into the same offense codes under the Patrol's guidelines and the disciplinary penalties that were imposed. (*See* Transcript, PageID 9262–9285.) The comparators' infractions included insubordination and violation of the appearance standards policy, mirroring Plaintiff's infractions. (*See id.*) Although the specific details of the comparators' conduct varied somewhat from Plaintiff's conduct (for example, a comparator's wearing nail polish as compared to plaintiff's tattoo), the conduct was of "comparable seriousness" and thus was properly admitted into evidence. *See Jackson* at 777.

### d. Lt. Dickerson's Deposition Testimony

Defendant also argues for judgment as a matter of law on the grounds that the Court improperly admitted the deposition testimony of Lt. Dickerson for several reasons. First, Defendant argues Plaintiff untimely notified it of Plaintiff's intent to use deposition testimony at trial, depriving it of the opportunity to conduct a trial deposition for further cross-examination. (Supp. Brief, PageID 10225.) Second, Lt. Dickerson's deposition testimony should have been excluded as inadmissible hearsay because the hearsay exception for the declarant being unavailable under Fed. R. Evid. 804(b)(1) should not apply. (*Id.*) Third, Defendant argues it was deprived of an opportunity to cross-examine Lt. Dickerson about whether he was dishonest with his superiors about Plaintiff's tattoo or was insubordinate because he had insufficiently investigated it, which Defendant claims were new arguments made by Plaintiff at trial. (*Id.*, PageID 10225–26.) Defendant argues it suffered prejudice for these errors because Lt. Dickerson's testimony "was essentially the only source of evidence for the profane comments and [Plaintiff's] claims of disparate treatment." (*Id.*, PageID 10226.)

### i. Use of Deposition Testimony Under Civil Procedure Rule 32

Under Federal Rule of Civil Procedure 32, the deposition of a witness who is unavailable for trial may be used at trial "for any purpose." Fed. R. Civ. P. 32(a)(4). A witness is "unavailable" for the purposes of the rule, among other reasons, if the court finds "that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition," or "that the party offering the deposition could not procure the witness's attendance by subpoena." Fed. R. Civ. P. 32(a)(4)(B) and (D).

Plaintiff demonstrated that she subpoenaed Lt. Dickerson to attend the trial and that he refused to attend. Notably, a subpoena for a civil trial generally cannot compel the presence and testimony of an out-of-state witness who does not currently reside, work, or regularly transact business within 100 miles of the trial location. Fed. R. Civ. P. 45(c)(1). Still, Plaintiff reasonably believed that Lt. Dickerson would follow the subpoena and attend the trial via the Zoom video link that was provided for his remote trial testimony, an arrangement to which Defendant had agreed. Defendant argues Plaintiff did not sufficiently demonstrate that Lt. Dickerson was unavailable as a witness. (Supp. Brief, PageID 10225–26.) But Plaintiff diligently attempted to communicate with the witness to coordinate his presence, including through repeated phone calls to multiple points of contact, emails, and a former co-worker. Thus, the Court finds that Lt. Dickerson was unavailable as a witness under Rule 32(a)(4), both because he resided and worked more than 100 miles away from the trial court and because Plaintiff could not procedure his attendance by subpoena. Therefore, his deposition testimony could be used at trial under Rule 32.

### ii. Civil Procedure Rule 32 as an Independent Hearsay Exception

Plaintiff argues that Federal Rule of Civil Procedure 32 operates as an independent exception to the hearsay rule. Federal Rule of Evidence 802 provides that hearsay is inadmissible

unless as provided otherwise by federal statute, the rules of evidence, or "other rules prescribed by the Supreme Court." The Advisory Committee's notes on the 1972 amendments to the rule explicitly identify the deposition rule, Federal Rule of Civil Procedure 32, as one of those "other rules." Circuit courts have accordingly held that "Rule 32(a) is an independent exception to the hearsay rule." *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 914 (9th Cir. 2008) (citing *Ueland v. United States*, 291 F.3d 993, 996 (7th Cir. 2002)); *see Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 962–63 (10th Cir. 1993); *S. Indiana Broadcasting, Ltd. v. FCC*, 935 F.2d 1340, 1341–42 (D.C. Cir. 1991); *United States v. Vespe*, 868 F.2d 1328, 1339 (3d Cir. 1989); *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 204 (1st Cir. 1988). This Court agrees. But since the Sixth Circuit has not yet ruled on this question, the Court proceeds to independently assess the matter under Federal Rule of Evidence 804.

### iii. Additional Hearsay Exception Under Evidence Rule 804

The use of Lt. Dickerson's deposition transcript at trial did not violate the rule against hearsay, Federal Rule of Evidence 802. Under Federal Rule of Evidence 804, former testimony given at a deposition may be used at trial as an exception to the general rule against hearsay when the declarant is considered unavailable as a witness at trial. A declarant is unavailable under Rule 804 if, among other reasons, the declarant is absent from the trial and the proponent of the declarant's former testimony "has not been able, by process or other reasonable means, to procure" his attendance. Fed. R. Evid. 804(a)(5)(A). If the declarant is unavailable under the rule, his former testimony given at a lawful deposition is not excluded as hearsay so long that it "is now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Fed. R. Evid. 804(b)(1)(A) and (B).

Here, for the reasons stated above, Plaintiff adequately demonstrated that she used

reasonable means and process, including by subpoena, to obtain Lt. Dickerson's presence at trial. *See United States v. Alexander*, 467 F. App'x 355, 366 (6th Cir. 2012) ("The proponent [of deposition testimony under Fed. R. Evid. 804(a)] must make a 'good faith effort' to secure the witness's presence for trial.") (quoting *Barber v. Page*, 390 U.S. 719, 724–25 (1968)).

Defendant argues it did not have an opportunity and similar motive to develop Lt. Dickerson's testimony at the deposition. But the record reflects that Defendant's deposition counsel (who was the same counsel at trial) asked almost all the questions across about 100 of the 115 pages of Lt. Dickerson's deposition transcript. (*See* Dickerson Dep., ECF No. 82, PageID 2675.) Further, Defendant repeatedly asked Lt. Dickerson about his investigation of Plaintiff's tattoo at the deposition (*see, e.g., id.*, PageID 2694, 2698–700, 2706, 2713–14, 2725–30) and about whether he had sufficiently investigated Plaintiff's alleged policy violation. (*See id.*, PageID 2740–43). Finally, Defendant knew that Lt. Dickerson now lived in Hawaii and could have anticipated the fact he might not attend trial. If Defendant was dissatisfied with the depth of questioning from the initial deposition, it could have sought a trial deposition at any time prior to trial.

### e. Other Evidence Supporting the Verdict

Plaintiff presented additional evidence that her tattoo and alleged insubordination did not actually motivate Defendant's decision to constructively terminate her. For example, Plaintiff showed that Defendant deviated from its official policy by considering Plaintiff's supervisor status as an aggravating disciplinary factor. This evidence supported her argument that Defendant's official justification for constructively terminating her was pretextual and not the real motivating factor. *See Coburn v. Rockwell Automation, Inc.*, 238 Fed. App'x 112, 126 (6th Cir. 2007) ("[Defendant's] arguable failure to follow its own written . . . policy can support the inference that it was determined to layoff employees on the basis of age.").

12

Evidence of Plaintiff's exemplary job performance record and lack of disciplinary infractions over her twenty-four-year career with the Patrol also supported her pretext arguments. Lt. Dickerson described Plaintiff's job performance at "exemplary." (Transcript, PageID 9209.) She received positive job performance reviews from various supervisors, received performance-related awards, and gave presentations on behalf of the Patrol. (*Id.*, PageID 8759–8772, 8991–9002.) Plaintiff used this evidence to show that the Patrol's decision to constructively terminate her despite a positive job performance was unreasonable or based on pretext. *See Guyton v. Exact Software N. Am.,* No. 2:14-cv-502, 2016 WL 3927349 (S.D. Ohio July 21, 2016) (Marbley, J.) ("Here, there is evidence from which a jury could infer that the decision to terminate [the plaintiff], who had 25 years of experience with the company and favorable performance reviews, based on one conversation with the user group president relating to email typos and technical problems, was not a reasonable one.")

Additionally, Plaintiff showed inconsistencies in the Patrol's appearance standards policy. (*See* Transcript, PageID 9730–33.) For instance, Col. Pride first testified that he thought the Patrol's policy was clear that all Patrol employees could not get new visible tattoos. (*Id.*, PageID 9730.) But Plaintiff demonstrated that the policy was unclear regarding visible tattoos for employees, like Plaintiff, who were hired before July 22, 2015. (*See id.*, PageID 9730–33.) On that point, Col. Pride later testified that the section applying to employees hired prior to that date does not state that those employees cannot have visible tattoos. (*Id.*, PageID 9733.) Regardless, Defendant's witnesses testified that a violation of the tattoo policy should not alone have led to termination under the Patrol's disciplinary policies. (*Id.*, PageID 9238, 9555–56.) This evidence about the inconsistency of the Patrol's tattoo policies and about violations not leading to termination both supported Plaintiff's argument that Defendant's justifications for terminating

Plaintiff's employment were pretextual.

Finally, Plaintiff's pretext arguments were supported by evidence that Plaintiff's constructive termination took place less than two weeks after Plaintiff filed her EEOC complaint. Plaintiff testified that she filed her EEOC complaint on January 29, 2018, and that she immediately told multiple coworkers about it. (Transcript, PageID 8806–10.) She also disclosed the complaint to the Patrol's administrative investigations unit on February 5, 2018. (*Id.*, PageID 8821–22.) She was constructively terminated just a few days later. (*Id.*, PageID 8823–24.) A reasonable jury could infer that the EEOC complaint was a motivating factor in the Patrol's decision to terminate her and that the Patrol's justifications were pretextual. *See Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523–26 (6th Cir. 2008) (collecting case law on temporal proximity and assessing temporal proximity as one factor among several supporting plaintiff's argument that the defendant engaged in retaliatory discrimination).

Overall, the jury's verdict in favor of Plaintiff on her discrimination and retaliation claims was supported by legally sufficient evidence in the record. Viewing the above evidence in a light most favorable to the Plaintiff, a reasonable jury could have concluded that the Patrol discriminated and retaliated against Plaintiff in violation of Title VII. Accordingly, the Court **DENIES** Defendant's renewed Motion for Judgement as Matter of Law. (ECF No. 180.)

## II.    Defendant's Motion for a New Trial

### a.    Applicable Legal Standard

Under Rule 59 of the Federal Rules of Civil Procedure, a new trial may be granted for "any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Courts "uphold the verdict if it was one which the jury reasonably could have reached; we cannot set it aside simply because we think another result is more justified."

*Armisted v. State Farm Mut. Auto. Ins. Co.*, 675 F.3d 989, 995 (6th Cir. 2012) (citing *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007)). "'[A] new trial is warranted when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias.'" *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 606 (6th Cir. 2018) (cleaned up) (quoting *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1045 (6th Cir. 1996)). A court may not set aside a jury's verdict "simply because it believes that another outcome is more justified." *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007) (citing *TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 546 (6th Cir. 1981)).

### b. Manifest Weight of the Evidence

In support of its motion for a new trial, Defendant first argues that the jury's verdict was against the manifest weight of the evidence. (D. Mot., PageID 8560–61.) Defendant's manifest weight argument primarily relies on its contention that the Court improperly admitted Lt. Dickerson's deposition testimony and inappropriate comparator evidence. As determined in the prior section of this Opinion and Order, that evidence was properly admitted.

Relatedly, Defendant argues that Plaintiff's comparator evidence, even if properly admitted, was not strong enough to support the jury's verdict. (*Id.*, PageID 8561.) It contends that Plaintiff's comparators did not engage in similar enough conduct, were not all supervisors like Plaintiff, did not have the same supervisors as Plaintiff, and did not violate the Patrol's appearance and insubordination policies to the same extent as Plaintiff. (*Id.*)

The Court reiterates its findings above that Defendant too narrowly describes the appropriate legal standards for a comparator analysis for a Title VII discrimination claim. Plaintiff

introduced evidence of comparators whose conduct was similar enough to (though not exactly the same as) Plaintiff's conduct and highlighted the differences in the Patrol's punishment of those comparators. Again, the comparators shared an ultimate decision-maker and were subject to the same disciplinary procedures. Further, Plaintiff introduced evidence of non-supervisor comparators to rebut Defendant's argument that Plaintiff's supervisor status was an aggravating disciplinary factor. And Defendant does not argue that the jury failed to properly weigh other evidence advanced by Defendant. (*See id.*). Accordingly, Defendant fails to show that the jury's verdict was against the manifest weight of the evidence.

### c. Admission of Plaintiff's Expert Disclosures

Defendant next argues for a new trial on the basis that the Court improperly admitted supplemental and updated expert evidence from Plaintiff's expert, Dr. Stan Smith, that "put Defendant at a prejudicial disadvantage in preparing its case." (D. Reply, PageID 10314.) "For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition." Fed. R. Civ. P. 26(e)(2). "Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." *Id.*

If a party fails to provide information as required by Rule 26(a) or (e), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The Advisory Committee's note to Rule 37(c)(1) "strongly suggests that 'harmless' involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (internal citations omitted). The Sixth Circuit has adopted five factors to consider in assessing whether an omitted or late disclosure is

16

substantially justified or harmless:

> (1) the surprise to the party against whom the evidence would be offered;

> (2) the ability of that party to cure the surprise;

> (3) the extent to which allowing the evidence would disrupt the trial;

> (4) the importance of the evidence; and

> (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Id.* (citing *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396–97 (4th Cir. 2014)). District courts have broad discretion over whether to exclude untimely disclosed expert testimony. *See Pride v. BIC Corp.*, 218 F.3d 566, 578–79 (6th Cir. 2000); *see also Estes v. King's Daughters Med. Ctr.*, 59 Fed. Appx. 749, 752 (6th Cir. 2003) ("Rule 16 grants district courts broad discretion to enforce their scheduling orders.").

 Defendant received one of Dr. Smith's supplemental reports a few days before Dr. Smith's trial deposition and another supplemental report one day before the deposition. (ECF No. 160, PageID 8250–51.) At the final pretrial conference, held a week after Dr. Smith's trial deposition, the Court informed the parties that, if requested, it "would issue an order giving Defendant the right to depose Dr. Smith further." (*Id.*, PageID 8251) Defendant never requested such an order. (*Id.*) Instead, 11 days prior to trial, Defendant moved to exclude all of Dr. Smith's testimony and his supplemental expert reports because the new reports did not comply with the disclosure rules of Federal Rule of Civil Procedure 26. (ECF No. 150.)

This Court denied that motion and admitted the Plaintiff's expert's testimony, finding that Defendant declined opportunities to cure any potential prejudice to it. (ECF No. 160, PageID 8251.) The Court held that the timing of Plaintiff's expert disclosures was not unfairly prejudicial to Defendant because (1) some of the content of the supplemental reports appeared to *benefit*

Defendant, and (2) Defendant refused the Court's offers of more equitable remedies, including an option for additional deposition testimony. (*Id.*, PageID 8252–53.) As this Court previously concluded, the drastic remedy requested by Defendant (exclusion of all of Dr. Smith's testimony) was inappropriate then, and it remains inappropriate now. (*Id.*, PageID 8251–53.)

Defendant now seeks a new trial, certainly an even more drastic remedy, due to Plaintiff's use of the expert's testimony at trial. Again, this Court concludes that Defendant was not deprived of a meaningful opportunity to respond to the expert disclosures or to prepare for trial. In fact, it was given multiple opportunities to cure any alleged prejudice, and it declined to pursue those more measured remedies. The admission of Plaintiff's expert testimony, including evidence included in his supplemental reports, was harmless and did not so substantially prejudice Defendant to justify a new trial.

### d. Plaintiff's Closing Arguments

Finally, Defendant argues that a new trial is required because Plaintiff's counsel made several inappropriate comments to the jury during closing arguments. Generally, if "counsel's closing argument was improper, and if 'there is a reasonable probability that the verdict of [the] jury has been influenced by such conduct, it should be set aside.'" *Strickland v. Owens Corning,* 142 F.3d 353, 358 (6th Cir. 1998) (quoting *Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980)). "[F]ailure to object at trial to closing arguments does raise the degree of prejudice which must be demonstrated in order to get a new trial on appeal." *Id.* at 358–59 (citing *Reese v. Mercury Marine Div. of Brunswick Corp.*, 793 F.2d 1416, 1429 (5th Cir. 1986)); *see also Park West Galleries, Inc. v. Hochman*, 692 F.3d 539, 548–49 (6th Cir. 2012) (holding that a party's failure to object to closing arguments at trial did not constitute a complete waiver of that argument under a Rule 59 motion for a new trial).

Here, Defendant first alleges Plaintiff's counsel told personal stories that were not part of evidence and improperly appealed to the jury's emotions to rule for Plaintiff. (Supp. Brief, PageID 10236.) Second, it argues Plaintiff's counsel asked the jury to "send a message to Plaintiff's children" by finding in her favor. (*Id.*) Third, it contends Plaintiff's counsel asked for damages "well beyond the statutory limits without a good faith basis to do so." (*Id.*)

Regarding Plaintiff's appeal to emotion, Defendant asserts that Plaintiff's counsel made an inappropriate "Golden Rule" argument. (*Id.*, PageID 10237.) Such arguments asking the jurors to put themselves in Plaintiff's shoes or suggesting to jurors that "it could have been you" or "it could have been your children" are inappropriate. *See United States v. Hall*, 979 F.3d 1107, 1119 (6th Cir. 2020) (citing *United States v. Al-Maliki*, 787 F.3d 784, 795 (6th Cir. 2015)). But no such arguments appear in the record. Defendant cites to one remark made by Plaintiff at closing argument: "There are only so many days that we will care to one day tell our grandchildren about. Today can be one such day for the six of you." (Transcript, PageID 10069; Supp. Brief, PageID 10236–37.) This remark does not suggest that the jurors or their grandchildren could have been victims here. Plaintiff's counsel merely appealed to jurors' sense of justice and the importance of the verdict. The remark was not so outrageous to introduce extreme prejudice and to justify a new trial, especially given Defendant's failure to object at trial.

Further, Plaintiff's counsel's use of personal experiences at the outset of his closing argument did not step outside of bounds. Counsel merely relayed a story about witnessing discrimination as a child as an analogy to the present case and did not ask the jury to rule based on his personal experience. Such conduct does not introduce such extreme prejudice to justify a new trial. *See United States v. Gregory*, 54 F.4th 1183, 1210–11 (10th Cir. 2022) (holding that the district court did not err in overruling defense counsel's objection to the prosecutor's closing

argument engaging in a hypothetical impersonating the defendant). Additionally, Plaintiff's counsel did not ask the jury to "send a message to Plaintiff's children." Defendant cites nowhere in the record to support its claim, and the Court independently sees no such request.

Finally, the fact Plaintiff's counsel did not explain the statutory cap on compensatory damages under 42 U.S.C. § 1981a at closing argument does not justify a new trial. Defendant does not advance any argument on this ground beyond asserting that it was inappropriate. (*See* Supp. Brief, PageID 10236–38.) In fact, the Sixth Circuit has held that the opposite occurrence—a reference to the statutory cap at closing argument—"was not so outrageous or egregious" as to justify a new trial and did not prejudice the defendant. *EEOC v. EMC Corp. of Mass.*, No. 98-1517, 2000 WL 191819, at * 9 (6th Cir. Feb 9, 2000). The inverse is also true here: *not* explaining the statutory cap did not prejudice defendant and does not justify a new trial, especially absent any substantive argument from Defendant on this point.

Defendant is not entitled to a new trial under Federal Rule of Civil Procedure 59. The jury's verdict was not against the manifest weight of the evidence. Plaintiff's use of her expert's testimony and supplemental reports did not so egregiously prejudice Defendant as to justify a new trial. And Defendant failed to demonstrate how Plaintiff's closing argument was inappropriate. Accordingly, this Court **DENIES** Defendant's Motion for a New Trial (ECF No. 180).

## III.   Remittitur of Damages

### a.   Statutory Cap on Compensatory Damages

As its last alternative form of relief, Defendant moves the Court to reduce Plaintiff's compensatory damages award of $1,308,927.00 to $300,000.00 in accordance with the statutory cap for compensatory damages under 42 U.S.C. § 1981a(b)(3). (D. Mot., PageID 8566.) Section 1981a(a) permits compensatory damages in Title VII cases, among other types of claims. 42 U.S.C.

§ 1981a(a)(1). Section 1981a(b), in turn, caps compensatory damages "for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses" at an amount based on the number of people employed by the defendant. 42 U.S.C. § 1981a(b)(3).

Here, the parties agree that § 1981a both authorizes and caps Plaintiff's compensatory damages. (D. Mot., PageID 8566; Pl. Resp., PageID 10283.) Defendant argues, and Plaintiff concedes, that Plaintiff's compensatory damages are capped at $300,000.00 under § 1981a(b)(3)(D) because Defendant "has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 1981a(b)(3)(D). The parties are correct, and the Court must remit the jury award to comply with the cap. The Court **REMITS** Plaintiff's compensatory damages award from $1,308,927.00 to **$300,000.00**.

### b. Defendant's Additional Remittitur Arguments

Defendant also moved for a reduction in the jury's verdict "based on the speculative nature of a significant amount of the damages awarded." (D. Mot., PageID 8567.) Specifically, it argues Plaintiff's expert improperly inflated the calculation of Plaintiff's back pay and front pay by $10,000.00 per year based on an assumption that Plaintiff would be promoted to Lieutenant and by $7,900.00 per year based on a valuation of Plaintiff's lost employee benefits. (*Id.*)

"[A]s a general rule, a jury verdict should not be remitted by the court 'unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss.'" *Jackson v. City of Cookeville*, 31 F.3d 1354, 1359 (6th Cir. 1994) (quoting *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir. 1990)). More specifically, "[a] trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or

prejudice; or is so excessive or inadequate as to shock the judicial conscience of the court." *Farber*, 917 F.2d at 1395.

Plaintiff, who held the rank of sergeant (one rank below lieutenant), demonstrated that she was on the road to becoming a lieutenant. She testified that she took the lieutenant's exam and scored high enough to qualify for "follow-up" but not for automatic promotion. (Transcript, 9023–24.) As part of the follow-up promotion process, Plaintiff could shadow lieutenants, complete additional research, and read books to earn more points towards a promotion. (*Id.*, PageID 9024.) She testified about taking those steps, including by shadowing at least two lieutenants. (*See id.*) Defendant points to no evidence in the record to rebut Plaintiff's evidence of her progress toward a promotion.

Based on Plaintiff's unrebutted testimony, a reasonable jury could have agreed with the assumption she would be promoted and awarded damages according to the calculation by Plaintiff's expert. *See Jackson v. City of Cookeville*, 31 F.3d at 1361 ("An economically accurate measure of [the plaintiff's] lost future income would include his expected salary over eleven years *including expected pay raises*." (emphasis in original)). Therefore, the jury's verdict factoring in a $10,000 per year salary increase was reasonable and not clearly excessive.

Additionally, Defendant does not support its argument that Plaintiff's expert improperly calculated an annual loss of $7,900 for Plaintiff's employee benefits. Defendant merely ties this additional benefit amount to its argument about Plaintiff's expected promotion, and thus the two arguments rise and fall together. Regardless, this Court finds no reason in the record to believe that the benefits amount calculated by Plaintiff's expert was clearly excessive, and it does not shock the conscience.

Defendant also argues that this Court should entirely remit Plaintiff's front pay award

because it was "speculative" that she would continue to work for the Patrol until age 60. (D. Mot., PageID 8567–68.) Plaintiff presented evidence that the Patrol had a mandatory retirement age of 60. (Stan Dep., ECF No. 162, PageID 8265–66.) Damages awards for front pay up until the plaintiff's expected retirement age are supported by case law. *See, e.g.*, *Pollard v. E.I. DuPont De Nemours, Inc.*, 412 F.3d 657, 668–69 (6th Cir. 2005). Plaintiff's expert calculated Plaintiff's front pay damages for the time of the trial through the time she would turn 60, offset by her expected future wages, for a total of $684,815.00. (*See* Expert Supplement, ECF No. 162-2, PageID 8313.) The Court finds that this figure is reasonable and adequately supported by evidence in the record, and it does not shock the conscience.

In sum, Defendant does not meet its burden to show that Plaintiff's back pay and front pay damages were clearly excessive. The jury's awards of $624,109.00 in back pay and $684,815.00 in front pay are reasonable and adequately supported by the record. This Court thus declines to remit those amounts. Combined with her reduced compensatory damages award of $300,000.00, Plaintiff's total damages are now **$1,608,924.00.**

## IV. Attorney's Fees and Litigation Costs

Plaintiff moves for an attorney's fees award of $906,053.24 and a litigation costs award of $64,208.66. (Pl. Mot., PageID 8570.) Defendant does not dispute that Plaintiff is considered a prevailing party and thus is entitled to a reasonable attorney's fees award. (D. Resp., PageID 10152–53.); *see Farrar v. Hobby*, 506 U.S. 103 111–12 (1992). The only issue is the amount.

### a. Legal Standard

Prevailing parties in Title VII civil rights actions are entitled to an award of reasonable attorney's fees. 42 U.S.C. § 2000e-5(k). "[T]he standard for awarding attorneys' fees is essentially the same under § 1988 and § 2000e–5(k), as the provision for attorneys' fees under § 1988 was

patterned after that in § 2000e-5(k)." *Virostek v. Liberty Township Police Department/Trustees*, 14 F. App'x. 493, 509–10 (6th Cir. 2001). The appropriateness of attorney's fees is not necessarily a matter of proportionality. *See City of Riverson v. Rivera*, 477 U.S. 561, 574 (1996) ("We reject the proposition that fee awards under § 1988 should necessarily be proportionate to the amount of damages a civil rights plaintiff actually recovers.") Rather, the fee process starts with a "lodestar" calculation, followed by consideration of several factors. *Barnes v. City of Cincinnati*, 401 F.3d 729, 745–46 (6th Cir. 2005).

The lodestar amount is calculated as "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). A "reasonable hourly rate" is determined according to the "prevailing market rate," defined as "that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record." *Adcock-Ladd v. Secretary of Treasury*, 227 F.3d 343, 349–50 (6th Cir. 2000) (citing *Hudson v. Reno*, 130 F.3d 1193, 1208 (6th Cir. 1997)). Because of its objectivity, "there is a strong presumption that the lodestar figure is reasonable." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010) (internal quotations omitted).

From the lodestar figure, a court may adjust the fee amount upward or downward based on a set of relevant factors:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Hensley*, 461 U.S. at 429–30 n.3 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974)). "Most critical" among these factors is the "results obtained." *Id.* at 436.

24

Although whether the fee is fixed or contingent is one of the enhancement factors listed in *Hensley* and *Johnson*, the U.S. Supreme Court has since held that fees may not be enhanced based on plaintiff's counsel's contingency fee arrangement under federal fee shifting statutes. *City of Burlington v. Dague*, 505 U.S. 557, 561–62, 567 (1992) (holding that contingency enhancements may not be applied under 42 U.S.C. § 6972(e) and 33 U.S.C. § 1365(d) and that "our case law construing what is a 'reasonable' fee applies uniformly to" other federal fee shifting statutes, including 42 U.S.C. §§ 1988 and 2000e-5(k)); *see Davis v. Mutual Life Ins. Co. of New York*, 6 F.3d 367, 381 (6th Cir. 1993) (applying *City of Burlington*).

### b.  Lodestar Calculation

Plaintiff submitted detailed, itemized records documenting the hours billed for this case and the fee rate billed by the relevant law firm employee. (*See* Starling Ledger, ECF No. 181-1; Camillus Ledger, ECF No. 181-3.) Those ledgers are supported by declarations from the employees requesting fees. (ECF Nos. 181-2, 181-3, 181-4, 181-5. 181-6.) Plaintiff also provides two supporting declarations from Central Ohio lawyers with expertise in fees. (*See* ECF Nos. 181-8, 181-9.) Plaintiff requests fees for the following hours at the following rates:

- Mr. Starling (attorney): 727.50 hours x $475 per hour = $345,562.50

- Mr. Camillus (attorney): 278.30 hours x $525 per hour = $146,107.50

- Ms. Bates (paralegal): 98.40 hours x $175 per hour = $17,220.00

- Mr. Filippelli (attorney): 11.60 hours x $375 per hour = $4,350.00

- Ms. Doogan (attorney): 1.6 hours x $425 per hour = $680.00

- Total lodestar request[1]: $513,920.00

---

[1] Plaintiff states that the total requested lodestar amount is $517,744.71, several thousand more dollars than the Court's calculation based on the hours and rates provided by Plaintiff. (Pl. Mot., PageID 8578.) It is unclear where the discrepancy lies, but it appears Plaintiff might have

(Pl. Mot., PageID 8576–78.) Plaintiff seeks a 1.75 multiplier of the total lodestar amount, which calculates to $899,360.00 total in attorney's fees based on a $513,920.00 lodestar amount. (*Id.*, PageID 8573–74.)

### i. Reasonable Rates

Defendant argues Plaintiff's hourly rates are excessive because (1) Mr. Starling's and Mr. Camillus's rates were above the prevailing market rate and (2) their requested rates reflect only their current, increased rates rather than their rates as they increased incrementally across the five years of litigation in this case. (D. Resp., PageID 10154–57.)

As a starting point, "the attorney's normal hourly billing rate should be a key focal point in award determinations" and is relevant to the "prevailing market rate" determination. *Kelley v. Metro. Cnty. Bd. of Educ.*, 773 F.2d 677, 683 (6th Cir. 1985) (citing *Blum*, 465 U.S. at 895–96). Courts in this Circuit have approved fee awards based on the attorney's current billing rate at the time of the motion, rather than requiring a staggered billing rate calculation over the years of the relevant litigation. *See, e.g.*, *Barnes*, 401 F.3d at 745–46.

Defendants cite to the 2019 Economics of Law Practice Study, a report from the Ohio State Bar Association (OSBA), which reported a mean hourly rate for employment law (labor-side) of $353 and a median hourly rate of $375 as of 2019. (D. Resp., PageID 10154); *see* Ohio State Bar Association, 2019 Economics of Law Practice Study, at 45 (Dec. 2019), *available at* https://www.ohiobar.org/member-tools-benefits/practice-resources/practice-library-search/practice-library/economics-of-law/eol-2019/. But Defendant's reliance on the OSBA report is unpersuasive because "[i]t does not reflect information regarding the skill, experience, and

---

inadvertently added Mr. Camillus's litigation costs ($3,822.45) to the requested lodestar total. (*See* Camillus Ledger, PageID 8654–55.) The Court thus disregards the requested total and considers the total lodestar request to be $513,920.00, as calculated here.

reputation of the responding attorneys—key considerations in the attorney's fees reasonableness analysis." *Northeast Ohio Coal. for the Homeless v. Husted*, No. 2:06-cv-562, 2014 WL 4829597, at *15 (S.D. Ohio Sept. 29, 2014) (Marbley, J.), *vacated in part on other grounds*, 831 F.3d 686 (6th Cir. 2016). Further, a legal market researcher who provided the data for the 2019 report declared that the report "significantly understates" private practitioner fee rates and that the report "is not intended for use in setting minimum, average, or maximum attorney fees or salaries." (ECF No. 193-2, PageID 10203–04.)

Mr. Starling and Mr. Camillus, the two lead attorneys on Plaintiff's case, successfully represented Plaintiff in a complex and time-consuming case. They are experienced litigators in the employment law area, both carrying years of experience working for large law firms followed by years of primarily plaintiff-side practice, including labor-side employment disputes. Mr. Starling has 16 years of litigation experience and currently bills clients at a rate of $475 per hour. (Starling Decl., ECF No. 181-2, PageID 8640–41.) Mr. Camillus is a solo practitioner with over 20 years of litigation experience and declares that $525 per hour is his standard rate. (Camillus Decl., ECF No. 181-3, PageID 8648–49.)

The Court finds Mr. Starling's and Mr. Camillus's declared billing rates of **$475 per hour** and **$525 per hour**, respectively, are reasonable and proximate to the prevailing market rate for labor-side employment law attorneys in Central Ohio as of the date of Plaintiff's Motion for fees.[2]

---

[2] Although the Court does not rely on the OSBA report for the reasons stated above, for the sake of Defendant's argument, Mr. Starling's and Mr. Camillus's rates are close to the mean and median rates identified in the report when adjusted for inflation. Adjusted for inflation from December 2019 to September 2023 (the date of Plaintiff's Motion), the mean rate would be approximately $423, and the median rate would be approximately $450. See BLS.gov, CPI Inflation Calculator (accessed Nov. 18, 2024), https://data.bls.gov/cgi-bin/cpicalc.pl. Further, these fee rates align with this Court's previous holding in a class-action settlement case "that a reasonable hourly rate for lawyers of comparable skill and experience, in similar complex litigation, within the venue of this Court is no higher than $600 per hour." *Smith v. FirstEnergy Corp.*, Nos. 2:20-cv-3755, 2:20-cv-3954, 2:20-cv-3987, 2022 WL 22691867, at *9 (S.D. Ohio Dec. 5, 2022).

Accordingly, the Court anchors its lodestar calculations to the rates requested by Mr. Starling and Mr. Camillus.

Additionally, Mr. Filippelli's rate of $375 per hour is generally reasonable for an attorney of his experience level (about eight years), but not all the work Mr. Filippelli performed required his legal skills and experience. (*See* D. Resp., PageID 10159–60.) Mr. Filippelli billed 1.6 hours for jury research and 10 hours for "litigation support and to serve as the stand-in witness reading Nathan Dickerson's deposition," which took place over two days of the trial. (Starling Ledger, PageID 8635.) Plaintiff does not explain what "litigation support" Mr. Filippelli provided beyond serving as a stand-in witness, which, respectfully, did not require his legal skills and experience. (*See* Pl. Reply, PageID 10175.) The Court finds that Mr. Filippelli's **$375 per hour** rate is reasonable for the 1.6 hours of jury research billed but finds that his additional 10 hours of billed time is reasonably billed at **$50 per hour**.

Last, the Court finds that Ms. Doogan's rate of **$425 per hour** (not contested by Defendant) is also reasonable, given her nearly 10 years of experience as a lawyer and her history with labor litigation. (Doogan Decl., ECF No. 181-6, PageID 8666.) And the Court finds that Ms. Bates's rate of **$175 per hour** (also not contested by Defendant) is reasonable for a paralegal with her experience and level of involvement in the case.

### ii. Hours Billed

In reviewing counsel's hours billed in a motion for attorney's fees, "district courts are not required to . . . 'achieve auditing perfection' but instead must simply to do 'rough justice.'" *Northeast Ohio Coal. for the Homeless*, 831 F.3d at 703 (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)). A party's motion for fees is sufficiently supported by "itemized billing records that specify, for each entry, the date that the time was billed, the individual who billed the time, the

28

fractional hours billed (in tenths of an hour), and the specific task completed." *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 553 (6th Cir. 2008).

Defendant argues Plaintiff's hours billed should be reduced for those hours Plaintiff spent litigating her claims against Individual Defendants, including her litigation of the Court's qualified immunity decision on appeal, which resulted in a dismissal of the claims against Individual Defendants. (D. Resp., PageID 10158.) Defendant calculates those hours as totaling 126.7 for Mr. Starling and 6.4 hours for Mr. Camillus. (*Id.*)

Plaintiff's claims against Individual Defendants were factually bound to the rest of her case against the Patrol. Plaintiff successfully litigated those claims before this Court through the summary judgment stage. (*See* ECF No. 112.) Although the claims against Individual Defendants were dismissed pursuant to the circuit court's decision on appeal, Plaintiff's counsel diligently tracked and reasonably billed their efforts prosecuting those related claims in support of the overall case. *See Hensley*, 461 U.S. at 440 ("Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."). Plaintiff's degree of success on those claims is best weighed as part of the post-lodestar factors rather than as part of the initial lodestar analysis.

Additionally, Defendant argues Plaintiff engaged in "duplicative billing," but does not identify any instances of that practice. (D. Resp., PageID 10159.) Upon its independent review, the Court sees no instances of duplicative billing. Defendant makes no other arguments against specific billing entries.

Overall, Plaintiff reasonably billed the hours requested in her Motion at the rates she specified, except for the 10 hours billed by Mr. Filippelli relating to the Lt. Dickerson testimony and "litigation support." Mr. Filippelli's lodestar amount is thus reduced to **$1,100.00** ((1.6 hours

x $375 per hour = $600.00) + (10 hours x $50 per hour = $500.00) = $1,100.00). This Court finds that Plaintiff's requested hours and fee rates are otherwise reasonable. The total lodestar amount is thus calculated as **$510,670.00.**[3]

### c. Degree of Success and Additional Factors

Plaintiff requests a 1.75 times multiplier to the lodestar amount due to her "exceptional success." (Pl. Mot., PageID 8584.) Defendant argues that a multiplier is unnecessary for the lodestar amount to represent a "reasonable fee." (D. Resp., PageID 10160–61.) It also contends her fee amount should be reduced because her claims against Individual Defendants were dismissed because they were entitled to qualified immunity. (D. Resp., PageID 10157–59.)

"Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley*, 461 U.S. at 435. "[I]n some cases of exceptional success an enhanced award may be justified." *Id.* In determining whether to increase or decrease the lodestar calculation of the fee award, "[t]he key issue is whether an adjustment is necessary to the determination of a reasonable fee." *Barnes*, 401 F.3d at 745 (citing *Blum*, 465 U.S. at 895).

Here, Plaintiff's counsel obtained excellent results for Plaintiff. After a weeklong trial, a jury found in her favor on all her remaining claims, concluding that Defendant constructively discharged her, discriminated against her on the basis of her sex and her sexual orientation, and retaliated against her for engaging in protected activity. (Jury Verdict, PageID 8459–61.) The jury awarded Plaintiff over $1.3 million in compensatory damages (reduced to $300,000 in this Opinion and Order pursuant to a statutory cap), $624,109 in back pay, and $684,815 in front pay. (ECF No. 175, PageID 8461.) These damages awards precisely match the amounts Plaintiff requested at trial.

---

[3] (727.50 hours x $475 per hour = $345,562.50) + (278.30 hours x $525 per hour = $146,107.50) + (98.40 hours x $175 per hour = $17,220.00) + (1.6 hours x $375 per hour = $600.00) + (10 hours x $50 per hour = $500.00) + (1.6 hours x $425 per hour = $680.00) = $510,670.00.

(Transcript, PageID 10065–67.) The jury's substantial compensatory damages award, given for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary damages," reflects Plaintiff's counsel's successful arguments and presentation of the evidence at trial. (*See* Jury Instructions, ECF No. 171, PageID 8436.)

Although the claims against Individual Defendants were dismissed because they were entitled to qualified immunity, Plaintiff's success on her related claims against the Patrol substantially, if not entirely, fulfilled her goals in the litigation: "She seeks to recover for the harm she has suffered, to punish Defendants for their conduct, and to deter Defendants from ever perpetrating their conduct against any other person." (Amended Compl., ECF No. 13, PageID 674). Plaintiff's fee award is not to be reduced simply because she did not prevail on every claim and contention raised in the lawsuit. *See Hensley*, 461 U.S. at 435, 440.

Even with Plaintiff's substantial success at trial, though, the baseline lodestar fee calculation adequately reflects a reasonable fee for the results obtained without an upward adjustment. The fee award adequately accounts for the time and labor required, the relatively average novelty and difficulty of the legal questions involved, and the skill necessary to perform the required legal services. *See Hensley*, 461 U.S. at 429–30 n.3. Unlike the case in *Barnes*, 401 F.3d 729, which involved a novel discrimination question regarding a transgender police officer in the late 1990s and early 2000s, this case involved a comparatively ordinary legal question of whether a gay woman experienced discrimination at work because of her sex and sexual orientation. *See Barnes*, 401 F.3d at 746 (affirming the district court's attorney's fee award that included a 1.75 multiplier in part because of the "novelty and difficulty" of the legal question). Indeed, the Circuit Court in *Barnes* cautioned that the 1.75 multiplier amount was "near the upper end of what we consider 'reasonable.'" *Id.* at 746 n.4.

Accordingly, the Court finds that the lodestar fee calculation is reasonable and that an upward adjustment is unnecessary to account for Plaintiff's success at trial and other relevant factors. Likewise, a downward adjustment is not required because Plaintiff demonstrated adequate billing practices, took on a fairly complex case, and obtained successful results at trial. Therefore, the final attorney's fee award is **$510,670.00**.

### d. Litigation Costs

The Federal Rules of Civil Procedure authorize litigation cost awards to prevailing parties. Fed. R. Civ. P. 54(d)(1). A prevailing party is presumptively entitled to an award of litigation costs. *White & White, Inc. v. American Hosp. Supply Corp.*, 786 F.2d 728, 730 (6th Cir. 1986). Generally, cost awards are limited to the categories defined in 28 U.S.C. § 1920. *See Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987). Additionally, under 42 U.S.C. § 2000e-5(k), for Title VII cases, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee (including expert fees) as part of the costs." Plaintiff splits her costs requests between those authorized under 28 U.S.C. § 1920 and those authorized under 42 U.S.C. § 2000e-5(k).

The Sixth Circuit has upheld a costs award for expenses including "focus groups, mock trials, jury-selection services, and mediation." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 827 (6th Cir. 2013). Although the Circuit Court in *Waldo* assessed the costs award under 42 U.S.C. § 1988, the plaintiff had requested fees and costs under both § 1988 and the Title VII fee statute, 42 U.S.C. § 2000e-5(k). *See id.* at 812, 827. Here, Plaintiff relies in part on *Waldo* to assert that the authorization of costs under § 2000e-5(k) "is broader than the taxation of costs statute," 28 U.S.C. § 1920. (Pl. Brief, PageID 8588.) Defendant takes no position on the scope of these statutes.

Plaintiff requests the following costs under 28 U.S.C. § 1920: (1) a $400 filing fee,

(2) $46,459.98 in fees for deposition and trial transcripts, and (3) $1,364.98 in e-discovery imaging fees. (Pl. Mot., PageID 8587–88.) Separately, Plaintiff requests the following costs under 42 U.S.C. § 2000e-5(k): (1) $2,254.10 in e-discovery data hosting costs, (2) $10,122.50 in expert witness costs, and (3) $3,531.35 for the cost of a trial strategy focus group. (*Id.*, PageID 8588.) Together, these amounts total $64,132.91. All of these costs are itemized as part of Plaintiff's Bill of Costs (ECF No. 179), which lists the total as $64,208.66.[4]

Defendant only contests the costs requested for "videotaped depositions that were neither filed with the Court, used in support of any motion, or used at trial (written transcripts were used.)" (D. Resp., PageID 10160.) Defendant also makes note of Plaintiff's cost requests for e-discovery and the focus group but does not contest them or make any argument about them. (*See id.*) Defendant's argument about the videotaped depositions is underdeveloped and unpersuasive— Defendant does not identify what video depositions were recorded and billed but not used at trial. Regardless, depositions, including videotaped ones, are a key part of the trial preparation process. Even if Plaintiff used written transcripts of the depositions at trial, rather than video recordings of them, Plaintiff can still reasonably bill for those costs under 28 U.S.C. § 1920(2). Further, Plaintiff supports her costs requests with citations to relevant authorities. (*See* Pl. Mot., PageID 8587–88.); *see Colosi v. Jones Lang LaSalle Americas, Inc.*, 781 F.3d 293, 295–97 (6th Cir. 2015) (affirming costs award for e-discovery); *Waldo*, 726 F.3d at 827 (costs awarded for trial focus group).

Accordingly, the Court **GRANTS** Plaintiff's request for litigation costs in the total amount of **$64,208.66**, as reflected in the Bill of Costs (ECF No. 179).

---

[4] Because this discrepancy is *de minimis*, and because the Bill of Costs includes itemized amounts and receipts, the Court relies on the Bill of Costs total rather than the total calculated from Plaintiff's Motion.

## V.    Additional Interest

Plaintiff moves for pre-judgment interest and post-judgment interest. (Pl. Mot., PageID 8589–93.) Defendant contests only the motion for pre-judgment interest, specifically arguing that it should not be awarded for Plaintiff's compensatory damages and front pay. (D. Resp., PageID 10162–63.)

### a.    Pre-Judgment Interest

"Prejudgment interest . . . is 'an element of complete compensation'" and may be awarded against public entity defendants in Title VII cases. *Loeffler v. Frank*, 486 U.S. 549, 558–59, 565 (1988) (quoting *West Virginia v. United States*, 479 U.S. 305, 310 (1987)). Pre-judgment interest is awarded in the discretion of the trial court and "is usually appropriate to make a discrimination plaintiff whole" because it "'compensates them for the true cost of money damages they incurred.'" *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1170 (6th Cir. 1996) (quoting *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 841–42 (6th Cir. 1994)). "While pre-judgment interest should be awarded as a part of backpay, it should be excluded for delays specifically attributable to the plaintiff." *Id.* (citing *Shore v. Federal Express Corp.*, 42 F.3d 373, 380 (6th Cir. 1994)). Pre-judgment interest on an award of front pay may be appropriate where "the pertinent judgment on front pay was entered subsequent to the accrual of a substantial portion of front pay that is as yet unpaid." *Shore* at 380.

Here, Plaintiff's request for pre-judgment interest on back pay and compensatory damages is appropriate and reasonable. The back pay award, calculated according to the years of pay at the Patrol she missed between her constructive termination (February 12, 2018) and the date of the judgment (August 8, 2023), minus offsets, is not a complete representation of her lost pay for those years because the purchasing power of that money decreased over time due to inflation. *See*

*Thurman*, 90 F.3d at 1170. Further, the compensatory, non-economic damages the jury awarded to Plaintiff "are 'just as much an actual loss (for which pre-judgment interest is in order)' as purely economic damages." *Barnard v. Theobald*, 721 F.3d 1069, 1078 (9th Cir. 2013) (quoting *Murphy v. City of Elko*, 976 F. Supp. 1359, 1364 (D. Nev. 1997)) (cleaned up). Additionally, the record and Defendant's argument do not bear out specific litigation delays attributable to Plaintiff.

Conversely, pre-judgment interest is not appropriate for Plaintiff's front pay award. Unlike in *Shore*, where pre-judgment interest was awarded on a front pay award following a months-long delay between the award of front pay and the date the court entered its judgment, judgment here was entered immediately following trial. (*See* ECF Nos. 175, 176.)

Accordingly, the Court **GRANTS** Plaintiff's request for pre-judgment interest on her award of back pay and compensatory damages and **DENIES** her request for pre-judgment interest on her front pay award.

### b. Post-Judgment Interest

District courts are required to award post-judgment interest under 28 U.S.C. § 1961. *Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 586 (6th Cir. 2002). "Such interest shall be calculated from the date of the entry of the judgment," "shall be computed daily to the date of payment[,] . . . and shall be compounded annually." 28 U.S.C. § 1961(a) and (b). Further, post-judgment interest is appropriately awarded on an award attorney's fees and costs and on pre-judgment interest. *See Caffey* at 586, 588–89 (citing *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1031 (4th Cir. 1993) (en banc) and citing *Associated General Contractors of Ohio, Inc. v. Drabik*, 250 F.3d 482, 485 (6th Cir. 2001)). Defendant does not contest Plaintiff's request for post-judgment interest.

Accordingly, the Court **GRANTS** Plaintiff's request for post-judgment interest on her entire award, including back pay, front pay, compensatory damages, attorney's fees, costs, and

pre-judgment interest.

### c. Pre-Judgment and Post-Judgment Interest Rates

According to 28 U.S.C. § 1961, post-judgment "interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment." 28 U.S.C. § 1961(a).

In this Circuit, "'the statutory postjudgment framework set forth in 28 U.S.C. § 1961 is a reasonable method for calculating prejudgment interest awards.'" (*Meoli v. Huntington Nat'l Bank*, 848 F.3d 716, 735 (6th Cir. 2017) (quoting *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 619 (6th Cir. 1998)). This method is appropriate for setting the pre-judgment interest rate, though, "only if the district court ensures that the 'the statutory rate [is] fair,'" after considering several factors. *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 807 (6th Cir. 2018) (quoting *Meoli*, 848 F.3d at 736). To determine whether the statutory rate is appropriate, courts should consider "the remedial goal to place the plaintiff in the position that he or she would have occupied prior to the wrongdoing; the prevention of unjust enrichment on behalf of the wrongdoer; the lost interest value of money wrongly withheld; and the rate of inflation." *Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan*, 711 F.3d 675, 685–87 (6th Cir. 2013)).

Here, judgment was entered on August 8, 2023. According to data retrieved from the Federal Reserve's website, the 1-year constant maturity Treasury yield for the week prior to the judgment (July 31, 2023 to August 4, 2023) varied between 5.33% to 5.38%, with a weekly average of 5.36%. *See FederalReserve.gov*, Data Download Program: H.15 Selection Interest Rates (accessed Nov. 19,

36

2024), https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15.          Accordingly,

Defendant is **ORDERED** to pay post-judgment interest at the rate of **5.36%**, compounded

annually, from the date of the judgment, August 8, 2023, until the judgment is satisfied.

As for pre-judgment interest, the post-judgment rate of 5.36% is not fair and appropriate.

Between the date of Plaintiff's constructive termination, February 12, 2018, and the judgment,

August 8, 2023, the 1-year constant maturity Treasury yield rate fluctuated greatly, varying from

as low as 0.04% (on May 21, 2021) to as high as 5.44% (on July 11, 2023), just before the

judgment. This period covered the outset and peak of the COVID-19 pandemic and the subsequent

economic tumult, which featured substantial fluctuations in interest rates and market conditions.

Therefore, this Court finds that awarding pre-judgment interest at a rate of 5.36% for the entire

pre-judgment period would result in an unfair windfall to Plaintiff. *See Pittington*, 880 F.3d at

807–08.

A more fair and appropriate measure of the pre-judgment interest rate in this case is

achieved by taking an average of the daily 1-year constant maturity Treasury yield rate between

February 12, 2018 and August 8, 2023. That figure calculates to an average rate of 1.90%.[5] The

Court finds that this rate is a more fair and accurate measure of the pre-judgment interest owed to

Plaintiff. This rate accounts for the wide fluctuations in the Treasury yields over this time. It helps

achieve the remedial goal of placing Plaintiff in the position she was in before the wrongdoing by

accounting for the decreasing value of her damages award between the time of the harm in 2018

and the time of her ultimate judgment more than five years later. The rate also prevents Plaintiff

---

[5] Data was taken from the "H.15 Selected Interest Rates" dataset available from the Federal
Reserve's Data Download Program at Federalreserve.gov/datadownload. The average was
calculated by adding together the interest rate value (e.g., "0.04" and "5.44") for every day for
which data was available between February 12, 2018 and August 8, 2023 (totaling 2604) and
dividing that total by the total number of days for which data was available (1373 days). 2604
value points / 1373 days = 1.89657, rounded up to 1.90.

from receiving an unfair windfall and prevents unfair liabilities to the Defendant.

Accordingly, Defendant is **ORDERED** to pay Plaintiff pre-judgment interest on her $624,109.00 back pay award and her $300,000.00 compensatory damages award (totaling **$924,109.00**) at a rate of **1.90%**, compounded annually, for the time between her constructive termination, February 12, 2018, and the date judgment was entered, August 8, 2023.

## VI.  Equitable Relief

Finally, Plaintiff moves this Court to grant her equitable relief regarding her retirement status with the Patrol. (Pl. Mot., PageID 8593–94.) Upon Plaintiff's retirement from the Patrol, which the jury determined constituted a constructive termination, Plaintiff was designated as retiring from the Patrol "not in good standing." (Transcript, PageID 8832–33, 9046, 9053.) Accordingly, Plaintiff did not receive a signed certificate of retirement, a retirement badge, or the ability to qualify for carrying a concealed weapon, which are standard Patrol retirement benefits for those leaving in good standing. (Transcript, PageID 8832–33, 9894.)

"When a plaintiff has demonstrated that an employer 'has intentionally engaged in . . . an unlawful employment practice charged in the complaint,' Title VII empowers the court to 'order such affirmative action as may be appropriate, which may include . . . equitable relief." *Howe v. City of Akron*, 801 F.3d 718, 743–44 (6th Cir. 2015) (quoting 42 U.S.C. § 2000e–5(g)(1)). Pursuant to Federal Rule of Civil Procedure 59(e), a party may move to alter or amend a judgment within 28 days of the judgment, including by requesting additional equitable relief. *See id*. "A district court has broad discretionary powers to craft an injunction to the specific violations found to ensure that the employer complies with the law." *EEOC v. Wilson Metal Casket Co.*, 24 F.3d at 842–43 (holding, in a Title VII case, that the district court did not abuse its discretion by enjoining the owner of the defendant-employer from engaging in certain behaviors).

The Court finds that granting Plaintiff retirement status "in good standing" is necessary to fulfill the "make whole" purpose of Title VII regarding Plaintiff. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419–21 (1975) (holding that the purpose of Title VII is to "make whole" the plaintiff). She worked for the Patrol for 24 years and was a decorated officer. Apart from the investigations relating to her constructive termination (which the jury concluded were pretextual), Plaintiff had an excellent disciplinary record.

Accordingly, this Court **ORDERS** Defendant to designate Plaintiff as retiring from the Patrol "in good standing" and to provide Plaintiff the benefits typically associated with that status, including but not limited to a retirement I.D. badge, a signed certificate of retirement, and the ability to qualify for concealed carry of a firearm. This Court shall amend the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure to include a permanent injunction to that effect.

## CONCLUSION

For the reasons stated in this Opinion and Order, the Court **DENIES** Defendant's Motion for Judgment as a Matter of Law, **DENIES** Defendant's Motion for a New Trial, and **GRANTS** Defendant's Motion for Remittitur. (ECF No. 180.) Plaintiff's compensatory damages are reduced to **$300,000.00** pursuant to the statutory cap under 42 U.S.C. § 1981a(b)(3).

Further, this Court **GRANTS IN PART and DENIES IN PART** Plaintiff's Motion for Attorney's Fees, Costs, Pre-Judgment Interest, Post-Judgment Interest, and Equitable Relief. (ECF No. 181.) In sum, Plaintiff's damages are now **$300,000.00** in compensatory damages, **$624,109.00** in back pay, **$684,815.00** in front pay, **$510,670.00** in attorney's fees, and **$64,208.66** in litigation costs, totaling **$2,183,802.66**. Further, this Court **AWARDS** Plaintiff pre-judgment interest on her compensatory damages and back pay awards only, at a rate of **1.90%**, compounded

annually, post-judgment interest at a rate of **5.36%**, compounded annually, and equitable relief as described in this Opinion and Order.

The Clerk is **DIRECTED** to amend the judgment (ECF No. 176) to reflect these amounts and to reflect that this Court **PERMANENTLY ENJOINS** Defendant to designate Plaintiff as retiring from the Patrol "in good standing" and to provide Plaintiff the benefits typically associated with that status, including but not limited to a retirement I.D. badge, a signed certificate of retirement, and the ability to qualify for concealed carry of a firearm.

**IT IS SO ORDERED.**

**12/2/2024**                                    **s/Edmund A. Sargus, Jr.**
**DATE**                                          **EDMUND A. SARGUS, JR.**
                                                  **UNITED STATES DISTRICT JUDGE**